KRAMER LEVIN NAFTALIS & FRANKEL LLP
919 Third Avenue
New York, New York  10022
(212) 715-9100
Kenneth H. Eckstein, Esq. (KE-6021)
Robert T. Schmidt, Esq. (RS-8881)
Jack A. Hazan, Esq. (JH-3833)
Matthew J. Williams, Esq. (MW-4081)

Proposed Attorneys for Debtor and Debtor in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| **Elite Model Management Corporation**, | : | Case No. 04-10845 (BRL) |
| | : | |
| Debtor. | : | |
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :x

### DEBTOR'S EMERGENCY MOTION FOR AN ORDER PURSUANT TO SECTION 364(c) OF THE BANKRUPTCY CODE (A) AUTHORIZING DEBTOR TO (i) OBTAIN POSTPETITION FINANCING ON A PERMANENT BASIS AND (ii) BORROW UNDER SUCH POSTPETITION FACILITY ON AN INTERIM BASIS, PENDING A FINAL HEARING ON THE MOTION, AND (B) SCHEDULING A FINAL HEARING ON THE <u>MOTION, PURSUANT TO BANKRUPTCY RULE 4001</u>

Elite Model Management Corporation ("Elite New York" or the "Company"), as

a debtor and debtor in possession (the "Debtor"), by its undersigned proposed counsel,

respectfully seeks entry of an order, pursuant to section 364(c) of the Bankruptcy Code, and Rule

4001 of the Bankruptcy Rules, (A) authorizing the Debtor to (i) obtain postpetition financing on

a permanent basis and (ii) borrow under the postpetition financing facility on an interim basis

pending a final hearing on the motion and (B) scheduling a final hearing on the motion.  In

support thereof, the Debtor respectfully represents:

KL2:2248887.7

## I.   **INTRODUCTION**

### A.   **Relief Requested**

1.   By this Motion, the Debtor seeks approval of, among other things, postpetition financing (the "DIP Financing") pursuant to the terms and conditions of that certain form of postpetition term loan agreement (the "DIP Credit Agreement") a copy of which is attached hereto as Exhibit "B" and related documents (the "DIP Financing Documents").[1]  As described in further detail below, the agreement provides for financing by Careyes Funding Group, LLC ("DIP Lender" or "Careyes") in the aggregate principal amount of $1.5 million. The Debtor will use these funds -- in combination with cash generated from its operations -- to meet the working capital needs of the business as this case progresses.  In addition, a portion of the loans may be used for payment of certain outstanding amounts authorized by the Bankruptcy Court to be paid pursuant to typical "first day" orders (including certain prepetition amounts owed to employees and independent contractor models).

### B.   **Proposed Security and Superpriority Administrative Expense Status**

2.   The Debtor proposes that obligations under the DIP Financing be secured as follows:

- Pursuant to Bankruptcy Code §364(c)(2) and subject only to the Carveout, a valid, perfected, and enforceable first priority security interest in and lien upon all property of the Debtor as of the Commencement Date that was not otherwise subject to a valid, perfected, enforceable, non-avoidable lien as of the Commencement Date; and

- Pursuant to Bankruptcy Code §364(c)(3), a valid, perfected, and enforceable security interest in and lien upon all property of the Debtor and the Debtor's estate as of the Commencement Date that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Commencement Date, which security interest and lien is junior to such valid, perfected and unavoidable liens.

---

[1] A form of proposed Security Agreement is attached hereto as Exhibit "C" and a form of proposed Guarantee Agreement is attached hereto as Exhibit "D".

KL2:2248887.7

3.      In addition, the Debtor requests that the obligations incurred under the DIP

Financing be granted, subject to the Carveout, superpriority administrative expense priority

pursuant to section 364(c)(1) of the Bankruptcy Code.

## II.      RELEVANT FACTS

### A.      Jurisdiction and Venue

4.      On the date hereof (the "Commencement Date"), the Debtor commenced

its case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The

Debtor continues to operate its business and manage its properties as a debtor in possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court has jurisdiction to

consider this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of this motion is a

core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of this proceeding is proper in this

district pursuant to 28 U.S.C. §§ 1408 and 1409.

### B.      Events Leading to Chapter 11 Case

5.      Elite New York is a privately-held company incorporated in the state of

New York.  Its primary business consists of  locating, developing and representing professional

fashion models.  In this regard, the Company manages, advises, counsels, promotes and

negotiates on behalf of its models in the entertainment, print media, photography, advertising,

industrial exhibition, runway, live show, video, internet, film and other industries.  The Company

employs 27 employees in its New York office.   This number does not include approximately

350 models, who are independent contractors.

6.      For the fiscal year ended December 31, 2003, the Company had gross

revenues of approximately $19.4 million.  As of December 31, 2003, the Company's books and

records reflected assets totaling approximately $4.5 million and liabilities totaling approximately

$7 million (including a recent judgment entered against the Company in a litigation in the state

of New York).

KL2:2248887.7

7. For many years, the Company has been and continues to be recognized as one of New York's leading model management companies. Nonetheless, over the last few years, it has been forced to spend a significant portion of its income (and incur serious distraction, dislocation and negative publicity) defending itself in several costly and highly-publicized class action and other litigations, which are described in more detail in the Affidavit of Edward R. Curtin pursuant to Bankruptcy Rule 1007-2.

8. The cost of litigation has had a severe adverse impact on the Company's cash flow. Most recently, one group of plaintiffs sought and obtained an order to show cause from the New York State Supreme Court which (i) restrained the Company from taking certain actions and (ii) scheduled a hearing to consider whether a temporary receiver of all of the Company's properties and assets should be appointed. It is the opinion of the Company's management that the appointment of a receiver would seriously undermine the ability of the Company to operate and could destroy the value of the Company as a going concern. Accordingly, the Company determined that its only viable option was to file for protection under chapter 11 of the Bankruptcy Code.

9. The Company recently adopted a number of cost saving measures including: (i) a restructuring of the Company's lease for its New York headquarters which reduced monthly rent from approximately $45,000 to $25,000; (ii) workforce reductions resulting in annual savings of approximately $370,000, and (iii) a cost reduction program with the Company's major vendors resulting in an annual savings of approximately $50,000. In addition, prior to the Commencement Date, the Company engaged AMJ Advisors LLC ("AMJ") as its financial advisor and restructuring consultant to assist it in accomplishing a successful reorganization without interfering with or unduly burdening the day to day operations of the modeling business.

4

### III.     THE DEBTOR'S NEED FOR DIP FINANCING

10.     The Debtor currently has no secured or unsecured bank facility and has no outstanding publicly-held debt.  Rather, prior to the Commencement Date, the working capital needs of Elite New York were met primarily with cash generated from ongoing operations. Notwithstanding the cost-cutting measures described above, litigation costs and other factors have had a severe adverse impact on the Company's cash flow.  Absent entry of an Interim Order approving the DIP Facility, the Debtor would not have sufficient liquidity to meet its postpetition obligations on a timely basis, which would result in a loss of value to the Debtor's assets to the detriment of its creditors, employees, and its estate.

11.     The Debtor has determined, in the exercise of its sound business judgment, that it is critical to obtain a postpetition credit facility that provides the Debtor with the ability to borrow up to $500,000 on an interim basis, and $1,500,000 on a final basis (the "DIP Facility") to finance the operation of its business during this chapter 11 case.  The DIP Facility is being implemented pursuant to a budget (the "Budget") (a copy of which is attached hereto as Exhibit "A") that has been negotiated by the Debtor and the Lender, and the Lender will make advances under the DIP Facility so long as the Debtor is within a 10% variance of the Budget.  The Debtor believes that the Budget and the proposed availability under the DIP Facility will provide it with adequate liquidity to pay all administrative expenses due and payable during the period covered by the Budget.

12.     Authorizing the Debtor to obtain DIP Financing should help stabilize the Debtor's business at this critical juncture.  By approving the DIP Financing, this Court will enable the Debtor to demonstrate to employees, vendors, suppliers, independent contractors, and others that notwithstanding the chapter 11 filing, the Debtor and its business remain a viable going concern.

5

KL2:2248887.7

## IV.   THE DEBTOR'S EFFORTS TO OBTAIN OTHER FINANCING

13.     Prior to the Commencement Date, and with the assistance of AMJ, the Debtor sought potential DIP financing from, and distributed financial and other information packages to, numerous potential lenders and equity investors.  In response, the Debtor received approximately eight (8) informal expressions of interest.  After examining all of its options, the Debtor considered the DIP Lender's commitment to provide DIP Financing to be the best option available to it under the circumstances.  Subsequently, the Debtor began detailed and arms'-length negotiations with the DIP Lender, which led to the DIP Credit Agreement and related documents.  However, even as negotiations progressed, the Debtor continued to survey numerous sources of postpetition financing from both financial institutions and potential equity investors.  The Debtor ultimately determined that the DIP Financing to be made available pursuant to the DIP Credit Agreement represented the most attractive financing source.[2]

## V.   TERMS AND CONDITIONS OF THE DIP FINANCING

14.     The DIP Lender is willing to make the DIP Financing available to the Debtor upon the terms and conditions set forth in the DIP Credit Agreement.  The significant terms and conditions of the DIP Credit Agreement are summarized below:[3]

| | |
|---|---|
| **Borrower:** | Elite Model Management Corporation NY (the "Borrower"), as Debtor-in-Possession. |
| **Guarantors:** | Elite Model Management Corporation Miami and Elite Model Management Corporation (L.A.) (the "Guarantors"). |
| **DIP Lender:** | Careyes Funding Group LLC (the "DIP Lender"). |
| **Credit Facility:** | The DIP Facility consists of a senior secured super-priority debtor-in-possession credit facility in an aggregate principal amount not to |

---

[2] The Debtor has been advised that an overseas affiliate of the DIP Lender is simultaneously pursuing a potential joint venture transaction with Elite Model Management Corporation, S.A. ("Elite S.A.), the holder of 90% of the Debtor's equity, and certain of Elite S.A.'s affiliates.  The DIP Financing to be provided hereunder is not dependent on the outcome of the aforementioned potential transaction.

[3] This summary is qualified in its entirety by reference to the provisions of the DIP Credit Agreement.  The DIP Credit Agreement will control in the event of any inconsistency between this Motion and the DIP Credit Agreement.

6

exceed $1,500,000 ($500,000 on an interim basis) and constitutes debtor-in-possession financing pursuant to section 364 of the Bankruptcy Code.

**Budget:** Borrower's use of DIP Financing must be in accordance with Budget and projections, which shall be acceptable to Lender.

**Term:** Borrowings shall be repaid in full, on the Termination Date, which is the earliest of (a) July 16, 2004; (b) occurrence of an Event of Default; (c) the Consummation Date, (d) the date the Bankruptcy Court enters an order (i) converting the Cases to Chapter 7 of the Bankruptcy Code, (ii) dismissing the Cases or (iii) appointing a Chapter 11 trustee or an examiner with expanded powers.

**Interest Rate:** LIBOR + 8%

**Default Rate:** Applicable Rate plus 2%

**Fees/Expenses:**
- *Commitment Fee* -- of $40,000, deemed earned upon entry of the Interim Order but not be payable until the Termination Date;
- *Prepayment Penalty* -- If Borrower prepays the loan prior to the Maturity Date, must pay prepayment fee of $75,000; and
- *Fees* -- Borrower to pay all reasonable fees and expenses of lender incurred in connection with the transaction.

**Use of Proceeds:** Funding the Borrowers' day to day business expenses, including payment of professional fees and expenses arising in the Chapter 11 case, as more particularly described in the Budget.

**Carveout:** Liens, security interests and administrative claims of the DIP Lender are subject and subordinate only to "Rolling Carveout" of $600,000 ($500,000 if no statutory committee is appointed within 60 days of the Commencement Date) for the payment of Professional Fees and Expenses of Debtor and any statutory committee plus other Carveout expenses.

**Bankruptcy Court Approval:** DIP Financing is subject to Court approval and entry of Interim and Final Orders. Final Order to be entered within 30 days of Commencement Date.

**Representations and Warranties:** Usual and customary for this kind.

**Covenants:** Affirmative and negative covenants usual for transactions of this kind, including preservation of property, compliance with laws, maintenance of properties, prohibiting indebtedness other than incurred in DIP Credit Agreement or in ordinary course, restricting grant of superpriority or senior liens in assets, and prohibiting

7

KL2:2248887.7

Borrower from selling substantially all of its assets absent provision to pay DIP Lender in full.  In addition, Borrower agrees that, on or before March 15, 2004, Borrower shall provide the Lender with either of the following: (a) a business plan setting forth the basic terms, conditions and timeline for the filing and implementation of a plan of reorganization or (b) a schedule setting forth a proposed timeline for the sale of Borrower's business as a going concern pursuant to section 363 of the Bankruptcy Code.

**Security:**   As security for the Interim Financing, subject to the Carveout, the Borrower will grant to the Lenders: (i) an administrative expense claim with priority over any and all administrative expenses under section 364(c)(1) of the Bankruptcy Code, of the kind specified in sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b) and 726 of the Bankruptcy Code; (ii) perfected first priority security interests in and liens upon all unencumbered collateral (other than Bankruptcy Causes of Action) under section 364(c)(2) of the Bankruptcy Code; and (iii) perfected junior security interests and liens upon all encumbered collateral under section 364(c)(3) of the Bankruptcy Code.  Guarantors grant lien on substantially all of their assets as security for the DIP Financing.

**Events of Default:**   Standard events of default, including, without limitation, breach of representations and warranties, breach of covenants, payment defaults and conversion to chapter 7.

**Governing Law:**   New York, except as governed by Bankruptcy Code.

15.     The DIP Financing Documents include certain "Extraordinary Provisions" as defined in the proposed Guidelines for Financing Requests dated March 20, 2002, issued by the United States Bankruptcy Court for the Southern District of New York, including provisions relating to (i) limitations of the Debtor's right to surcharge collateral under Section 506(c) of the Bankruptcy Code; (ii) modifications of the automatic stay and the amount of prior notice which much be provided before the DIP Lender can exercise remedies under the DIP Credit Agreement; and (iii) consents of DIP Lender (or order of the Court requiring all of Borrower's Obligations to the Lender be satisfied in full) prior to sale, use, or lease, other than in the ordinary course of business, of Debtor's property in which the Lender has a interest.  Given that despite its diligent efforts --the Debtor has been unable be able to obtain more attractive

financing, the Debtor believes that these extraordinary provisions are warranted and appropriate under the circumstances.

## VI.   THE PROPOSED DIP FINANCING ARRANGEMENT SHOULD BE AUTHORIZED BY THIS COURT PENDING A FINAL HEARING

16.   As shown in the attached Budget, the Debtor's working capital needs can only be satisfied if the Debtor is authorized to borrow up to at least $500,000 on an emergency basis.  The credit provided under the DIP Facility should enable the Debtor to continue operating its business and pay its employees, independent contractors and vendors, as well as meet its other ongoing expenses.  The DIP Facility is thus necessary to preserve and enhance the value of the Debtor's assets for the benefit of all parties in interest.

### A.   Interim Approval Should Be Granted

17.   Rule 4001(c) of the Bankruptcy Rules provide that a final hearing on a motion to obtain credit pursuant to section 364 may not be commenced earlier than fifteen (15) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on a motion for authority to obtain of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  Pursuant to Bankruptcy Rule 4001(c), the Debtor requests that the Court conduct an expedited preliminary hearing on the Motion and authorize the Debtor to borrow up to $500,000 under the DIP Credit Agreement on an interim basis, pending a final hearing on the Motion in order to finance continued operations of the Debtor's business avoid immediate and irreparable harm and prejudice to the Debtor's estate.

18.   As set forth above, the Debtor has an urgent and immediate need for cash to continue operating its business.  The Debtor is unable to obtain unsecured credit or debt allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code in an amount sufficient and readily available to maintain ongoing operations.  Absent interim

9

KL2:2248887.7

postpetition financing, the Debtor's objective of continued operation of its business and maximizing value for its creditors, employees, and independent contractors will be seriously impaired.  In these circumstances, the granting of the relief requested by the Motion is warranted.

### VII.   WAIVER OF MEMORANDUM OF LAW

19.    This Motion does not raise any novel issues of law and, accordingly, the Debtor respectfully requests that the Court waive the requirement contained in Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York that a separate memorandum of law be submitted in support of the motion.

### VII.   NOTICE / NO PRIOR REQUEST

20.    No trustee, examiner, or creditors' committee has been appointed in the Debtor's chapter 11 case.  Notice of this motion has been provided to (i) the Office of the United States Trustee for the Southern District of New York; (ii) the Debtor's Lender; and (iii) each of the entities listed on the list of the Debtor's twenty (20) largest unsecured creditors.

21.    The Debtor submits that under the circumstances and because of the nature of the relief requested, such notice is sufficient and that no further notice is required.

22.    No prior request application for the relief requested herein has been made to this or any other court.

KL2:2248887.7

WHEREFORE the Debtor respectfully requests entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated:   New York, New York
         February 11, 2004

KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/ Robert T. Schmidt
Kenneth H. Eckstein, Esq. (KE-6021)
Robert T. Schmidt, Esq. (RS-8881)
Jack A. Hazan, Esq. (JH-3833)
Matthew J. Williams (MW-4081)
919 Third Avenue
New York, New York  10022
(212) 715-9100

Proposed Attorneys for Debtor and Debtor in
Possession

11