**EXHIBIT B**

**$1,500,000**

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**between**

**ELITE MODEL MANAGEMENT CORPORATION**
**a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code**

**<u>as Borrower</u>**

**and**

**CAREYES FUNDING GROUP, LLC**

**<u>as Lender</u>**

**Dated as of February __, 2004**

KL2:2248858.9

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

THIS DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of February __, 2004 (this "Agreement"), between ELITE MODEL MANAGEMENT CORPORATION, a New York corporation and a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (the "Borrower") and CAREYES FUNDING GROUP, LLC as the Lender (the "Lender").   Unless otherwise defined herein or the context clearly requires otherwise, capitalized terms used in this Agreement shall have the meanings given such terms in Article I.

## PRELIMINARY STATEMENTS

The Borrower has filed a voluntary petition with the Bankruptcy Court commencing a case under Chapter 11 of the Bankruptcy Code and the Borrower has continued in the possession of its assets and in the management of its business pursuant to Section 1107 and 1108 of the Bankruptcy Code.

Subject to the provisions of the Bankruptcy Code and the terms of this Agreement, the Borrower has applied to the Lender for term loans in an aggregate principal amount not to exceed $1,500,000.

To assure repayment of the Obligations, the Borrower shall provide to the Lender, pursuant to this Agreement and the Orders, the following (each as more fully described in this Agreement):

(i)     an allowed administrative expense claim in each of the cases pursuant to Section 364(c)(1) of the Bankruptcy Code having priority over any and all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code; and

(ii)     a perfected Lien on the Collateral as provided, and with the priorities set forth, in Section 2.12.

All of the claims and the Liens granted to the Lender pursuant to the Loan Documents and the Orders shall be subject to the Carve-Out to the extent provided in Section 2.12 and the Orders.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained in this Agreement, the Borrower and the Lender hereby agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01 Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

KL2:2248858.9

**EXHIBIT B**

"Affiliate" means, as to any Person, any other Person that, directly or indirectly, through one or more intermediaries controls, is controlled by, or is under common control with such Person or is a director or officer of such Person.  For purposes of this definition, the term "control" (including the terms "controlling", "controlled by" and "under common control with") of a Person means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning specified in the preamble hereto.

"Approved Budget" means, at any time, the most recent Budget that has been submitted to, and approved by, the Lender in accordance with Section 5.01(h).  Until a proposed new Budget is approved by the Lender, the Approved Budget shall remain in effect only for the period covered by such Approved Budget. At no time shall a Budget be deemed to be an Approved Budget beyond the period of time covered by such Budget

"Bankruptcy Causes of Action" shall mean actions for preferences, fraudulent conveyances and other avoidance power claims and any recoveries under sections 506(c), 542, 544, 545, 547, 548, 549, 550, 552(b) and 553 of the Bankruptcy Code.

"Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. Section 101 et seq.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York or any other court having jurisdiction over the Cases from time to time.

"Borrower" as the meaning specified in the preamble hereto.

"Borrowing Date" means any Business Day specified in a Notice of Borrowing as a date on which the Borrower requests the Lender to make Loans to the Borrower pursuant to this Agreement.

"Budget" means a weekly reporting cycle forecast for each Calendar Week, on a rolling basis, for the Borrower for the thirteen (13) Calendar Week period following the date of delivery of such Budget, with the delivery of the first Budget to be within two weeks after the Petition Date, the first Calendar Week of such initial Budget to be the third Calendar Week after the Petition Date, showing assets and liabilities (including without limitation cash balance, accounts receivable and current liabilities) as of the end of each Calendar Week,, and revenues, expenses, and cash flow for each Calendar Week,, provided that, the Budget to be provided to Lender on or about the Petition Date shall be for the four (4) Calendar Week period following the Petition Date (the "First Budget"), and provided further that the First Budget shall not be required to make any weekly forecasts and shall only contain the applicable information required to be disclosed for the four (4) Calendar Week period following the date of delivery.

"Business Day" means a day of the year on which banks are not required or authorized by law to close in New York City.

"Calendar Week" means a seven (7) day period that begins on Monday and ends on the next Sunday.

**- 2 -**

**EXHIBIT B**

"Carve-Out" means the Carve-Out as defined in the Orders.

"Case" means the Chapter 11 case of the Borrower pending in the Bankruptcy Court.

"Cash Report" means, with respect to any Calendar Week, a report that (a) sets forth the actual cash receipts, cash disbursements and ending cash balance for such Calendar Week, and (b) explains the variances, if any, between the actual financial results of such Calendar Week and the financial results forecast for such Calendar Week in the Approved Budget.

"Collateral" means all of the assets and other property that is or is intended to be subject to any Lien in favor of the Lender pursuant to the Collateral Documents, including without imitation all receivables (including without limitation sums due the Borrower from any affiliate), all inventory, equipment and all other real, personal, intellectual, tangible or intangible property of the Borrower).

"Collateral Documents" means the Security Agreement and any other agreement or instrument that creates or purports to create a Lien in favor of the Lender.

"Commitment" means with respect to the Lender at any time, the Lender's Interim Loan Commitment and Final Loan Commitment.

"Commitment Amount" means $1,500,000.

"Commitment Fee" means a fee in the amount of $40,000 payable to the Lender under the terms of this Agreement.

"Confidential Information" means information that the Borrower furnishes to the Lender on a confidential basis, but does not include any information that (a) is or becomes generally available to the public other than as a result of a breach by the Lender of its obligations under this Agreement, or (b) is or becomes available to the Lender from a source other than the Borrower that is not, to the actual knowledge of the Lender, acting in violation of a confidential agreement with the Borrower.

"Confirmation Order" means an order of the Bankruptcy Court confirming a Plan of Reorganization.

"Consummation Date" means the date of the substantial consummation of a Plan of Reorganization (as defined in Section 1101(2) of the Bankruptcy Code) and which for purposes of this Agreement shall be no later than the date that all of the conditions precedent to the effectiveness of such Plan of Reorganization have been satisfied or waived.

"Contract" means (a) any agreement (whether bilateral or unilateral or executing or non-executing and whether a Person entitled to rights thereunder is so entitled directly or as a third-party beneficiary), including any indenture, lease or license, and (b) any deed or other instrument of conveyance.

"Default" means any Event of Default or any event that would constitute an Event of Default but for the giving of notice or elapse of time or both.

KL2:2248858.9

**EXHIBIT B**

"ERISA" means the Employee Retirement Income Security Act of 1974 as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"Events of Default" has the meaning specified in Section 6.01.

"Existing Liabilities" means all of the Liabilities of the Borrower at the time the Borrower filed for bankruptcy.

"Final Loan Availability Period" means the period beginning with the date on which the Final Order is entered by the Bankruptcy Court and ending on the Termination Date.

"Final Loan Commitment" means, with respect to the Lender, at any time after the Final Order has been entered by the Bankruptcy Court, an amount equal to (i) $1,500,000, minus (ii) the aggregate outstanding principal amount of the Lender's Interim Loans as of such date.

"Final Loan" has the meaning specified in Section 2.01(b).

"Final Order" means an order of the Bankruptcy Court entered in the Cases after a final hearing under Bankruptcy Rule 4001(b)(2), form and substance reasonably satisfactory to the Lender, granting final approval of the Loan Documents and the Transactions.

"First Budget" has the meaning specified in the definition of Budget.

"Governmental Authority" means any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality or any court, in each case whether in the United States or a foreign jurisdiction.

"Guarantors" means Elite Model Management Miami Corporation and Elite Model Management Corporation , a California corporation.

"Guaranty" means that Agreement of Guaranty and Suretyship by the Guarantors and in favor of the Lender of even date herewith.

"Guarantor's Security Agreement" means that Security Agreement by the Guarantors and in favor of the Lender of even date herewith.

"Indemnified Costs" has the meaning specified in Section 8.04(b).

"Indemnified Party" has the meaning specified in Section 8.04(b).

"Indemnified Taxes" has the meaning specified in Section 2.08(a).

"Interest Payment Date" means the last Business Day of each calendar month.

"Interest Period" means the period beginning on and including: (a) the first day of each month (for Loans made prior to the commencement of the then current month), or (b) the date the Loan is made, and ending on and including the last day of each month.  The first Interest Period shall commence as of the date hereof.

KL2:2248858.9

**EXHIBIT B**

"Interest Rate" means LIBOR plus 8%, as determined by Lender prior to the commencement of each Interest Period.

"Interim Loan Availability Period" means the period beginning on the date on which the Interim Order is approved by the Bankruptcy Court and ending on the earlier of (a) the date on which the Final Order is approved by the Bankruptcy Court, and (b) the Termination Date.

"Interim Loan" has the meaning specified in Section 2.01(a).

"Interim Loan Commitment" means, at any time, before the Final Order has been entered by the Bankruptcy Court, $500,000.

"Interim Order" means an order of the Bankruptcy Court, satisfactory to the Lender, authorizing and approving the Loan Documents and the Transactions.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"Law" means (a) all common laws and principles of equity, and (b) all provisions of all (i) constitutions, statutes, rules, regulations and orders of Governmental Authorities, (ii) approvals, consents and authorizations from Governmental Authorities, and (iii) orders, decisions, judgments and decrees of all Governmental Authorities (whether at law or in equity or admiralty) and arbitrators.

"Liabilities" means debts, liabilities, obligations and duties of every kind, whether absolute or contingent, monetary or non-monetary, direct or indirect, known or unknown, or matured or unmatured (including, without limitation, guaranties of third parties' debts or obligations).

"LIBOR" means the rate for U.S. dollar deposits with one month maturity, as reported on Telerate page 3750 as of 11:00 a.m., London time, on the second London Business Day before the relevant Interest Period begins (or if not so reported, then as determined by Lender from another recognized source or interbank quotation).

"London Business Day" means in respect of any date that is specified in this Agreement or the Note, a day on which commercial banks settle payments in London, England.

"Lien" means any lien, security interest or other charge or encumbrance of any kind, or any other type of preferential arrangement, including the lien or retained security title of a conditional vendor and any easement, right of way or other encumbrance on title to real property.

"Loan" means an Interim Loan or a Final Loan, less any Reserve established by the Lender.

"Loan Documents" means (a) this Agreement, (b) the Note, (c) the Collateral Documents, (d) any other agreement, document or instrument executed and delivered by the Borrower or entered by  in connection with any of the foregoing agreements or documents or the Transactions, (e) the Interim Order, and (f) when entered, the Final Order.

**- 5 -**

KL2:2248858.9

**EXHIBIT B**

"Loan Draw Schedule" shall have the meaning specified in Section 2.02(b).

"Material Adverse Change" means any material adverse change in the business, financial condition, operations, prospects, performance or properties of the Borrower, taken as a whole after giving effect to the condition of the Borrower as of the date hereof.

"Material Adverse Effect" means (a) a material adverse effect on the business, financial condition, operations, prospects, performance or properties of the Borrower, taken as a whole after giving effect to the condition of the Borrower as of the date hereof, (b) a material adverse effect on the rights and remedies of the Lender under the Loan Documents, or (c) a material adverse effect on the ability of the Borrower to perform their obligations under the Loan Documents.

"Maturity Date" means July 16, 2004.

"Note" means a promissory note of the Borrower payable to the order of the Lender, substantially in the form of Exhibit B, as amended.

"Notice of Borrowing" has the meaning specified in Section 2.02(a).

"Obligations" means all amounts payable to the Lender pursuant to the Loan Documents (including, without limitation, the outstanding principal amount of the Loans, all interest payable on the Loans, the Commitment Fee, the Prepayment Fee and all fees, expenses (including but not limited to reasonable attorneys' fees and expenses), premiums, penalties, fees, indemnifications, advances, liabilities, obligations, debts, contract causes of action, costs and other amounts payable to the Lender pursuant to the Loan Documents, whether direct or indirect, absolute or contingent, including any extensions, modifications, substitutions, amendments and renewals thereof).

"Orders" means the Interim Order and the Final Order.

"Other Taxes" has the meaning specified in Section 2.08(b).

"Permit" has the meaning specified in Section 4.01(j).

"Permitted Liens" means (a) the Liens securing the Obligations and (b) with respect to any equipment purchased or leased by the Borrower prior to the Petition Date, any Lien on such equipment that secures the purchase or lease obligations of the Borrower regarding such equipment and that was, as of the Petition Date, a valid and perfected Lien.

"Person" means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof.

"Petition Date" means the date on which the Borrower filed for bankruptcy.

"Prepayment Fee" means a fee in the amount of $75,000 payable as set forth in Section 2.03(b).

**- 6 -**

**EXHIBIT B**

"Register" has the meaning specified in <u>Section 8.08(d)</u>.

"Reserve" means a holdback from Loans to be made available under the Interim Commitment or the Final Commitment, which may be made by the Lender in its sole and absolute discretion, in an amount not to exceed the then remaining unfunded portion of the Carveout.

"Security Agreement" means the Debtor-In-Possession Security Agreement, dated as of the date of this Agreement, by the Borrower in favor of the Lender, as the same may be amended or modified from time to time.

"Subsidiary" means, as to any Person at any time, (a) any corporation more than 50% of whose outstanding capital stock having ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether at the time capital stock of any other class or classes of such corporation shall or might have voting power upon the occurrence of any contingency) is owned by such Person, directly or indirectly, at such time, (b) any partnership, limited liability company, joint venture association or other entity more than 50% of whose outstanding equity interests are owned, directly or indirectly, by such Person at such time, and (c) as to the Borrower, this term shall include, without limitation, the Guarantors.

"Super-Priority Claim" means a claim that is an administrative expense claim having priority over any and all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code.

"Termination Date" means the earliest to occur of (a) the Maturity Date, (b) an Event of Default under any Loan Document; (c) the Consummation Date, (d) the prepayment of all of the Obligations, or (e) the date the Bankruptcy Court enters an order (i) converting the Cases to Chapter 7 of the Bankruptcy Code, (ii) dismissing the Cases, (iii) appointing a Chapter 11 trustee or an examiner with expanded powers**.**

"Transactions" means the Interim Loans, the Final Loans, the granting of Liens on the Collateral to the Lender to secure the Obligations, and all of the other transactions contemplated by the Loan Documents.

SECTION 1.02 <u>Computation of Time Periods; Other Definitional Provisions</u>.   In this Agreement and the other Loan Documents in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding."   References in the Loan Documents to any agreement or contract "as amended" shall mean and be a reference to such agreement or contract as amended, supplemented or otherwise modified from time to time.

SECTION 1.03 <u>Rules of Construction</u>.  Unless the context otherwise requires:

(i)      a term has the meaning assigned to it;

(ii)     "or" is not exclusive;

(iii)    words in the singular include the plural, and in the plural include the singular;

**- 7 -**

**EXHIBIT B**

(iv)     provisions apply to successive events and transactions;

(v)      the word "including" means including without limitation and the terms "include" or "includes" shall have correlative meanings;

(vi)     "$" means U.S. dollars; and

(vii)    unless otherwise provided, references to Sections, Exhibits and Schedules refer to sections, exhibits and schedules to this Agreement.

**ARTICLE II**
**AMOUNTS AND TERMS OF THE LOANS**

SECTION 2.01  Commitments.  Subject to the terms and conditions of this Agreement and relying upon the representations and warranties set forth in this Agreement, the Lender agrees to (a) make term loans to the Borrower during the Interim Loan Availability Period in an aggregate principal amount not to exceed the Interim Loan Commitment (each such term loan, an "Interim Loan"), and (b) make term loans to the Borrower during the Final Loan Availability Period in an aggregate principal amount not to exceed the Final Loan Commitment (each such term loan, a "Final Loan"), provided that all such Loans shall be made subject to and in full compliance with the terms of this Agreement only.

SECTION 2.02 (a)   Unless otherwise agreed by the Lender, (i) each Loan shall be made on notice, given not later than 11:00 A.M. (New York City time) on the third Business Day prior to the Borrowing Date, by the Borrower to the Lender, and (ii) notice of a Loan (a "Notice of Borrowing") may only be given on the first or second day of each Calendar Week.  Each Notice of Borrowing shall be by telephone, confirmed immediately in writing, or telecopier, substantially in the form of Exhibit A, specifying therein the requested (i) Borrowing Date and (ii) aggregate amount of such Loan.  Each Notice of Borrowing shall be accompanied by a Cash Report for the Calendar Week immediately preceding such Notice of Borrowing and all such other reports and information required for making such Loan pursuant to this Agreement.  Upon fulfillment of the conditions to such Loan set forth in this Agreement, the Lender will disburse or make such funds available to the Borrower.

(b)      Each Notice of Borrowing shall be irrevocable and binding on the Borrower.  The proposed Loan requested in each Notice of Borrowing shall be in an increment of $10,000 and shall not be less than $150,000 in the aggregate (or such lesser increment or amount as is agreed to by the Lender) and shall in all cases be subject to and consistent with the schedule of loan draws as set forth in Schedule 2.02(b), which such schedule may be modified, supplemented or amended from time to time by the Borrower and the Lender (the "Loan Draw Schedule").  A Notice of Borrowing shall not be honored if and to the extent that such Notice of Borrowing seeks a Loan in an amount that would cause the aggregate outstanding principal amount of the Loans to exceed any of the maximum Commitment, the Final Commitment, or the amount specified in the Loan Draw Schedule.  In addition, unless otherwise agreed by the Lender, a Notice of Borrowing shall not be honored (i) if and to the extent that such Notice of Borrowing seeks a Loan in an amount that exceeds the amount of cash required by the Borrower through the date that is four weeks after the proposed Borrowing Date as reflected in the Approved Budget

**- 8 -**

**EXHIBIT B**

after taking all available cash of the Borrower into consideration as reflected in the Cash Report for the immediately preceding Cash Report, or (ii) if a Default or an Event of Default has occurred and is continuing; or (iii) the Termination Date shall have occurred. Unless otherwise agreed by the Lender, the Lender shall not be required to extend Loans to the Borrower more frequently than twice per month.

SECTION 2.03 <u>Notes; Prepayments; Prepayment Fee</u>. (a) The Loans made by the Lender to the Borrower shall be evidenced by a Note, duly executed on behalf of the Borrower, dated as of the date of this Agreement, in the form of <u>Exhibit B</u>, delivered and payable to the Lender. The outstanding balance of each Loan shall mature and be due and payable on the Termination Date. Each Note shall bear interest on the outstanding principal balance thereof as provided in <u>Section 2.04</u>.

(b)      The Borrower may, upon at least five (5) Business Days' notice to the Lender, prepay all (but not less than all) of the Obligations. Should the Borrower prepay all of the Obligations, such prepayment must be accompanied by the Prepayment Fee. Upon the prepayment of the Obligations, the Commitments shall terminate and the Borrower shall no longer be entitled to borrow any funds under this Agreement.

SECTION 2.04 <u>Interest</u>. (a) Except as otherwise provided in <u>Section 2.04(b)</u>, each Loan shall bear and accrue interest at a rate per annum equal to the Interest Rate as determined by Lender prior to the commencement of each consecutive interest period during the term of this Agreement. Upon the determination by Lender of the Interest Rate for any Interest Period, such Interest Rate shall remain in effect for the entire Interest Period until redetermined for the next successive Interest Period. Interest shall be paid in arrears on the unpaid principal amount of each Loan on each Interest Payment Date, on the Termination Date and after the Termination Date, if interest remains unpaid, on demand.

(b)      Upon the occurrence and during the continuance of an Event of Default, the Interest Rate shall be the Interest Rate plus 2% per annum, compounded monthly. In addition, the amount of any interest, fee, expense or other amount payable under the Loan Documents that is not paid when due, from the date such amount shall be due until such amount shall be paid in full, shall also bear interest, payable in arrears on the date such amount shall be paid in full and on demand, at a rate per annum equal to the Interest Rate in effect from time to time.

SECTION 2.05 <u>Commitment Fee</u>. The Commitment Fee shall be deemed to be fully earned and shall not be subject to review, offset, recoupment or reduction upon entry of the Interim Order. Notwithstanding the foregoing, the Commitment Fee shall not be payable until the occurrence of the Termination Date.

SECTION 2.06 [Intentionally Omitted]

SECTION 2.07 <u>Payments and Computations</u>. (a) All payments required to be made by the Borrower pursuant to the Loan Documents shall be paid in full, irrespective of any right of counterclaim or set-off, on the day when due not later than 11:00 A.M. (New York City time) in U.S. dollars to the Lender in same day funds, with payments being received by the Lender after such time being deemed to have been received on the next succeeding Business Day.

KL2:2248858.9

**EXHIBIT B**

(b)      The Borrower hereby authorizes the Lender, if and to the extent payment owed to the Lender is not made when due under the Loan Documents, to charge from time to time, to the fullest extent permitted by law, against any and all of the accounts of the Borrower maintained with the Lender, any amount so due.  When Lender charges an account of the Borrower pursuant to this Section 2.07, it shall use reasonable efforts to promptly notify the Borrower after making any such charge; provided, however, that the failure to give such notice shall not affect the validity of such charge.

(c)      All computations of interest shall be made by the Lender on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest, fees or commissions are payable.  Each determination by the Lender of an interest rate, fee or commission hereunder shall be conclusive and binding on the Borrower for all purposes, absent manifest error.

(d)      Whenever any payment under the Loan Documents shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest.

(e)      If the Lender receives funds for application to the payment of any Obligations under circumstances in which the Loan Documents do not specify the Obligations to which, or the manner in which, such funds should be applied, the Lender shall apply such funds in such order, manner and priority as determined in its sole and absolute discretion.

SECTION 2.08 <u>Taxes</u>.  (a)  Except as required by law, any and all payments by or for the account of the Borrower pursuant to the Loan Documents shall be made, in accordance with <u>Section 2.07</u>, free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding, in the case of the Borrower, taxes that are imposed on its overall net income by the United States and taxes that are imposed on its overall net income (and franchise taxes imposed in lieu thereof) by the state or foreign jurisdiction under the laws of which the Lender, as the case may be, is organized or any political subdivision thereof (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities in respect of payments hereunder or under the Notes being hereinafter referred to as the "<u>Indemnified Taxes</u>").  If the Borrower shall be required by law to deduct any Indemnified Taxes from or in respect of any amount payable under the Loan Documents to the Lender, (i) the sum payable by the Borrower shall be increased as may be necessary so that after the Borrower have made all required deductions (including deductions applicable to additional sums payable under this Section 2.08) the Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make all such deductions, and (iii) the Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b)      In addition, the Borrower shall pay any present or future stamp, documentary, excise, property or similar taxes, charges or levies that arise from any payment made under the Loan Documents or from the execution, delivery or registration of, performance under, or

**- 10 -**

**EXHIBIT B**

otherwise with respect to, any of the Loan Documents (such taxes, charges and levies are hereinafter referred to as "Other Taxes").

(c)     The Borrower shall indemnify the Lender for and hold it harmless against the full amount of Indemnified Taxes and Other Taxes, and for the full amount of taxes of any kind imposed by any jurisdiction on amounts payable under this Section 2.08, imposed on or paid by the Lender and any liability (including penalties, additions to tax, interest and reasonable expenses) arising therefrom or with respect thereto, except to the extent that such payments result solely from any act or omission to act on the part of the Lender.  Any payments required to be made by the Borrower to the Lender pursuant to this Section 2.08(c) shall be made within ten (10) days of the date that the Lender makes written demand therefor.

(d)     As soon as practicable after any payment of Indemnified Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Lender.

(e)     If Lender is not eligible to be classified as an "exempt recipient" (as defined in the Treasury Regulations under the Internal Revenue Code) with respect to which no backup holding is required, the Lender shall, upon the reasonable request by the Borrower provide the Borrower two completed copies of Internal Revenue Service Form W-9 or any successor form.

(f)     If the Lender is entitled to receive any payment pursuant to this Section 2.08, the Lender shall use reasonable efforts (consistent with legal and regulatory restrictions) to file any certificate or document reasonable requested by the Borrower, at the expense of the Borrower, if the making of such filing would avoid the need for, or reduce the amount of, any amounts payable by the Borrower pursuant to this Section 2.08.

SECTION 2.09  [INTENTIONALLY OMITTED]

SECTION 2.10 Use of Proceeds.  The proceeds of the Loans shall only be used to provide working capital for the Borrower and for other general corporate purposes of the Borrower (including the payment of amounts payable to the Lender pursuant to this Agreement and the payment of costs and expenses of administering the Cases that have been approved by the Bankruptcy Court), in all cases subject to the terms of this Agreement and the Orders and in accordance with the Approved Budget, and shall not on any account be used to fund any investigation of, challenge to (except in connection with the defense against any such investigations, challenges or defense), or litigation with respect to the amount, validity or enforceability of any Obligation hereunder, or any Lien or priority granted with respect hereto

SECTION 2.11 No Discharge; Survival of Claims.  The obligations of the Borrower under the Loan Documents shall not be discharged by the entry of a Confirmation Order (and pursuant to Section 1141(d)(4) of the Bankruptcy Code, the Borrower hereby waive any such discharge) and the entry of a Confirmation Order shall not in any manner affect the nature, priority and extent of the Super-Priority Claims granted to the Lender pursuant to the Loan Documents and/or the Orders.  The obligations of the Borrower under the Loan Documents shall survive the

**- 11 -**

**EXHIBIT B**

conversion of the Cases to cases under Chapter 7 of the Bankruptcy Code and the dismissal of one or more of the Cases, and any such conversion or dismissal of the Cases shall not in any manner affect the nature, priority and extent of the Super-Priority Claims granted to the Lender pursuant to the Loan Documents and/or the Orders.

SECTION 2.12 <u>Priority and Liens</u>.  (a) The Borrower hereby covenants, represents and warrants that, upon entry of the Interim Order, the Obligations hereunder and under the Loan Documents (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed administrative expense claims in the Cases having priority over all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code, (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, shall at all times be secured by a perfected first priority Lien on all unencumbered pre- and post-petition property of the Borrower (including, but not limited to, after-acquired property to the extent the same is not proceeds of property that is, as of the Petition Date, subject to a valid, perfected and enforceable Lien which pursuant to its terms or applicable law extends to such proceeds), but excluding Bankruptcy Causes of Action and the proceeds thereof, (iii) pursuant to Section 364(c)(3) of the Bankruptcy Code, shall at all times be secured by a perfected second priority Lien upon all pre- and post-petition property of the Borrower that is subject to valid and perfected Liens that are in existence on the Petition Date (including, without limitation, general intangibles, inventory, receivables, rights under license agreements, intellectual property, property, plant and equipment, interests in leaseholds and real property, and capital stock of subsidiaries and membership interests in limited liability companies), which liens in favor of the Lender shall be senior to any and all Liens granted after the commencement of the Cases;  provided that the Liens described above shall be subject, in each case, to the Carve-Out; provided, however, that except as otherwise provided in the Orders, no portion of the Carve-Out shall be utilized for the payment of professional fees and disbursements incurred in connection with any challenge (other than with the defense of such challenge) to the amount, extent, priority, validity, perfection or enforcement of (i) any Order or (ii) the use of proceeds from the Loans.  The Lender agrees that so long as no Event of Default or event which with the giving of notice or lapse of time or both would constitute an Event of Default shall have occurred and be continuing, the Borrowers shall be permitted to pay compensation and reimbursement of expenses allowed and payable under 11 U.S.C. § 330 and 11 U.S.C. § 331, as the same may be due and payable, and the same shall not reduce the Carve-Out.

(b)     As to all real property the title to which is held by the Borrower, or the possession of which is held by the Borrower pursuant to leasehold interest, the Borrower and each of the other Borrower hereby assigns and conveys as security, grants a security interest in, hypothecates, mortgages, pledges and sets over unto the Lender all of the right, title and interest of the Borrower in all of such owned real property and in all such leasehold interests, together in each case with all of the right, title and interest of the Borrower in and to all buildings, improvements, and fixtures related thereto, any lease or sublease thereof, all general intangibles relating thereto and all proceeds thereof.  The Borrower acknowledges that, pursuant to the Orders, the Liens in favor of the Lender in all of such real property and leasehold instruments shall be perfected without the recordation of any instruments of mortgage or assignment.  The Borrower further agrees that, upon the request of the Lender, the Borrower shall enter into separate fee and leasehold mortgages in recordable form with respect to such properties on terms reasonably satisfactory to the Lender.

KL2:2248858.9

**EXHIBIT B**

## ARTICLE III
## CONDITIONS OF LENDING

SECTION 3.01 <u>Conditions Precedent to Interim Loans</u>.  The obligation of the Lender to make any Interim Loan shall be subject to the satisfaction, immediately prior to or concurrently with the making of such Interim Loan, of the following conditions:

(a)      All orders material to the interests of the Lender and all other "first day orders" submitted to, and/or approved by, the Bankruptcy Court on or after the Petition Date shall be in form and substance satisfactory to the Lender.

(b)      The Lender shall have received the following, each in form and substance satisfactory to the Lender:

(i)      a Note payable to the order of the Borrower pursuant to Section 2.03;

(ii)      a Notice of Borrowing relating to such Loan pursuant to Section 2.02; and

(iii)      the Loan Documents duly executed by the Borrower.

(c)      A copy of the Interim Order shall have been delivered to the Lender, and the Interim Order shall:

(i)      have been entered by the Bankruptcy Court;

(ii)      be in form and substance reasonably satisfactory to the Lender;

(iii)      authorize the Interim Loans in the amounts and on terms and conditions satisfactory to the Lender;

(iv)      approve the payment by the Borrower of all of the fees and expenses set forth in the Loan Documents, including without limitation reasonable legal fees and expenses incurred by the Lender in connection with due diligence required in connection with the Transactions and the negotiation, drafting, execution, delivery and consummation of this Agreement in an amount not exceeding $25,000;

(v)      approve the grant of valid and perfected Liens on the Collateral in favor of the Lender, as provided in and contemplated by Section 2.12 and the Collateral Documents with the priorities set forth in Section 2.12; and

(vi)      be in full force and effect and shall not have been amended, stayed, vacated, reversed, modified or rescinded in any respect except as consented to by the Lender.

(d)      The Borrower shall have provided the Lender with such documents, certificates, instruments and opinions as reasonably requested by the Lender to evidence the due authorization, execution and delivery of the Loan Documents and the satisfaction of the

**- 13 -**

**EXHIBIT B**

conditions precedent contained therein by the Borrower and the due authorization of the Interim Loans, Final Loans and other Transactions.

(e) No pending claim, investigation or litigation by any Governmental Authority shall exist with respect to the Borrower or the transactions contemplated hereby except to the extent they relate to any action, suit investigation, litigation or proceeding specified in Exhibit C attached hereto.

(f) The Lender shall have received an Approved Budget for the requisite period pursuant to Section 5.01(h).

SECTION 3.02 Conditions Precedent to Each Loan. The obligation of the Lender to make any Loan shall be subject to the satisfaction, or waiver by the Lender immediately prior to or concurrently with the making of such Loan, of the following:

(a) all of the representations and warranties in the Loan Documents being correct on and as of such date, before and after giving effect to such Loan and to the application of the proceeds therefrom, as though made on and as of such date other than any such representations or warranties that, by their terms, refer to a specific date other than applicable Borrowing Date, in which case as of such specific date;

(b) no event has occurred and is continuing, or would result from such Loan or the application of the proceeds therefrom, that constitutes a Default or an Event of Default;

(c) since January 31, 2004, there has not occurred any Material Adverse Change or any development, event or circumstances that is reasonably likely to result in a Material Adverse Change;

(d) the Lender has received (i) a Notice of Borrowing, duly executed by the Borrower that complies with Section 2.02(a) and Section 2.02(b), and (ii) a Cash Report for the preceding Calendar Week as required by Section 2.02(b);

(e) the Borrower shall have paid all fees and expenses (including reasonable attorneys' fees and expenses) due and owing to the Lender under this Agreement;

(f) the Borrower shall have delivered a Budget (which must become an Approved Budget) covering at least thirteen (13) full Calendar Weeks after the Borrowing Date (except the disbursement of the Interim Loan, which shall only require delivery of the First Budget), and in such delivered Budget (except in the case of the First Budget) (i) accrual revenues of the Borrower must be at least 90% of the amount forecast for such accrual revenues compared to the most recently Approved Budget, and (ii) projected gross disbursements in cash flow cannot exceed 110% of the amount forecast for such projected disbursements in the aggregate compared to the most recently Approved Budget;

(g) all accounts payable of the Borrower shall have been in the ordinary course of business since the Petition Date and none of the accounts payable of the Borrower incurred since the Petition Date is more than forty-five (45) days past due after industry standard (other than accounts payable that are being disputed in good faith);

**- 14 -**

**EXHIBIT B**

(h)      the Lender shall have received all of the information, reports and records regarding the Borrower that have been reasonably requested by them and all such information, reports and records shall be complete and accurate;

(i)      other than relating to any action, suit investigation, litigation or proceeding specified in <u>Exhibit C</u> attached hereto, to the knowledge of Borrower, there shall exist no action, suit, investigation, litigation or proceeding affecting the Borrower pending or threatened in writing before any Governmental Authority or arbitrator that (i) could reasonably be expected to have, individually or together with all other events and circumstances, a Material Adverse Effect, or (ii) purports to affect the legality, validity or enforceability of any Loan Document, the consummation of the Transactions;

(j)      the Borrower shall have provided the Lender with such documents, certificates, instruments and opinions as have been reasonably requested by them regarding the Borrower, the Collateral and the Borrower's compliance with the Loan Documents;

(k)      the Lender shall have received an Approved Budget for the requisite period pursuant to Section 5.01(h); and

(l)      if the Borrower extends any credit to any Subsidiary, (i) such credit has been evidenced by a note in form and substance satisfactory to the Lender in its sole and absolute discretion, (ii) the note has been secured by a Lien on assets of the Subsidiary in form and substance satisfactory to the Lender in its sole and absolute discretion and (iii) the note has delivered to the Lender.

SECTION 3.03 <u>Additional Conditions to Final Loans</u>.  The obligation of the Lender to make any Final Loan is subject to the satisfaction, or waiver by the Lender immediately prior to or concurrently with the making of such Loan, of the following:

(a)      A copy of the Final Order shall have been delivered to the Lender, and the Final Order shall:

(i)      have been entered by the Bankruptcy Court;

(ii)      be in form and substance satisfactory to the Lender;

(iii)      authorize the Final Loans in the amounts and on terms and conditions satisfactory to the Lender;

(iv)      approve the payment by the Borrower of all of the fees set forth in the Loan Documents;

(v)      approve the grant of valid and perfected security interests in the Collateral in favor of the Lender, for the benefit of the Lender, as provided in and contemplated by <u>Section 2.12</u> and the Collateral Documents with the priorities set forth in <u>Section 2.12</u>;

(vi)      be in full force and effect; and

**- 15 -**

KL2:2248858.9

**EXHIBIT B**

(vii)    not have been amended, stayed, vacated, reversed, modified or rescinded in any respect except as consented to by the Lender; and

(viii)    not subject to any appeal, proceeding for rehearing, mandamus or other review; provided, however, that if any party in interest seeks to appeal or moves for rehearing, mandamus or other review of  the Final Order, the Lender may, in its sole and absolute discretion, waive this condition.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES**

SECTION 4.01 <u>Representations and Warranties of the Borrower</u>.   The Borrower represents and warrants as of the date of this Agreement and each date on which a Loan is made to the Borrower pursuant to this Agreement as follows:

(a)      <u>Organization and Authority</u>.  The Borrower (i) is a corporation or other legal entity duly organized, validly existing and in  good standing under the laws of the jurisdiction of its incorporation, (ii) is duly qualified and in good standing as a foreign corporation in each other jurisdiction in which it owns or leases property or in which the conduct of its business requires it to so qualify or be licensed, and (iii) has all requisite corporate power and authority to own or lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted.  Each Loan Document has been duly authorized, executed and delivered by the Borrower.  Each Loan Document is the legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms.

(b)      <u>Ownership</u>.  No Person has any right to purchase or otherwise acquire any of the equity securities of the Borrower pursuant to an option, warrant, right of conversion or any similar right or otherwise.  All of the outstanding equity securities of the Borrower have been validly issued, are fully paid and non-assessable and are owned directly or indirectly by the Borrower free and clear of all Liens, except those created under the Collateral Documents.

(c)      <u>No Conflict</u>.  The execution, delivery and performance by the Borrower of each Loan Document, and the consummation of the Transactions, are within the Borrower's corporate or other powers, have been duly authorized by all necessary corporate or other action, and do not (i) contravene the Borrower's certificate of incorporation, bylaws or other organizational documents, (ii) violate any Law, (iii) conflict with or result in the breach of, or constitute a default or require any payment to be made under, any Contract binding on or affecting the Borrower or any of their properties, or (iv) except for the Liens created pursuant to the Loan Documents, result in or require the creation or imposition of any Lien upon or with respect to any of the properties of the Borrower.  The Borrower is not in violation, breach or default of any Law or Contract.

(d)      <u>No Consent</u>.  Except for the entry by the Bankruptcy Court of the Interim Order and the Final Order, no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or any other third party is required for (i) the due execution, delivery, recordation, filing or performance by the Borrower of any Loan Document, or for the consummation of the Transactions, (ii) the grant by the Borrower of the Liens to the Lender

**- 16 -**

**EXHIBIT B**

pursuant to the Loan Documents, (iii) the perfection or maintenance of the Liens created pursuant to the Loan Documents (including the first priority nature of the Liens granted as provided in Section 2.12), or (iv) the exercise by the Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Loan Documents.  All applicable waiting periods in connection with the Transactions have expired without any action having been taken by any competent authority restraining, preventing or imposing materially adverse conditions upon the Transactions or the rights of the Borrower freely to transfer or otherwise dispose of, or to create any Lien on, any properties now owned or hereafter acquired by any of them.

(e)    No Litigation.   Except as set forth on Exhibit C, there is no action, suit, investigation, litigation or proceeding affecting the Borrower that is pending or threatened before any court, Governmental Authority or arbitrator that (i) could be reasonably expected to have or result in, individually or together with all other events and circumstances, a Material Adverse Effect, or (ii) seeks to affect the legality, validity or enforceability of any Loan Document or the consummation of the Transactions.

(f)    Budgets.  All of the Budgets delivered to the Lender were prepared in good faith on the basis of the assumptions stated therein, which assumptions the Borrower believes were reasonable in the light of conditions existing at the time of delivery of such Budget, and represented, at the time of delivery, the Borrower's reasonable best estimate of the Borrower's future financial performance.

(g)    ERISA and Environmental Liabilities.  The Borrower does not maintain, and is not required to maintain, any pension plan that is subject to ERISA (other than a 401(k) plan for which the Borrower have no unfunded Liability) and the Borrower does not have any Liabilities under ERISA or under any pension plan.  The Borrower is not subject to any environmental Liabilities under any Law or otherwise.

(h)    Compliance with Laws.  The Borrower is in compliance with all Laws.

(i)    Information.  No representation or warranty made by the Borrower in any Loan Document, nor any of the statements, documents, certificates or other written information furnished or to be furnished to the Lender by the Borrower, contains or will contain any untrue statement of a material fact, or omits or will omit to state any material fact required to make the statements contained herein or therein not misleading.  There are no facts, events or circumstances, contingent or accrued, known to the Borrower that have not been disclosed to the Lender that could reasonably be expected to have or result in a Material Adverse Effect.

(j)    Permits and Licenses.  The Borrower owns, holds or possesses all governmental licenses and permits (each, a "Permit" and collectively, "Permits") that are required under applicable Laws to entitle it to own or lease, operate and use its assets and to carry on and conduct its business as currently conducted by it, and all such Permits are valid and in full force and effect, except for those the failure of which to be in full force and effect would not have a Material Adverse Effect.  The Borrower has not received any written notice that any Governmental Authority intends to cancel, terminate or not renew any such Permit.

**- 17 -**

**EXHIBIT B**

(k)     <u>Taxes</u>.   The Borrower has filed or caused to be filed all tax returns which are required to be filed and has paid all taxes shown to be due and payable on said returns or on any assessments made against it or any of its property and all other taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (other than any the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with United States generally accepted accounting principles have been provided on the books of the Borrower); no tax Lien has been filed and no claim is being asserted, with respect to any such tax, fee or other charge.

(l)     <u>No Material Adverse Change</u>.   Since January 31, 2004, there has been no change in the operations, financial condition, assets, properties, prospects or liabilities of the Borrower which has had, individually or together with all other events and circumstances, a Material Adverse Effect.

(m)     <u>Absence of Default</u>.   The Borrower is not in default under or with respect to any of its obligations under any Contract in any respect which could reasonably be expected to have a Material Adverse Effect.  No Default or Event of Default has occurred and is continuing.

(n)     <u>Insurance</u>.   The Borrower maintains insurance with responsible and reputable insurance companies or associations in such amounts and covering such risks as is usually carried by companies engaged in similar businesses and owning similar properties in the same general areas in which the Borrower operates and any other insurance or self-insurance required by Law.

(o)     <u>Security Interest, Perfection, Etc</u>. The Loan Documents create in favor of the Lender for the benefit of the Lender a valid and, together with such filings and other actions, perfected first priority or second priority (as applicable in accordance with the provisions of <u>Section 2.12</u> hereof) Lien in the Collateral.  The Borrower and the Guarantors are the legal and beneficial owners of the Collateral free and clear of any Lien, except for the Liens created or permitted under the Loan Documents.  On and after the fifth calendar day following the Petition Date, all filings and other actions necessary or desirable to perfect and protect the Liens in the Collateral created under the Loan Documents have been duly made or taken and will be in full force and effect.

(p)     <u>Financial Statements</u>. For purposes of this Agreement, "Financial Statements" shall mean the audited consolidated balance sheets of the Borrower as of December 31, 2002, and the related consolidated income statements for the years then ended.  The Borrower has delivered to the Lender true and complete copies of the Financial Statements.  The Financial Statements for the year ended December 31, 2002 (i) have been prepared from the books and records of the Borrower in accordance with United States generally accepted accounting principles, (ii) fully reflect all liabilities and contingent liabilities of the Borrower  required to be reflected therein on such basis as at the date thereof, and (iii) fairly present the financial position of each of the Borrower as of the date of the balance sheet included in the Financial Statements and the results of operations for the period indicated.

SECTION 4.02 <u>Notices of Borrowing</u>.  The delivery of each Notice of Borrowing for any Loan shall constitute a representation and warranty of the Borrower that (i) all of the conditions

KL2:2248858.9

**EXHIBIT B**

to such Loan have been satisfied other than the conditions, if any, expressly identified by such Notice of Borrowing as not being satisfied, and (ii) no Default or Event of Default has occurred and is continuing except as expressly set forth in such Notice of Borrowing.

**ARTICLE V**
**COVENANTS OF THE BORROWER**

SECTION 5.01 Affirmative Covenants.   So long as any Loan is outstanding or any Obligation remains unpaid or the Lender shall have any Commitment, the Borrower and its Subsidiaries shall at all times:

(a)   Compliance with Laws.   Comply with all Laws, Permits, licenses and regulatory and other approvals and Contracts.

(b)   Maintenance of Insurance.   Maintain at its own expense insurance with responsible and reputable insurance companies or associations in such amounts and covering such risks as is usually carried by companies engaged in similar businesses and owning similar properties in the same general areas in which such Borrower or Subsidiary operates, and maintain any other insurance or self-insurance required by Law or required by the Lender.   Each policy for liability insurance maintained by such Borrower or Subsidiary shall (i) provide for all losses to be paid on behalf of the Lender and such Borrower or Subsidiary as their interests may appear, and (ii) name the Lender as additional insured thereunder (without any representation or warranty by or obligation upon the Lender) as its interests may appear and have such other terms and conditions as may be requested by the Lender.

(c)   Preservation of Corporate Existence.   Preserve and maintain its existence, legal structure, legal name, rights (charter and statutory), permits, licenses, approvals, privileges and franchises.

(d)   Inspection and Information Rights.   (i)   Permit the Lender, and/or any of its agents, advisors or representatives, at any time to examine and make copies of and abstracts from the records and books of account of, and visit the properties of, and evaluate and monitor, such Borrower or Subsidiary and to discuss the affairs, finances and accounts of such Borrower or Subsidiary with any of its officers, directors, employees, agents, representatives and advisors.   In addition, such Borrower or Subsidiary shall promptly provide the Lender, and/or any of its agents, advisors or representatives, with all information, reports, agreements and records regarding such Borrower or Subsidiary and/or the Collateral as they may reasonably request in the form and manner requested.

(ii)   Promptly provide the Lender with all information, reports, agreements and records regarding such Borrower or Subsidiary and/or the Collateral as he may reasonably request, all of which shall be presented in a form and manner reasonably satisfactory to the Lender.   The Lender shall be permitted to continuously remain on the premises such Borrower or Subsidiary and/or visit such Borrower or Subsidiary from time to time without any advance notice.   The Lender shall be given reasonable access to all of the officers, directors, and senior employees of such Borrower or Subsidiary as and to the extent the Lender reasonably determines necessary or appropriate (and such Borrower or Subsidiary understands and agrees that the

**- 19 -**

**EXHIBIT B**

Lender may be monitoring, evaluating and working with its officers, employees, agents, representatives and advisors on a daily basis).  Such Borrower or Subsidiary shall cause all of its officers, senior employees, agents, representatives and advisors to promptly cooperate in good faith with the Lender at all times.

(e)     <u>Keeping of Books</u>.  Keep proper books of record and account, in which full and correct entries shall be made of all financial transactions and the assets and business of such Borrower or Subsidiary in accordance with generally accepted accounting principles then in effect.

(f)     <u>Maintenance of Properties</u>.  Maintain and preserve all of its properties that are used or useful in the conduct of its business in good working order and condition, ordinary wear and tear excepted.

(g)     <u>Further Assurances</u>. (i)  Promptly upon request by the Lender, correct any defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof.

(ii)     Promptly upon request by the Lender, do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, conveyances, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments as the Lender may reasonably require from time to time in order to (w) carry out more effectively the purposes of the Loan Documents, (x) to the fullest extent permitted by applicable law, subject any of the properties, assets, rights or interests of the Borrower or its Subsidiaries to the Liens now or hereafter intended to be covered by any of the Loan Documents, (y) perfect and maintain the validity, effectiveness and priority of any of the Loan Documents and any of the Liens intended to be created by the Loan Documents, and (z) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively the rights granted or now or hereafter intended to be granted to the Lender under the Loan Documents.

(h)     <u>Budgets</u>.  Submit to the Lender (i) a First Budget, on or prior to the Petition Date, and (ii) thereafter, on a rolling basis, a Budget for the 13-week period following such date of delivery of such Budget, or such other period agreed upon between the Borrower and Lender, as approved by the Lender, the first such Budget to be delivered within two weeks after the Petition Date.  Upon delivery to, acceptance and approval by the Lender, such Budget shall be an Approved Budget.   In the event of any material change between the periods covered by the current Approved Budget and the proposed new Budget, the Borrower shall provide a written explanation of the reasons for each such change, which explanation shall be delivered to the Lender with the proposed new Budget.  Until a proposed new Budget is approved by the Lender, the current Approved Budget shall remain in effect for the period covered by such Approved Budget. If a proposed new Budget is approved by the Lender in its sole and absolute discretion, such Budget shall thereafter be the Approved Budget for all periods covered by such proposed Budget until the next proposed new Budget is approved by the Lender; however, the Lender shall have no obligation to approve any Budget submitted to it.  The Borrower may request the Lender to approve a change to any Approved Budget at any time; however, the Lender shall be under no obligation to approve any change to any Approved Budget.  Each Budget shall be presented in a

**- 20 -**

form reasonably satisfactory to the Lender and each Approved Budget shall be in form and substance reasonably satisfactory to the Lender.

(i)      Cash Management.  Manage their cash in a manner reasonably acceptable to the Lender and, to the extent requested by the Lender, promptly change their cash management systems and procedures in a manner reasonably acceptable to the Lender (including, without limitation, creating and using concentration, lock-box and other accounts under the control of the Lender or its designees).

(j)      Ordinary Course of Business.  Except as expressly required by this Agreement or otherwise consented to by the Lender in writing, carry on its business in the ordinary course of business and, in connection therewith, use its reasonable best efforts to (i) preserve or improve its relationships with customers, suppliers and others having business dealings with it, (ii) keep available the services of its significant employees, and (iii) preserve or improve its present business, each in a manner consistent with past practice.

(k)      ERISA and Environmental.  Maintain any pension plan that is subject to ERISA (other than a 401(k) plan for which the Borrower has no unfunded Liability) or have any Liabilities under ERISA or under any pension plan or become subject to any environmental Liabilities under any Law or otherwise.

(l)      Obligations and Taxes.  Pay all of its material obligations arising after the Petition Date promptly and in accordance with their terms and pay and discharge all material taxes, assessments and governmental charges or levies imposed on it or upon its income and profits or in respect of its property after the Petition Date, before the same be in default, as well as all material lawful claims for labor, materials and supplies or otherwise arising after the Petition Date which, if unpaid, would become a Lien or charge on any part of its assets or properties; provided, however, that the Borrower shall not be required to pay and discharge or cause to be paid and discharged any obligation, tax, assessment, charge, levy or claim so long as the validity or amount thereof is being contested in good faith by appropriate proceedings (if the Borrower have set aside on their books adequate reserves therefor).  In addition, the Borrower shall not permit any of their accounts payable to become more than forty-five (45) days past due after industry standard (other than payables being contested in good faith).

(m)      Exit Plan:  On or before March 15, 2004, Borrower shall provide the Lender with either of the following: (a) a business plan setting forth the basic terms, conditions and timeline for the filing and implementation of a plan of reorganization, or (b) a schedule setting forth a proposed timeline for the sale of Borrower's business as a going concern pursuant to section 363 of the Bankruptcy Code.

(n)      Post-Closing Deliverables.  Deliver, on or before February 13 2004, complete schedules and exhibits to the Security Agreement, if not otherwise provided to Lender as of the date of this Agreement.

SECTION 5.02 Negative Covenants.  So long as any Loan is outstanding or any other Obligation is payable to the Lender or the Lender shall have any Commitment, the Borrower nor any of its Subsidiaries shall, at any time:

**- 21 -**

**EXHIBIT B**

(a)      Liens.  Create, incur, assume or suffer to exist any Lien on or with respect to any of its assets or properties of any character (including accounts) whether now owned or hereafter acquired, or sign or file or suffer to exist under the Uniform Commercial Code of any jurisdiction, a financing statement that names the Borrower or a Subsidiary as debtor, or sign or suffer to exist any security agreement authorizing any secured party thereunder to file such financing statement, or assign any accounts or other right to receive income, excluding, however, from the operation of the foregoing restrictions the following:

(i)      Liens created under the Loan Documents in favor of the Lender for the benefit of the Lender; and

(ii)      Permitted Liens.

(b)      Liabilities.  (i) Create, incur, assume or suffer to exist any Liability other than: (w) amounts payable to the Lender pursuant to the Loan Documents, (x) Liabilities incurred in the ordinary course of business that are contemplated by, and included, in the Approved Budget, (y) Liabilities permitted by Section 5.02(j), and (z) Existing Liabilities; or

(ii)      Pay any Liability other than (x) amounts payable to the Lender pursuant to the Loan Documents, or (y) pursuant to the Approved Budget or (z) with the prior written consent of the Lender in its sole and absolute discretion.

(c)      Mergers; Sales of Assets.  Merge or consolidate with or into another Person or reorganize or restructure or use, sell, lease, transfer or otherwise dispose of any assets, or grant any option or other right to use, purchase, lease or otherwise acquire any assets, or otherwise allow any Person to acquire the Borrower (whether by stock sale, asset sale or otherwise), or file a motion or support any motion seeking Bankruptcy Court approval of any such transaction without (i) the consent of the Lender or (ii) provision for repayment of the Obligations in full; provided, however, that the Borrower may sell inventory in the ordinary course of business and dispose of surplus, obsolete or damaged equipment if the proceeds of such sales are immediately applied to permanently repay Obligations.

(d)      Dividends; Capital Stock.  Declare or pay, directly or indirectly, any dividends or make any other distribution or payment, whether in cash, property, securities or a combination thereof, with respect to (whether by reduction in capital, purchase, redemption or otherwise) any shares of capital stock (or any options, warrants, rights or other equity securities or agreements relating to any capital stock), or set apart any sum for any of the foregoing purposes.

(e)      Change in Nature of Business.  Make any material change in the nature or type of its business as conducted on the Petition Date except as required by the Bankruptcy Code or consented to by the Lender.

(f)      Amendment of Organizational Documents and Material Contracts.  Amend its certificate of incorporation, bylaws or other organizational documents; or enter into, assume, amend, terminate or reject any Contract other than in the ordinary course of business.

**- 22 -**

KL2:2248858.9

**EXHIBIT B**

(g)      Accounting Changes.  Make or permit (i) any material change in accounting policies or reporting practices, except as recommended by its independent public accountants or required by generally accepted accounting principles, or (ii) any change in its fiscal year.

(h)      Prepayments of Liabilities.  Except for a prepayment of the Obligations pursuant to Section 2.03(b) or as provided in the Approved Budget, prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in violation of any subordination terms of, any debt or other Liability without the prior written consent of the Lender granted or withheld in its sole and absolute discretion.

(i)      Negative Pledge.  Enter into or suffer to exist any agreement or other arrangement prohibiting or conditioning the creation or assumption of any Lien upon any of its property or assets other than (i) in favor of the Lender, (ii) in favor of the Borrower pursuant to Section 5.02(j)(iii), or (iii) in connection with any Existing Liabilities if such agreement or other arrangement was entered into prior to the Petition Date and constituted a valid and perfected Lien on such date.

(j)      Limits on Forming Companies; Investments.  Create or invest in, or purchase or otherwise acquire any interest in, or merge, consolidate or otherwise combine with, any corporation, partnership, limited liability company, joint venture, company or other entity, without the consent of the Lender and approval of the Court.  In addition, the Borrower shall not, without the consent of the Lender and approval of the Court, purchase, redeem, hold or acquire any equity, debt or other securities of, make or permit to exist any loans or advances to, or make or permit to exist any investment in, any other Person, except for (i) ownership by the Borrower of the Subsidiaries owned by them as of the Petition Date and (ii) advances and loans among the Borrower in the ordinary course of business for a legitimate business purpose.

(k)      Certain Actions.  Knowingly or intentionally take or permit any action(s), or fail to take any action(s), if such action(s) or failure(s) would or could reasonably be expected to (i) adversely affect any of the Lender's rights in the Collateral, (ii) result in a breach of any of the representations, warranties, covenants or agreements made by the Borrower in the Loan Documents, or (iii) result in a Material Adverse Change.

(l)      Transactions With Affiliates.  Enter into any transaction with any of its Affiliates other than transactions in the ordinary course of business entered into in good faith upon commercially reasonable terms that are no less favorable to the Borrower than would be obtained with a non-Affiliated Person.

(m)      Chapter 11 Claims.  At any time incur, create, assume, suffer to exist or permit (i) any Super-Priority Claim other than those granted to or for the benefit of the Lender, or (ii) any other claim or right to payment that is pari passu with or senior to the Obligations except as provided in Section 2.12 and the Orders.

(n)      Settlement of Claims.  Without the consent of the Lender, enter into any settlement or compromise of any litigation, claim (including a claim for insurance proceeds) or cause of action in which the Borrower or any of its Subsidiaries initially sought or demanded, or file or support any motion seeking Bankruptcy Court approval of any such compromise or

**- 23 -**

settlement.  For purposes of this Section 5.02(n), any waiver or release of any litigation, claim (including a claim for insurance proceeds) or cause of action by or on behalf of the Borrower or any of its Subsidiaries shall be considered a compromise or settlement.

(o)      <u>Use of Cash</u>.  Except as otherwise agreed to by the Lender, at any time  use or invest cash or other funds for any purpose or in any way (including, without limitation, by making any capital expenditures) other than in accordance with the Approved Budget or to pay Liabilities in accordance with Section 5.02(b); provided, however, that subject to Section 5.01(k), the Borrower may deposit cash or funds in a demand or money market account at a financial institution that is reasonably acceptable to the Lender.

(p)      <u>Employees</u>.  Except as contemplated by, and included in, the Approved Budget or otherwise agreed to by the Lender, (i) change the compensation of any employee, (ii) enter into an employment, severance or similar agreement with any employee, or (iii) hire any employee.

(q)      <u>Sale and Leaseback Transactions</u>. Sell or transfer (or permit its Subsidiaries to sell or transfer) to a Person any real property, whether now owned or hereafter acquired, if at the time or thereafter the Borrower or a Subsidiary shall lease as lessee such property or any part thereof or other property which such Party or a Subsidiary intends to use for substantially the same purpose as the property sold or transferred.

SECTION 5.03 <u>Reporting Requirements</u>.  So long as any as any Obligation shall remain unpaid, or the Lender shall have any Commitment, the Borrower shall furnish to the Lender, such information, reports and records as reasonably requested by any Lender, all of which shall be in form and substance reasonably satisfactory to the party requesting such information, reports and records.  In addition, the Borrower shall furnish to the Lender the following:

(a)      <u>Default and Prepayment Notices</u>.  As soon as possible and in any event within one (1) Business Day after any senior officer (including, without limitation, any chief executive officer, chief financial officer, chief operating officer or senior vice-president) of the Borrower learns of the occurrence of each Default, Event of Default, or any event, development or occurrence reasonably likely to have or result in, individually or together with all other events and circumstances, a Material Adverse Effect continuing on the date of such statement, a statement of the chief financial officer or vice president responsible for financial matters of the Borrower setting forth details of such Default, Event of Default, event, development or occurrence and the action that the Borrower has taken and proposes to take with respect thereto.

(b)      <u>Financial Information</u>.  Within thirty (30) days after the end of each calendar month, a consolidated and consolidating balance sheet of the Borrower and its Subsidiaries as of the end of such month and consolidated and consolidating statements of income of the Borrower and its Subsidiaries for such month, all of which shall be in form and substance reasonably satisfactory to the Lender.

(c)      <u>Litigation</u>.  Promptly after the commencement thereof, notice of all actions, suits, investigations, litigation and proceedings before any Governmental Authority, domestic or foreign, affecting the Borrower or any of its Subsidiaries; provided, however, that unless

KL2:2248858.9

**EXHIBIT B**

requested by the Lender, the Borrower shall not be required to give notice of any proofs of claim filed in the Cases.

(d)     Securities Reports.  Promptly after the sending or filing thereof, copies of all proxy statements, financial statements and reports that the Borrower or any of its Subsidiaries sends to its stockholders, and copies of all regular, periodic and special reports, and all registration statements, that the Borrower or any of its Subsidiaries files with the Securities and Exchange Commission or any Governmental Authority that may be substituted therefor, or with any national securities exchange.

(e)     Creditor Reports.  Promptly after the furnishing thereof, copies of any statement or report furnished to any other holder of the securities of the Borrower or of any of its Subsidiaries pursuant to the terms of any indenture, loan or credit or similar agreement and not otherwise required to be furnished to the Lender pursuant to this Section 5.03.

(f)     Chapter 11 Filings.  Copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Borrower with the Bankruptcy Court in the Cases, or distributed by or on behalf of the Borrower to any official committee appointed in the Cases or to any unofficial committee.

(g)     Cash Report.  On the first or second Business Day of each Calendar Week, a Cash Report for the immediately preceding Calendar Week shall be furnished to the Lender, each of which shall be in form and substance reasonably satisfactory to the Lender.

(h)     Other Information.  Such other information, reports and records regarding the Borrower and its Subsidiaries (including, without limitation, any information, reports and records with respect to the business, condition (financial or otherwise), operations, performance, properties or prospects of the Borrower or any of its Subsidiaries) or the Collateral as the Lender may from time to time reasonably request, promptly after each request is made, all of which shall be in form and substance reasonably satisfactory to the requesting party and shall be accurate and complete in all material respects when delivered or given to the Lender and, if any such information becomes inaccurate in any material respect after being delivered to the Lender, the Borrower shall provide the Lender with updated information that is accurate in all material respects.

**ARTICLE VI**
**EVENTS OF DEFAULT**

SECTION 6.01 Events of Default.  If any of the following events (each, an "Event of Default") shall occur and be continuing:

(a)     the Borrower shall fail to pay any Obligation payable to the Lender pursuant to the Loan Documents as and when such amount becomes due and payable, whether at the due date thereof or by acceleration  thereof or otherwise; or

(b)     any representation or warranty made (or deemed to be made) by the Borrower under, pursuant to or in connection with any Loan Document, or any material statement or representation made in any report, financial statement, certificate or other document furnished by

**- 25 -**

**EXHIBIT B**

the Borrower to the Lender or the Lender under, pursuant to or in connection with the Loan Documents, shall prove to have been false or misleading in any material respect when made or delivered; or

(c)      the Borrower or any of its Subsidiaries shall fail to perform or observe any term, covenant or agreement contained in Section 2.10, Section 2.12, or Article V; or

(d)      the Borrower or any of its Subsidiaries shall fail to perform or observe any other term, covenant or agreement contained in any Loan Document or any Order that is to be performed or observed by it if such failure shall remain unremedied for more than ten (10) days; or

(e)      there shall occur any Material Adverse Change or any development, event or occurrence that, individually or in the aggregate, is reasonably likely to result in a Material Adverse Change; or

(f)      one or more judgments or orders as to any post-petition liability for the payment of money not covered by insurance shall be rendered against one or more of the Borrower since the Petition Date and the enforcement thereof shall not be stayed or vacated; or

(g)      any non-monetary judgment or order shall be rendered against the Borrower or any of its Subsidiaries with respect to any post-petition event that is reasonably likely to have or result in a Material Adverse Effect or cause a Material Adverse Change, and there shall be any period of ten (10) days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(h)      any material provision of (i) any Loan Document shall for any reason cease to be valid and binding on or enforceable against the Borrower, or the Borrower shall so state or assert, or (ii) any Loan Document shall for any reason cease to create a valid and perfected first priority or second priority (as applicable in accordance with Section 2.12) Lien on and security interest in the Collateral; or

(i)      any of the following occurs:  (i) any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or the Borrower shall seek the dismissal of any of the Cases; (ii) a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed or elected in the Cases and the order appointing such trustee, responsible officer or examiner shall not be reversed or vacated within thirty (30) days after the entry thereof; or (iii) an application shall be filed by the Borrower for the approval of any Super-Priority Claim or other claim or right to payment (other than as provided in Section 2.12 and the Orders) in the Cases that is pari passu with or senior to the Obligations, or there shall arise or be granted any such pari passu or senior Super-Priority Claim or other claim or right to payment; or

(j)      (i) the Interim Order shall cease to be in full force and effect and the Final Order shall not have been entered prior to such cessation, or (ii) the Final Order shall not have been entered within forty-five (45) days after the Petition Date, or (iii) from and after the date of entry

**- 26 -**

**EXHIBIT B**

of the Final Order, the Final Order shall cease to be in full force and effect, or (iv) the Borrower shall fail to comply with the terms of either Order in any material respect, or (v) either the Interim Order or the Final Order shall be amended, supplemented, stayed, reversed, vacated or modified (or the Borrower shall apply for authority to do so) without the written consent of the Lender; or

(k)    the assets and liabilities (including without limitation cash, accounts receivable and accounts payable), revenues, expenses and cash flow reported by the Borrower for any week shall be less favorable to the Borrower than the amount forecast for the "Gross Billing" and "Closing Balance" identified in the most recent Approved Budget for such week by more than 10% of such forecasted amount; or

(l)    the Borrower fail to pay their accounts payable in the ordinary course of business or any such payables are more than forty-five (45) days past due after industry standard (excluding accounts payable being disputed in good faith); or

(m)    the Borrower shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of a pre-petition claim other than claims contemplated by, and included in, the Approved Budget or approved by the Lender in writing, or (ii) approving any "first day" order not approved by the Lender; or

(n)    a change of control shall occur with respect to the Borrower pursuant to which the stockholders as of the Petition Date cease to own of record and beneficially, directly or indirectly, at least 50% of the outstanding capital stock of the Borrower; or

(o)    the Borrower fails to maintain any material Permit;

then, and in any such event and without further order of or application to the Bankruptcy Court, the Lender shall at the request, or may with the consent, of the Lender, by notice to the Borrower (with a copy to (i) counsel for each statutory committee appointed in the Cases, if any, (ii) the United States Trustee for the Southern District of New York, and (iii) counsel to the Borrower), take one or more of the following actions at any time or from time to time, at the same or different times:  (a) declare the Commitment of the Lender and the obligation of the Lender to make Loans to be terminated, whereupon all of the Commitments shall immediately terminate, (b) shall, by notice to the Borrower, declare the Loans, all interest thereon and all other Obligations payable under the Loan Documents to be immediately due and payable, whereupon the Loans, all such interest and all such Obligations shall become and be immediately due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower; and (c) exercise any and all remedies under the Loan Documents and under applicable law available to the Lender; provided, however, that in the event of an actual or deemed entry of an order for relief with respect to the Borrower or any of its Subsidiaries under the Bankruptcy Code, (x) the Commitments of the Lender and the obligation of the Lender to make Loans shall automatically be terminated, and (y) the Loans, all such interest and all such Obligations shall automatically and immediately become and be due and payable, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by the Borrower.

- 27 -

KL2:2248858.9

**EXHIBIT B**

### ARTICLE VII
### [intentionally omitted]

### ARTICLE VIII
### MISCELLANEOUS

SECTION 8.01 <u>Amendments</u>.  (a)  No amendment or waiver of any provision of any Loan Document, nor consent to any departure by the Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed (or, in the case of the Collateral Documents, consented to) by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that except as otherwise provided or permitted in <u>Sections 2.04(c) and 8.01(b)</u>, no such amendment, waiver or consent shall, unless in writing and signed by the Borrower affected thereby, (w) increase the Commitment of the Lender, (x) reduce the principal amount of, or the rate of interest payable on, any Loan payable to the Lender, (y) extend any date for payment, or reduce the amount, of any interest, fees or expenses payable to the Lender under the Loan Documents, or (z) extend the final maturity of the Loans.  In addition, no such amendment, waiver or consent regarding the Loan Documents shall affect any of the rights of the Lender under the Loan Documents without the prior written consent of the Lender.

SECTION 8.02 <u>Notices</u>.  All notices and other communications provided for under this Agreement shall be in writing (including telegraphic or telecopy communication) and mailed, telegraphed, telecopied or delivered, if to the Borrower, at the Borrower's address at 111 East 22nd Street, New York, New York 10010, Attention: Edward Curtin, with a copy to Kramer Levin Naftalis & Frankel LLP, 919 Third Avenue, New York, New York 10022, Attention: Robert T. Schmidt, Esq.; at its specified address in this Section 8.02; if to the Lender to the specified address in Schedule 8.02,,or, as to the Borrower, at such other address as shall be designated by such party in a written notice to the other parties and, as to each other party, at such other address as shall be designated by such party in a written notice to the Borrower.  All such notices and other communications shall, when mailed, telegraphed or telecopied, be effective when deposited in the mails, delivered to the telegraph company or transmitted by telecopier, respectively, except that notices and communications to the Lender regarding a change in address or pursuant to Article II shall not be effective until received by the Lender. Delivery by telecopier of an executed counterpart of any amendment or waiver of any provision of this Agreement or any Loan Document or of any other agreement, document or instrument delivered pursuant to, or in connection with, any Loan Document shall be effective as delivery of an original executed counterpart thereof.

SECTION 8.03 <u>No Waiver; Remedies</u>.  No failure on the part of the Lender to exercise, and no delay in exercising, any right under the Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.  The remedies provided in the Loan Documents are cumulative and not exclusive of any remedies provided by law or in equity.

SECTION 8.04 <u>Costs and Expenses</u>.  (a)  Whether or not the Transactions are consummated, the Borrower agrees to pay on demand (i) all reasonable fees, costs and expenses incurred by or on behalf of the Lender in connection with the preparation, execution, delivery,

**- 28 -**

**EXHIBIT B**

administration, modification and amendment of the Loan Documents (including (x) all due diligence, collateral review, syndication, transportation, computer, duplication, appraisal, audit, insurance, consultant, search, filing and recording fees and expenses, (y) the reasonable fees and expenses of counsel for the Lender with respect to the Loan Documents, with respect to advising the Lender as to their rights and responsibilities, or the perfection, protection or preservation of rights or interests, under the Loan Documents, with respect to negotiations with the Borrower or with other creditors of the Borrower or any of its Subsidiaries arising out of any Default, Event of Default or any events or circumstances that may give rise to a Default or Event of Default and with respect to presenting claims in or otherwise participating in or monitoring any bankruptcy, insolvency or other similar proceeding involving creditors' rights generally and any proceeding ancillary thereto, and (z) the reasonable fees and expenses of such accounting firm or other financial advisors as the Lender may engage to advise it in respect of the Loans and/or Commitments from time to time), (ii) all reasonable out-of-pocket costs and expenses of the Lender in connection with the enforcement of the Loan Documents, whether in any action, suit or litigation, any bankruptcy, insolvency or other similar proceeding affecting creditors' rights generally (including the reasonable fees and expenses of counsel for the Borrower with respect thereto) and (iii) all transfer, stamp, documentary or similar taxes, assessments or charges levied by any Governmental Authority in respect of this Agreement or any of the other Loan Documents or any other document referred to herein or therein and all costs, expenses, taxes, assessments and other charges incurred in connection with any filing, registration, recording or perfection of any security interest contemplated by any of the Loan Documents or any other document referred to herein or therein.

(b)     The Borrower agrees to indemnify and hold harmless the Lender its Affiliates and its officers, directors, employees, agents and advisors (each, an "Indemnified Party") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever (including reasonable fees and expenses of counsel) that may be imposed on, incurred by, or asserted against any Indemnified Party in any way relating to or arising out of the Loan Documents or any action taken or omitted by such Indemnified Party in any way relating to or arising out of (i) the Loan Documents or (ii) the Borrower's petition with the Bankruptcy Court under Chapter 11 of the Bankruptcy Code and any orders of the Bankruptcy Court in connection thereto (collectively, the "Indemnified Costs"); that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of, or in connection with the preparation for a defense of, any investigation, litigation or proceeding arising out of, related to or in connection with (i) the Loans, the actual or proposed use of the proceeds of the Loans, the Loan Documents, any of the Transactions of the Borrower's petition with the Bankruptcy Court under Chapter 11 of the Bankruptcy Code and any orders of the Bankruptcy Court in connection thereto, or (ii)  the presence of any hazardous materials in violation of any environmental Law on any property owned or operated by the Borrower or any of its Subsidiaries; except to the extent such Indemnified Costs are found in a final, non-appealable judgment by a Bankruptcy Court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.   In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 8.04(b) applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Borrower, its directors, shareholders or creditors or an Indemnified Party or any Indemnified Party is otherwise a party thereto and whether or not the Transactions are consummated.   The Borrower also agree not to assert any

**- 29 -**

claim against the Lender or any of its respective Affiliates, or any of their respective officers, directors, employees, attorneys and agents, on any theory of liability, for special, indirect, incidental, consequential or punitive damages arising out of or otherwise relating to the Loans, the actual or proposed use of the proceeds of the Loans, the Loan Documents or any of the Transactions.

(c)   If the Borrower fails to pay when due any costs, expenses or other amounts payable by it pursuant to any Loan Document, including fees and expenses of counsel and indemnities, such amount may be paid on behalf of the Borrower by the Lender, in its sole discretion, in which case such amount shall be payable on demand by the Borrower to the Lender, as the case may be, and such amount shall accrue interest at the Interest Rate set forth in Section 2.04.

(d)   Without prejudice to the survival of any other agreement of the Borrower under any Loan Document, the agreements and obligations of the Borrower and other Borrower contained in Section 2.08 and this Section 8.04 shall survive the payment in full of principal, interest and all other Obligations payable under the Loan Documents.

SECTION 8.05 <u>Right of Set-off</u>.  Subject to Section 2.09, upon the occurrence and during the continuance of any Event of Default, the Lender and each of its respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set-off and otherwise apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Lender or such Affiliate to or for the credit or the account of the Borrower against any and all of the Obligations now or hereafter existing, irrespective of whether the Lender shall have made any demand under any Loan Document and although such Obligations may be unmatured.  The Lender agrees promptly to notify the Borrower after any such set-off and application; provided, however, that the failure to give such notice shall not affect the validity of such set-off and application.  The rights of the Lender and its Affiliates under this Section 8.05 (i) are in addition to other rights and remedies (including other rights of set-off) that the Lender and its respective Affiliates may have, and (ii) are subject to Section 2.09.

SECTION 8.06 [INTENTIONALLY OMITTED].

SECTION 8.07 <u>Binding Effect</u>.  This Agreement shall be binding upon and inure to the benefit of the Borrower, the Lender and its respective successors and assigns.  The Borrower may not assign or transfer (whether consensually, non-consensually, by operation of Law or otherwise) any of its rights or obligations under the Loan Documents without the consent of the Lender.

SECTION 8.08 [INTENTIONALLY OMITTED]

SECTION 8.09 <u>Execution in Counterparts</u>.  This Agreement may be executed in any number of counterparts and by different parties to this Agreement in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature

KL2:2248858.9

**EXHIBIT B**

page to this Agreement by facsimile shall be effective as delivery of an original executed counterpart of this Agreement.

SECTION 8.10 <u>Confidentiality</u>.  Lender shall not disclose any Confidential Information to any Person without the consent of the Borrower, other than (a) the Lender's Affiliates and to its and their officers, directors, employees, agents and advisors, and then only on a confidential basis to the extent necessary for the Lender to perform its duties in connection with the Loans or in connection with an actual or prospective assignment for participation in the Loans, (b) as required by any law, rule or regulation or judicial process, (c) as requested or required by any state, federal or foreign authority or examiner regulating the Lender, and (d) to any rating agency when required by it; provided that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Confidential Information relating to the Borrower received by it from the Lender substantially in accordance with this Section 8.10.

SECTION 8.11 <u>Governing Law</u>.  This Agreement and the other Loan Documents shall be governed by, and construed in accordance with, the laws of the State of New York and, to the extent applicable, the Bankruptcy Code.

SECTION 8.12 <u>WAIVER OF JURY TRIAL</u>.  THE BORROWER AND THE LENDER IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO ANY OF THE LOAN DOCUMENTS, THE LOANS, THE TRANSACTIONS OR THE ACTIONS OF THE LENDER IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT THEREOF.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

KL2:2248858.9

**EXHIBIT B**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**BORROWER:**

        **ELITE MODEL MANAGEMENT
CORPORATION,** as Borrower

By: _____

    Name:
    Title:

**LENDER:**

        **CAREYES FUNDING GROUP, LLC,**
as Lender

By: _____

    Name:
    Title:

**EXHIBIT B**

**Schedule 2.02(b)**

**LOAN DRAW SCHEDULE**

| <u>Loan Draw Schedule</u> | <u>Commitment Amount</u> |
|---|---|
| 1. Earlier of February 11, 2004 or Entry of Interim Order | $500,000 |
| 2. April 1, 2004 through April 30, 2004 | Amount to be determined by Borrower and Lender based on review of Budget. |
| 3. May 1, 2004 through May 30, 2004 | Amount to be determined by Borrower and Lender based on review of Budget. |
| 4. June 1, 2004 through June 30, 2004 | Amount to be determined by Borrower and Lender based on review of Budget. |

**EXHIBIT B**

**SCHEDULE 8.02**

## <u>NOTICES</u>

Carayes Funding Group, LLC
888 Seventh Avenue, Suite 1601
New York, New York  10106
Attention: Paul F. Cifelli
Phone: (212) 581.4720
Fax: (212) 265.4035
Email: pcifelli@gemny.com

Jon P. Leckerling, Esq.
Tyler Cooper & Alcorn, LLP
23 Woodland Road
Madison, CT 06443
Phone: (203) 318-3600
Fax: (203) 318-3609
Email: Leckerling@tylercooper.com

Niclas A. Ferland, Esq.
Tyler Cooper & Alcorn, LLP
205 Church Street
New Haven, CT 06510
Phone: (203) 784-8200
Fax: (203) 789-2133
Email: ferland@tylercooper.com

KL2:2248858.9

**EXHIBIT B**

**Exhibit A**

**Form of Notice of Borrowing**

**[LETTERHEAD OF BORROWER]**

_____ __, 200_

By Facsimile

Carayes Funding Group, LLC
888 Seventh Avenue, Suite 1601
New York, New York  10106
Attention: Paul F. Cifelli
Phone: (212) 581.4720
Fax:    (212) 265.4035
Email: pcifelli@gemny.com

Ladies and Gentlemen:

Reference is hereby made to the Debtor-in-Possession Credit Agreement, dated as of February __, 2004 (the "Credit Agreement"), by and among, Elite Model Management Corporation (the "Borrower") and the Lender.  Unless otherwise defined herein or the context clearly requires otherwise, capitalized terms shall have the meanings given to them in the Credit Agreement.

The Borrower hereby gives you an irrevocable, binding notice (this "Notice") pursuant to Section 2.02(a) of the Credit Agreement that the Borrower hereby requests a Loan in the aggregate amount of $_____ to be made to the Borrower on_____,  2004 (the "Borrowing Date").

The requested Loan is to be sent to:

> [Name of Bank]
> [City of Bank]
> Beneficiary:
> Account No.:  [number]
> ABA No.:  [number]
> Attn:  [name]

The Borrower hereby certifies that (i) except as set forth on Annex I to this Notice, all of the applicable conditions under Article III of the Credit Agreement to the obligations of the Lender to make the Loan requested by this Notice have been satisfied as of the date of this Notice, (ii) a Cash Report for the Calendar Week ending           , 2004, is attached hereto as Annex II, which report is true and correct in all material respects as of the date of this Notice, and (iii) no Default or Event of Default has occurred and is continuing on the date hereof or will be in existence on the Borrowing Date (before or after giving effect to the proposed Loans), and (iv) this Notice does not seek a Loan in an amount that exceeds the amount of cash required by the Borrower through the date that is two weeks after the proposed Borrowing Date as reflected

A-1

KL2:2248858.9

**EXHIBIT B**

in the Approved Budget after taking all available cash of the Borrower into consideration as reflected in the attached Cash Report for the immediately preceding Cash Report.

ELITE MODEL MANAGEMENT
CORPORATION

By:_____
    Name:
    Title:

A-2

KL2:2248858.9

**EXHIBIT B**

**Annex I**

**Unsatisfied Conditions**

**(Attached hereto)**

A-3

KL2:2248858.9

**Annex II**

## <u>Cash Report</u>

**(Attached hereto)**

A-4

**Exhibit B**

**Form of Note**

New York, New York

$_____

_____, 2004

FOR VALUE RECEIVED, the undersigned, ELITE MODEL MANAGEMENT CORPORATION, a New York corporation ("Borrower"), HEREBY PROMISES TO PAY to the order of CARAYES FUNDING GROUP, LLC ("Lender") at the offices of Lender at 888 Seventh Avenue, New York, New York  10106, or at such other place as Lender may designate from time to time in writing, in lawful money of the United States of America and in immediately available funds, the amount of _____ Dollars ($_____). Unless otherwise defined herein or the context clearly requires otherwise, capitalized terms shall have the meanings given to them in that certain Debtor-in-Possession Credit Agreement, dated as of February __, 2004, by and among Borrower, certain subsidiaries of Borrower, Careyes Funding Group, LLC, as Lender, (including all annexes, exhibits and schedules thereto and as from time to time amended, modified, or supplemented, the "Credit Agreement").

This Note is issued to Lender pursuant to the Credit Agreement and Lender is entitled to the benefit and security of the Credit Agreement, the Security Agreement and all of the other Loan Documents referred to in the Credit Agreement.  Reference is hereby made to the Credit Agreement for a statement of all of the terms and conditions under which the Loan evidenced hereby are made and are to be repaid.  The aggregate outstanding principal balance of the Loan, the rates of interest applicable thereto and the date and amount of each payment made on account of the principal thereof, shall be recorded by the Lender on its books; provided that the failure of Lender to make any such recordation shall not affect the obligations of Borrower to make a payment when due of any amount owing under the Credit Agreement or this Note.

The principal amount of the indebtedness evidenced by this Note shall be payable in the amounts and on the dates specified in the Credit Agreement.  Interest thereon shall be paid until such principal amount is paid in full at such interest rates and at such times, and pursuant to such calculations, as are specified in the Credit Agreement.  The terms of the Credit Agreement are hereby incorporated in this Note by reference.

If any payment on this Note becomes due and payable on a day other than a Business Day, the payment thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

Upon and after the occurrence and during the continuance of any Event of Default, this Note may, as provided in the Credit Agreement, and without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other legal requirement of any kind (all of which are hereby expressly waived by Borrower), be declared, and immediately shall become, due and payable.

B-1

KL2:2248858.9

Time is of the essence of this Note.

Except as provided in the Credit Agreement, this Note may not be assigned by Lender to any Person.

THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED ENTIRELY IN SUCH STATE.

[**To be used when this Note replaces an existing Note:** This Note is issued in [full/partial] substitution for and replacement of, but not in payment of the Note of Borrower dated _____, payable to the order of _____ in the original principal amount of _____ DOLLARS ($_____)]

<u>Borrower</u>:

ELITE MODEL MANAGEMENT CORPORATION

By:_____
   Name:
   Title:

KL2:2248858.9

**Exhibit C**

**Elite Model Management Corporation**
**Chart of Pending Litigation**

| Caption / Case Number | Court | Date Filed; Status | Nature of Action | Amount in Controversy | Opposing Counsel |
|---|---|---|---|---|---|
| Victoria Gallegos v. Elite Model Management Corporation, John Casablancas, Gerald Marie, Mary Ann D'Angelico, and Monique Pillard Index No.: 1205770/00 | New York State Supreme Court/Filed October 3, 2000 | Judgement entered January 8, 2004; Order to Show Cause filed January 28, 2004 requiring Elite to show cause by February 13, 2004 why Court should not appoint Receiver | Disability Discrimination against company and certain officers and directors | $4.3 million judgement | Rosalind Fink, Esq. Brill & Meisel 488 Madison Avenue New York, N.Y. 10022 (212) 753-5599 Robert Herbst, Esq. Beldock Levine & Hoffman, LLP 99 Park Avenue New York, N.Y. 10016-1503 (212) 490-0400 |
| Maryanne Fletcher, et al. v. Elite Model Management Corp.; Elite Model Management S.A.; Elite Group S.A.; Elite Premier; Gerald Marie; John Casablancas; Alain Kittler; Monique Pillard; Advertex Communications, Inc.; Macy's East, Inc.; and Federated Group, Inc. Index No.: 100456/04 | New York State Supreme Court/Filed January 13, 2004 | Issue has not yet been joined. Case has not been assigned to any justice | Breach of fiduciary duty, fraud, breach of contract. civil rights violations, operating in violation of Article 11 of the GBL | No specific amount in damages is demanded in ad damnum | Andrew Hayes, Esq. Boies Schiller & Flexner LLP 333 Main Street Armonk, New York 10504 |
| Carolyn Fears, et al. v. Wilhelmina Model Agency, Inc., et al. Case No. 02 Civ. 4911 | U.S. District Court for the Southern District of New York/Filed June 25, 2002 | Motion for summary judgment filed January 15, 2004 | Antitrust case against Elite and other model management companies | No specific amount in damages is demanded in ad damnum | Andrew Hayes, Esq. Boies Schiller & Flexner LLP 333 Main Street Armonk, New York 10504 Brian Rishwain, Esq. |

C-1

| Caption / Case Number | Court | Date Filed; Status | Nature of Action | Amount in Controversy | Opposing Counsel |
|---|---|---|---|---|---|
| | | | | | Johnson & Rishwain LLP<br>12121 Wilshire Boulevard Suit 1201<br>Los Angeles, CA 90025<br>(310) 826-2410<br><br>Merrill Davidoff<br>Berger & Montagne, PC<br>1622 Locust Street<br>Philadelhia, PA 10103<br>(215) 875-3000<br><br>Anthony J. Bolognese, Esq.<br>Bolognese & Associates, LLC<br>One Penn Center<br>1617 JFK Boulevard Suite 650<br>Philadelphia, PA 19103<br>(215) 814-6750<br><br>John Marcoretta<br>Spector, Roseman & Kodroff, PC<br>1818 Market Street, Suite 2500<br>Philadelphia, PA 19103<br>(215) 496-0300 |
| Next Model Management v. Elite Model Management Corporation, et al. Index No. 601651/02 | New York State Supreme Court /Filed May 1, 2002 | Trial scheduled for March 29, 2004; Elite to move for summary judgment by February 26, 2004 | Tortious Interference with Contract | $10,000,000 demanded in ad damnum | David Jaroslawicz & Jaros, Esqs.<br>150 William Street<br>New York, N.Y. 10038<br>(212) 227-2780 |
| Shelton v. Elite, et al. Index No. 601076/03 | New York State Supreme | July 2003; Motions to dismiss to be filed before | Class action against Elite and other model | No specific amount in damages is | Andrew Hayes, Esq.<br>Boies Schiller & |

C-2

KL2:2248858.9

| Caption / Case Number | Court | Date Filed; Status | Nature of Action | Amount in Controversy | Opposing Counsel |
|---|---|---|---|---|---|
| | Court/May 16, 2003 | March 12, 2004 | management companies | claimed | Flexner LLP 333 Main Street Armonk, New York 10504<br><br>Brian Rishwain, Esq. Johnson & Rishwain LLP 12121 Wilshire Boulevard Suit 1201 Los Angeles, CA 90025 (310) 826-2410 |
| Folkes v. Elite Case No. 02 Civ. 9579 | U.S. District Court for the Southern District of New York/Filed December 2, 2002 | $70,000 settlement reached but not consummated due to restrictions imposed by Court in Gallegos case | Class action by former Elite employees for violation of discrimination laws | $70,000 settlement reached | Joseph A. Turco Spar & Bernstein 225 Broadway, Suite 512 New York, New York 10007 212-227-3636 |
| VanTassel v. Elite Index No. 03/107541 | State Supreme Court/Filed April 24, 2003 | Parties in settlement negotiations | Breach of contract | $50,000 demanded in ad damnum | Robert Hantman, Esq. Hantman & Associates 65 Bleeker street, 4th Floor New York, N.Y. 212-228-2600 |
| Murray and Boselli v. Elite Case No. BC307749 | California State Superior Court | | | | |

C-3

KL2:2248858.9