**Hearing Date: July 28, 2004 @ 10:00 a.m. EDT**
**Objection Deadline: July 26, 2004 @ 5:00 p.m. EDT**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
919 Third Avenue
New York, New York  10022
(212) 715-9100
Kenneth H. Eckstein, Esq. (KE-6021)
Robert T. Schmidt, Esq.  (RS-8881)

Attorneys for Debtor and Debtor in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x

In re:                                                  :      Chapter 11
                                                        :
**Elite Model Management Corporation,**     :      Case No. 04-10845 (RDD)
                                                        :
                        Debtor.                 :
                                                        :
------------------------------------- x

## NOTICE OF MOTION FOR ORDERS (I) APPROVING BIDDING PROCEDURES, INCLUDING A BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (II) APPROVING REPLACEMENT POST PETITION FINANCING (III) SCHEDULING A SALE APPROVAL HEARING (IV) APPROVING FORM AND MANNER OF NOTICE; (V) AUTHORIZING AND APPROVING (A) PURCHASE AGREEMENT WITH EMMCAC, LLC SUBJECT TO HIGHER AND BETTER OFFERS, (B) SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; AND (C) GRANTING RELATED RELIEF

PLEASE TAKE NOTICE that on July 14, 2004, the above-captioned debtor and

debtor-in-possession (the "Debtor") filed the annexed Motion (the "Motion") for an order, under

Sections 105(a), 363, 364 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.

(the "Bankruptcy Code"), (i) Approving Bidding Procedures, Including a Break-Up Fee and

Expense Reimbursement; (ii) Approving Replacement Post Petition Financing (iii) Scheduling a

Sale Approval Hearing (iv) Approving Form and Manner of Notice; (v) Authorizing and

Approving (A) Purchase Agreement with EMMCAC, LLC Subject to Higher and Better Offers,

KL2:2271595.1

(B) Sale of Substantially All of the Debtor's Assets Free and Clear of Liens, Claims,

Encumbrances and Other Interests; and (C) Granting Related Relief, with the United States

Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

PLEASE TAKE FURTHER NOTICE that a hearing to consider the Motion will

be held before the Honorable Robert D. Drain, United States Bankruptcy Judge, in Room 610 of

the United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green,

New York, New York, 10004 on **Wednesday, July 28, 2004, at 10:00 a.m. EDT**.

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion must

be filed with the Bankruptcy Court, One Bowling Green, New York, New York 10004-1408,

with a copy to Chambers, together with proof of service thereof and served upon: (i) the Office

of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn:

Pamela J. Lustrin, Esq.; and (ii) Kramer Levin Naftalis & Frankel LLP, counsel for the Debtor,

919 Third Avenue, New York, New York 10022, Attention: Robert T. Schmidt, Esq.; so as to be

received no later than **5:00 p.m. EDT on Monday, July 26, 2004**.

Dated: New York, New York
        July 14, 2004

                                    KRAMER LEVIN NAFTALIS & FRANKEL LLP


                                    /s/ Robert T. Schmidt
                                    Kenneth H. Eckstein. Esq. (KE-6021)
                                    Robert T. Schmidt, Esq. (RS-8881)
                                    Jack A. Hazan, Esq. (JH-3833)
                                    919 Third Avenue
                                    New York, New York  10022
                                    (212) 715-9100

                                    Attorneys for Debtor and Debtor in Possession

KL2:2271595.1

**Hearing Date: July 28, 2004 @ 10:00 a.m. EDT**
**Objection Deadline: July 26, 2004 @ 5:00 p.m. EDT**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
919 Third Avenue
New York, New York 10022
(212) 715-9100
Kenneth H. Eckstein, Esq. (KE-6021)
Robert T. Schmidt, Esq. (RS-8881)
Jack A. Hazan, Esq. (JH-3833)

Attorneys for Debtor and Debtor in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                            :

                                                  :   Chapter 11

**Elite Model Management Corporation,**           :

                                                  :   Case No. 04-10845 ( RDD )

                    Debtor.                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MOTION FOR ORDERS (I) APPROVING BIDDING PROCEDURES, INCLUDING A BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (II) APPROVING REPLACEMENT POST PETITION FINANCING (III) SCHEDULING A SALE APPROVAL HEARING (IV) APPROVING FORM AND MANNER OF NOTICE; (V) AUTHORIZING AND APPROVING (A) PURCHASE AGREEMENT WITH EMMCAC, LLC SUBJECT TO HIGHER AND BETTER OFFERS, (B) SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; AND (C) GRANTING RELATED RELIEF

TO:    THE HONORABLE ROBERT D. DRAIN,
       UNITED STATES BANKRUPTCY JUDGE:

Elite Model Management Corporation ("Elite New York" or the "Debtor"), as debtor and

debtor in possession, hereby submits this motion (the "Motion") under Sections 105(a), 363, 364

and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"),

and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") for the following orders:

KL2 2266339.8

A.      An order (the "Procedures Order") (i) approving the bidding procedures annexed hereto as Exhibit A (the "Bidding Procedures"), with respect to the proposed sale (the "Sale") of substantially all of the Debtor's assets (the "Assets"), pursuant to a Purchase Agreement (the "Agreement")[1] by and among the Debtor and EMMCAC, LLC (the "Purchaser"), a copy of which is annexed hereto as Exhibit B; (ii) approving a Break-up Fee and Expense Reimbursement pursuant to the Agreement; (iii) approving a Post Petition DIP Financing Agreement (the "Purchaser DIP Financing Agreement"), pursuant to which the good faith deposit under the Agreement will be utilized as borrowings to repay in full the Obligations under the Existing DIP Financing Agreement (hereinafter defined)[2]; (iv) scheduling an auction (the "Auction") and a hearing (the "Sale Approval Hearing") to approve the Sale; (v) approving the form and manner of notice of the Auction and the Sale Approval Hearing and setting objection, cure amount and bidding deadlines; and (vi) granting related relief; and

B.      An order (the "Sale Approval Order") (i) authorizing and approving (a) the Sale by the Debtor to the Purchaser (or the successful bidder at the Auction, as the case may be) of the Assets free and clear of all liens, claims, encumbrances and interests other than those expressly permitted by the Agreement, (b) the Debtor's assumption and assignment to Purchaser (or the successful bidder at the Auction, as the case may be) of certain executory contracts, leases and/or licenses pursuant to the Agreement, and (c) granting related relief.

---

[1]      A copy of the Agreement is attached hereto as Exhibit B. Unless otherwise defined, capitalized terms used in this Motion have the meanings ascribed to them in the Agreement. As to any conflicts with respect to such terms, the meanings contained in the Agreement will govern. Exhibits and schedules have been redacted and will be made available to Qualified Bidders.

[2]      The Debtor contemplates that it will seek entry of separate orders at the same hearing, one approving the Bidding Procedures and the other approving the Purchaser DIP Financing Agreement.

- 2 -

## Jurisdiction and Venue

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Procedural Background

2.      On February 11, 2004 (the "Commencement Date") the Debtor commenced its case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor continues to operate its business as a debtor-in-possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

3.      On February 27, 2004, the United States Trustee formed an Official Committee of Unsecured Creditors (the "Committee").

4.      On March 18, 2004, the Court approved the appointment of Alan M. Jacobs ("Jacobs") as the Debtor's Chief Restructuring Officer and AMJ Advisors, LLC ("AMJ") as the Debtor's restructuring consultant.

5.      On the Commencement Date, the Court entered an order (i) authorizing the Debtor, on an interim basis, to obtain postpetition financing from Careyes Funding Group LLC (the "DIP Lender"); and (ii) granting security interests and liens and according superpriority claim status in favor of the DIP Lender. Subsequently, by order dated March 19, 2004, (the "Final DIP Order"), this Court, inter alia, authorized the Debtor on a final basis to enter into that certain first amended debtor in possession credit agreement between the Lender and the Debtor dated as of March 18, 2004, as amended from time to time (the "Existing DIP Financing Agreement"). Pursuant to the DIP Financing Agreement, the Final DIP Order, and the other DIP Financing Documents (as defined in the Final DIP Order), the Debtor was authorized to borrow up to $1.5 million from the Lender under a secured term loan facility. Borrowings under the DIP

- 3 -

KL2:2266339.8

Financing Agreement are secured by first priority liens on substantially all of the Debtor's assets and have superpriority status as more fully set forth in the DIP Financing Agreement, the Final DIP Order, and related DIP Financing Documents.

### Company Background

6. Elite New York is a privately-held company incorporated in the state of New York. Its primary business consists of locating, developing and representing professional fashion models. In this regard, the Company manages, advises, counsels, promotes and negotiates on behalf of its models in the entertainment, print media, photography, advertising, industrial exhibition, runway, live show, video, internet, film and other industries.

7. For many years, the Debtor has been and continues to be recognized as one of New York's leading model management companies. Nonetheless, over the last few years, it has been forced to spend a significant portion of its income, and it has incurred serious distraction, dislocation and negative publicity, defending itself in several costly and highly-publicized litigations, including 3 class actions suits brought on behalf of former and current models. Additionally, a $4.3 Million judgment was entered prior to the Commencement Date in favor of a former employee, which judgment is subject to an appeal by the Debtor. The aggressive litigation pursued by the class action plaintiffs coupled with the significant pre-petition judgment contributed to a liquidity crisis at the Company, which precipitated its bankruptcy filing. Chapter 11 has provided the Debtor and its employees with a breathing spell from the litigation, permitting the efficient and orderly operation of the Debtor for the benefit of its true creditors, shareholders and employees, as well as the models it represents.

8. Apart from the litigation claims, the Debtor was substantially current with its pre-petition obligations, which is confirmed by the minimal number of claims (approximately 50) filed on or before the Court approved June 7, 2004 bar date. In any event, because of the

- 4 -

magnitude of the potential liability resulting from the litigation and the time and cost in defending all of the actions, the Debtor has determined that a sale of the Assets would maximize and preserve the value of the Debtor's estate and provide for the best recovery for creditors in this case.

9.     Accordingly, the Debtor commenced a process for the sale of substantially all of its assets. The Debtor retained Carl Marks Capital Advisors ("CMCA") as its financial advisor to assist the Debtor in its conduct of the sale process. CMCA, together with the Debtor, undertook an extensive marketing effort in order to locate the best offer for the purchase of the Assets. Numerous potential purchasers were identified and contacted, several of which executed confidentiality agreements and have conducted substantial due diligence.

10.     After extensive negotiations with several potential purchasers, the Debtor has determined that the Purchaser's proposal to purchase the Assets offered the most advantageous terms and greatest economic benefit to the Debtor and its estate. As a result of these arms'-length negotiations, the Agreement was signed on July 9, 2004.

11.     Under the Agreement, the Purchaser will acquire the Assets for $5 million in cash and the assumption of certain liabilities as provided in the Agreement. The Debtor believes that the Agreement, coupled with the proposed Bidding Procedures, will ensure that the Debtor obtains the highest and best price for the Assets.

### Purchase Agreement

12.     As described in more detail below, pursuant to the Agreement, the Debtor proposes to sell, assign and transfer to Purchaser, the Assets, free and clear of all liens, claims, encumbrances and other interests (other than those expressly assumed by Purchaser pursuant to the Agreement) (hereinafter, "Interests"). Any such Interest against or in the Assets will attach solely to the portion of the cash amount to be paid by Purchaser at closing ultimately attributable

- 5 -

KL2:2266339.8

to the Assets that are subject to such Interest, in the order of priority and with the same validity,

force and effect that such interest may now have against the Assets.

13. The significant terms of the Agreement are as follows:[3]

(a) Purchase Price. On the Closing Date, Purchaser shall (i) tender to Debtor an amount equal to $5 million in cash (including release of the Deposit (hereinafter defined)) (the "Closing Cash Payment") and (ii) assume certain liabilities (collectively with the Closing Cash Payment, the "Purchase Price").

(b) Deposit/DIP Loan. Upon execution of the Agreement, the Purchaser made a good faith deposit of $2,000,000 (the "Deposit"), which upon entry of the Procedures Order (including the order approving the Purchaser DIP Financing Agreement) shall be utilized to repay the DIP Lender in full under the Existing DIP Financing Agreement and shall be considered borrowings under a new DIP Financing Agreement with Purchaser as lender thereunder, a copy of which is annexed as Exhibit C hereto (the "Purchaser DIP Financing Agreement").

(c) Sale of Assets Free and Clear. At the Closing, the Debtor shall sell, assign, transfer, convey and deliver to Purchaser all of the Debtor's right, title and interest in the Assets free and clear of liens, claims and encumbrances.

(d) Bidding Protections. Upon consummation of a Sale with a Party other than Purchaser under certain conditions, Purchaser is entitled to receive (i) a fee in the amount of $150,000 (3% of Purchase Price) (the "Break-Up Fee") and (ii) an aggregate amount not to exceed $75,000 as reimbursement of its documented out-of-pocket expenses (the "Expense Reimbursement" and collectively with the Break-Up Fee, the "Bidding Protections").

## Bidding Procedures

14. Consistent with the Agreement, the Debtor is proposing the Bidding Procedures as the procedures most likely to maximize the realizable value of the Assets for the benefit of the Debtor's estate, creditors and other interested parties. Accordingly, the Debtor seeks approval of the proposed Bidding Procedures which are described in detail in the annexed Exhibit A.

15. In summary, the Bidding Procedures generally provide as follows:[4]

---

[3] This summary of the Agreement is provided as a convenience only. To the extent that the summary differs in any way from the terms of the Agreement, the terms of the Agreement shall control.

[4] The following is intended as a summary description of the Bidding Procedures. Any conflict shall be interpreted in accordance with the Bidding Procedures annexed hereto as Exhibit A.

- 6 -

KL2 2266339.8

(a)    Requirements for becoming a "Qualified Bidder";

(b)    A deadline for the submission of Qualified Bids of **August 18, 2004**;

(c)    Instructions for the submission of bids;

(d)    Bid requirements, including, without limitation:

(i)    submission of a proposed agreement marked to show changes from Purchaser's Agreement;

(ii)    confirmation of offer staying open until closing of a Sale subject to an earlier termination date as provided in the Qualified Bid;

(iii)    confirmation that bid is not conditioned on obtaining financing or the outcome of additional due diligence; and

(iv)    good faith deposit of $2,000,000.

(e)    Minimum bid in excess of the sum of (x) the amount of the **Purchase Price** being offered by the Purchaser, plus (y) the amount of the **Break-up Fee** and Expense Reimbursement, plus (z) $175,000;

(f)    Scheduling an Auction (the "Auction") to be held at the offices of Kramer Levin Naftalis & Frankel LLP on or about **August 23, 2004**;

(g)    Establishing procedures for the Auction, including $50,000 minimum bid increments; and

(h)    Scheduling a Sale Approval Hearing for the day following the Auction, subject to the Court's availability.

16.    The Debtor believes that the Bidding Procedures are designed to foster a fair and reasonable competitive bid process that will generate the highest and best sale price for the Acquired Assets. Accordingly, approval of the Bidding Procedures is in the best interest of the Debtor's estate.

### Bidding Protections

17.    Pursuant to this Motion, the Debtor seeks immediate approval of payment in certain circumstances of the Break-Up Fee and the Expense Reimbursement as set forth in Article VII of the Agreement.

- 7 -

KL2:2266339.8

18.   In recognition of this expenditure of time, energy and resources, and the benefits to the Debtor's estate of securing a "stalking horse" or minimum bid, the Debtor has agreed to provide the proposed Bidding Protections to Purchaser. Specifically, the Debtor seeks to provide to Purchaser (i) a break-up fee in the amount of $150,000 (3% of the Cash Purchase Price) and (ii) an expense reimbursement in an aggregate amount not to exceed $75,000 to be paid under certain conditions described in the Agreement.

19.   The Expense Reimbursement and the Break-Up Fee are fair and reasonable, and were negotiated by the parties in good faith and at arm's length.

20.   The Debtor's payment of the Expense Reimbursement and the Break-Up Fee to Purchaser, as set forth in the Agreement, is (i) an actual and necessary cost and expense of preserving the Debtor's bankruptcy estate, within the meaning of Section 503(b) of the Bankruptcy Code, (ii) of substantial benefit to the Debtor's estate, (iii) reasonable and appropriate, in light of the size, complexity and nature of the Sale and the efforts (and the significant due diligence costs and expenses) that have been and will be expended by Purchaser even though the proposed Sale to Purchaser is subject to higher or better offers, and (iv) necessary to ensure that Purchaser will continue to pursue its proposed acquisition of the Assets.

21.   The Expense Reimbursement and the Break-Up Fee were and are material inducements for, and conditions of, Purchaser's entering into the Agreement. Purchaser is unwilling to commit to hold open its offer to purchase the Assets under the terms of the Agreement unless it is assured of payment of the Expense Reimbursement and the Break-Up Fee. Assurance to Purchaser of payment of the Expense Reimbursement and the Break-Up Fee has promoted and will promote more competitive bidding by inducing Purchaser's bid that otherwise would not have been made, and without which bidding would have been and would

KL2 2266339 8

continue to be limited. Further, because the Expense Reimbursement and the Break-Up Fee

induced Purchaser to conduct extensive due diligence (and incur substantial expenses in respect

thereof) with respect to the Assets and to submit a bid that will serve as a minimum or floor bid

for all of the Assets on which other bidders and the Debtor can rely, Purchaser has provided a

benefit to the Debtor's bankruptcy estate by increasing the likelihood that the price at which the

Assets are sold will reflect or exceed their true worth.  Further, due to the need by the Debtor to

consummate a sale of the Assets in a relatively short time-frame to preserve their value, the

Break-up Fee and Expense Reimbursement are reasonable, fair and justified.

22.   Absent authorization of the payment of the Expense Reimbursement and the

Break-Up Fee, the Debtor may lose the opportunity to obtain the highest and best available offer

for the Assets and the downside protection afforded by the Agreement. In light of the benefit to

the Debtor's estate realized by having a fully negotiated Agreement, an Agreement which will

enable the Debtor to preserve the value of its business, ample support exists for approval of the

Expense Reimbursement and the Break-Up Fee as contemplated in the Agreement.

23.   Furthermore, the Break-up Fee and Expense Reimbursement will only be paid out

of the proceeds of a successful competing transaction and therefore will not cause the estate to

incur any additional expense out of its current assets.

24.   The Debtor has demonstrated a sound business justification for authorizing the

Break-Up Fee and the Expense Reimbursement. The Debtor thus requests that this Court approve

the Bidding Protections and authorize payment of the Break-Up Fee and the Expense

Reimbursement pursuant to the terms and conditions of the Agreement.

### Good Faith Deposit/Purchaser DIP Loan

25.   As previously described, Purchaser made a Deposit of $2,000,000 upon signing of

the Agreement.  Pursuant to the Agreement, upon entry of the Procedures Order, the Purchaser

- 9 -

KL2:2266339.8

and Debtor shall execute the Purchaser DIP Financing Agreement, pursuant to which a portion of the Deposit will be utilized to pay in full all obligations under the Existing DIP facility. Thereafter, pursuant to the Purchaser DIP Financing Agreement, Debtor shall have the right to convert additional portions of the Deposit to borrowings.

26.     The terms of the Purchaser DIP Financing Agreement are substantially similar to the Existing DIP Financing Agreement other than the following modifications:

(a)     Increase of the facility from $1,500,000 to $2,000,000.

(b)     Extension of the maturity date through the earlier of closing of the Sale or November 1, 2004.

(c)     Allows borrowing by the Debtor's subsidiaries, subject to receipt of guarantees from the subsidiaries.

27.     Approval of the Purchaser DIP Financing Agreement is a necessary component of the proposed transaction, as it enables the Debtor to continue to finance its operations through the closing of this or a competing transaction.  Furthermore, it provides the Debtor with additional borrowing availability in excess of the amount provided under the existing facility.

## Notice of Auction and Sale Approval Hearing

28.     The Debtor seeks to have the Auction scheduled for on or around August 24, 2004, and the Sale Approval Hearing set for on or around August 25, 2004, with an objection deadline set for no less than five (5) business days prior to the Sale Approval Hearing.

29.     Not later than three (3) business days after the entry the Bidding Procedures Order, the Debtor will serve a copy of the Auction and Sale Notice substantially in the form attached hereto as Exhibit D to be sent by first-class mail, postage prepaid to:  (i) the Office of the United States Trustee; (ii) the members of the Official Committee of Unsecured Creditors; (iii) counsel to the DIP Lender; (iv) counsel to the Fears class action plaintiffs;  (v) the Debtor's twenty (20) largest creditors; (vi) all entities known to have expressed an interest in purchasing

- 10 -

KL2 2266339 8

the Assets; (vii) all federal, state, and local regulatory or taxing authorities or recording offices which have a known interest in the relief requested by the Motion; (viii) the United States Attorney's office; (ix) the Internal Revenue Service; (x) all non-debtor Parties to contracts or licenses to be assumed and assigned under the Agreement; and (xi) all other entities that have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure (collectively, the "Notice Parties").

30.     Not later than five (5) business days after the entry the Procedures Order, the Debtor shall cause a notice (the "Publication Notice") substantially in the form of the Auction and Sale Notice to be published in the national edition of The New York Times.  Pursuant to Bankruptcy Rule 2002(1), such notice is good and proper notice to interested parties, including those whose identities are unknown to the Debtor.

### Assumption and Assignment of Contracts/Cure Notice

31.     As part of the Motion, the Debtor is seeking authority, pursuant to Sections 105(a) and 365 of the Bankruptcy Code, to (i) assume and assign to Purchaser, effective upon the Closing, certain leases, licenses or other executory contracts in accordance with the Agreement (collectively, the "Contracts") and (ii) execute and deliver to Purchaser such documents or other instruments as may be necessary to assign and transfer the Contracts to Purchaser, and to evidence Purchaser's assumption of the Assumed Liabilities pursuant to the terms of the Agreement.

32.     All monetary defaults of the Debtor under the Contracts arising or accruing prior to the Closing under the Agreement (without giving effect to any acceleration clauses or any default provisions of the kind specified in Section 365(b)(2) of the Bankruptcy Code) shall be cured by the Purchaser at or prior to Closing or as soon thereafter as practicable, and Debtor shall not have any further liability or obligation arising or accruing therefrom. Each non-debtor party

- 11 -

KL2 2266339.8

to a Contract shall be forever barred, estopped, and permanently enjoined from asserting against Purchaser, or its property, any default existing as of the Closing. The Purchaser shall pay all Cure Costs under the Contract at or prior to Closing to the extent required under the Agreement.

33.     To facilitate the assumption and assignment of the Contracts, the Debtor proposes to serve a cure amount notice (the "Cure Amount Notice") substantially in the form attached hereto as Exhibit E on the non-debtor parties to all such Contracts no later than five business days after the entry of the Procedures Order and request that the Court approve the following procedure for fixing any cure amounts owed on Contracts.

34.     The Debtor will attach to the Cure Amount Notice their calculation of the undisputed Cure Costs that the Debtor believes must be paid to cure all monetary defaults under all Contracts (the "Cure Amount"). If no amount is listed on the Cure Amount Notice, the Debtor believes that there is no Cure Amount due.

35.     The Debtor requests that unless the non-debtor party to a Contract files an objection to its scheduled Cure Amount before 4:00 p.m. (prevailing Eastern Time) on the date that is no less than five (5) business days before the Sale Approval Hearing and serves a copy of the objection so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on the same day, upon the Notice Parties, such non-debtor party shall (A) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Contract and the Debtor shall be entitled to rely solely upon the Cure Amount; and (B) be deemed to have consented to the assumption and assignment of such Contract and shall be forever barred and estopped from asserting or claiming against the Debtor, Purchaser or such other successful bidder or any other assignee of the relevant Contract that any additional amounts

- 12 -

KL2:2266339.8

are due or defaults exist, or conditions to assumption and assignment must be satisfied under such Contract.

36.    In the event that any objection to such assumption or assignment is timely filed, such objection must set forth (i) the basis for the objection and (ii) the amount the objecting party asserts as the Cure Amount. After receipt of the objection, the Debtor will attempt to reconcile any difference in the Cure Amount believed to exist by the non-debtor party. In the event, however, that the Debtor and the non-debtor party cannot consensually resolve their difference, the Debtor may, in its discretion, consummate the Sale and segregate any disputed Cure Amounts pending the resolution of any disputes by this Court or mutual agreement of the parties.

### Authority for Requested Relief
### Standard of Approval of the Sale of the Assets outside the Ordinary Course of Business

37.    Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). As described above, approval of the Bidding Procedures will greatly assist the Debtor in maximizing the value that they may obtain for the Assets. Consequently, the Debtor respectfully submits that granting the requested relief is "appropriate" under the circumstances.

38.    Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 1 i U.S.C. § 363(b)(1). The Debtor's sale or use of property of the estate outside the ordinary course of business should be approved by this Court if the Debtor can demonstrate a sound business justification for the proposed transaction. See e.g., In re Gucci, 126 F.3d at 387; In re Bethlehem Steel Corp., 2003 WL 21738964 *10 (S.D.N.Y. July 28, 2003).

- 13 -

KL2 2266339.8

39.    The Debtor respectfully submits that there is ample business justification for selling the Assets.  As previously described,  the Debtor determined that an orderly sale of their Assets through a well orchestrated auction process, thereby monetizing the Debtor's remaining substantial assets, would maximize and preserve the value of the Assets to the benefit of the Debtor's estate and creditors.

40.    Furthermore, the consideration to be paid for the Assets will be fair and reasonable.  The Debtor and its investment banker actively shopped the Assets for [several] months.  Furthermore, to dispel any doubt, the Sale to Purchaser is subject to competing bids through a Court-approved auction process, thereby enhancing the Debtor's ability to receive the highest and best value for the Assets. Consequently, the fairness and reasonableness of the consideration ultimately will be demonstrated by a "market check" through an auction process, which is the best means for determining whether a fair and reasonable price is being paid.

41.    Finally, creditors and parties in interest will receive adequate notice of the Bidding Procedures, the Auction and the proposed Sale pursuant to the procedures proposed above. Such notice is reasonably calculated to provide timely and adequate notice to the Debtor's major creditor constituencies, those parties most interested in this case, those parties potentially interested in bidding on the Assets and others whose interests are potentially implicated by the proposed Sale. The Debtor submits that such notice is sufficient for entry of the Sale Approval Order and satisfies requisite notice conditions for approval of the Sale under Section 363(b) of the Bankruptcy Code.

42.    Under these circumstances, sound business reasons exist that justify the sale of the Assets, and accordingly, the Debtor respectfully request that the proposed Sale to Purchaser be approved pursuant to Section 363 of the Bankruptcy Code.

- 14 -

**Approval of the Bidding Procedures is in the**
**Best Interest of the Debtor's Estate**

43.     The Debtor submits that approval of the Bidding Procedures is in the best interests of the Debtor and its creditors because the Bidding Procedures will enable the Debtor to preserve and maximize the value of the Assets.

44.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See, e.g., In re Food Barn Stores, Inc., 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); In re Integrated Resources, Inc., 147 B.R. 650, 659 (S.D.N.Y. 1992) ("'It is a well-established principle of bankruptcy law that the ... Debtor's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.'"). To that end, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. See id. (such procedures "encourage bidding and maximize the value of the debtor's assets").

45.     Although the Debtor is only seeking approval to consummate the transaction after the conclusion of an Auction, the Debtor is requesting immediate authority to implement the Bidding Procedures and to enter into binding agreements thereunder. Section 105(a) of the Bankruptcy Code provides in pertinent part that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code." Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." In general, a debtor may use, sell or lease property of the estate outside of the ordinary course of its business where the sale represents an exercise of the debtor's "sound business judgment". See,

- 15 -

e.g., Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983). See also Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991)); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986); In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 145-47 (3d Cir. 1986); In re Titusville Country Club, 128 B.R. 396, 398 (Bankr. W.D. Pa. 1991).

46.   The implementation of bidding procedures to facilitate the sale of a debtor's assets is routinely approved by courts, including courts in this District. See, e.g., In re Alphastar Insurance Group Ltd., Case No. 03-17903 (SMB) (February 13, 2004) (order approving auction procedure for sale of 100% of debtor's issued and outstanding shares); In re Spiegel, Inc., Case No. 03-11540 (CB) (February 3, 2004) (order authorizing auction, establishing bidding procedures, and approving stalking horse protections in sale of debtor's real property); In re Loral Space & Communications LTD., Case No.s 03-41709 through 03-41728 (RDD) (August 18, 2003) (order authorizing and approving bidding procedures for auction of certain of debtor's assets); Heartland Securities Corp., Case No. 03-11817 (ALG) (April 10, 2003) (order scheduling auction and approving sale procedures and bidding protections for debtor's assets).

47.   The Debtor submits that the Bidding Procedures are tailored specifically to facilitate a timely and efficient sale process for the Acquired Assets, while preserving and protecting the rights of any party in interest to object or otherwise respond to any proposed sale.

48.   Based on the foregoing, the Debtor, in its business judgment, believes that the Bidding Procedures are in the best interests of its estate and creditors and are necessary to preserve the value of its Assets.

- 16 -

KL2:2266339.8

## The Payment of the Break-Up Fee and Expense Reimbursement is Warranted

49.     As noted above, pursuant to the Purchase Agreement, the Debtor has agreed, subject to Court approval, to pay Purchaser a Break-Up Fee of $150,000 and an Expense Reimbursement not to exceed $75,000 upon consummation of a sale of the Assets to a successful Bidder at the Auction other than Purchaser. The Debtor submits that the Break-Up Fee and the Expense Reimbursement provisions of the Purchase Agreement are reasonable and represent a sound exercise of the Debtor's business judgment.

50.     Section 363(b)(1) of the Bankruptcy Code provides:

> [t]he trustee, after notice and a hearing, may use sell, or
> lease, other than in the ordinary course of business,
> property of the estate.

11 U. S. C. § 363(b)(1). The applicable principle of law for the use of assets pursuant to section363(b)(1) of the Bankruptcy Code is that it is appropriate in circumstances where a transaction represents a reasonable business judgment on the part of a debtor. See In re Gucci, 126 F.3d 380 (2d Cir.1997) ("[a] sale of a substantial part of a Chapter 11 estate may be conducted if a good business reason exists to support it"); In re Chateaugay Corp., 973 F.2d 141 (2d Cir.1992) (holding that there must be a good business reason to grant a motion to sell assets under Bankruptcy Code § 363(b)).

51.     Moreover, it is well established that "[a] bankruptcy court should uphold a break-up fee which was not tainted by self-dealing and was the product of arm's length negotiations." In re Integrated Resources, Inc., 147 B.R. 650, 658 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993). In the instant case, the proposed Break-Up Fee is the product of good faith, arm's length negotiations between the Debtor and Purchaser. The Break-Up Fee is fair and reasonable in proportion to the time, effort, cost, and expense that Purchaser has incurred in negotiating the Purchase Agreement and the aggregate consideration to be paid by Purchaser

- 17 -

KL2:2266339.8

thereunder. Indeed, the Break-Up Fee is only approximately 3% of the purchase price of the Assets, and, therefore, well within the range approved in this district in other cases. If higher or better offers for the Purchased Assets are received, it will be because Purchaser has served as a "stalking horse" for such offers and generated interest among other parties in participating in the Auction.

52.     Bankruptcy courts have approved bidding incentives comparable to the Break-Up Fee and Expense Reimbursement requested here under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. Thus, the approval of termination fees and other forms of bidding protections in connection with the sale of significant assets pursuant to section 363 of the Bankruptcy Code has become an established practice in chapter 11 cases. See, e.g., In re Loral Space & Commissions Ltd., Case No. 03-41710(RDD) (Approving break-up fee and expense reimbursement); In re Magellan Health Services, Inc., Case No. 03-405115 (PCB) (Bankr. S.D.N.Y. 2003) (approving termination fee, commitment fee, and reimbursement of expenses); In re Bradlees Stores, Inc., Case Nos. 00-16033 (BRL) through 00-16036 (BRL) (Bankr. S.D.N.Y 2000) (approving termination fee and reimbursement of expenses); Integrated Resources, 147 B.R. at 662 (approving termination fee plus reimbursement of expenses); In re Marrose Corp., 1992 WL 33848 at *5 (Bankr. S.D.N.Y 1992) (bidding incentives are "meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"); In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 879 (Bankr. S.D.N.Y 1990) (approving termination fee); In re 995 Fifth Ave. Assocs., L.P., 96 B. R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a white knight to

- 18 -

KL2.2266339.8

enter the bidding by providing some form of compensation for the risks it is undertaking")
(citation omitted).

53.    Payment of the Expense Reimbursement and Break-Up Fee will not diminish the Debtor's estate. The Debtor will incur the obligation to pay the Break-Up Fee only upon consummation of another Sale. Further, the Break-Up Fee will only be paid upon the consummation of a Sale and will be paid from the proceeds thereof.

54.    The Expense Reimbursement and Break-Up Fee are the product of extensive good faith, arm's-length negotiations between the Debtor and Purchaser. They are fair and reasonable in amount, particularly in view of Purchaser's efforts to date, the risk to Purchaser of being used as a "stalking horse," and the stabilizing effect that the execution of the Agreement is expected to have on the Debtor's orderly liquidation process, thereby preserving value for creditors and increasing the likelihood of additional bidding.

55.    Further, the Expense Reimbursement and Break-Up Fee already have encouraged competitive bidding, in that Purchaser would not have entered into the Agreement without these provisions. Similarly, Purchaser's offer, which was formulated only after an extensive due diligence, provides a minimum bid on which other bidders can rely, thereby setting a floor for the sale of the Assets. Finally, the mere existence of the Expense Reimbursement and Break-Up Fee permits the Debtor to insist that competing bids for the Assets be higher or otherwise better than the Purchase Price under the Agreement, a clear benefit to the Debtor's estates.

56.    Furthermore, absent authorization of the payment of the Expense Reimbursement and Break-Up Fee, the Debtor may lose the opportunity to obtain the highest and best available offer for the Assets and the downside protection afforded by the Agreement. In light of the benefit to the Debtor's estate realized by having a fully negotiated Agreement, an Agreement

- 19 -

KL2:2266339.8

which will enable the Debtor to preserve the value of its business, ample support exists for the approval of the Expense Reimbursement and Break-Up Fee as contemplated in the Agreement.

57.     The Debtor's payment of the Expense Reimbursement and Break-Up Fee to Purchaser is (i) an actual and necessary cost and expense of preserving the Debtor's estate, within the meaning of section 503(b) of the Bankruptcy Code; (ii) of substantial benefit to the Debtor's estate; (iii) reasonable and appropriate, including in light of the size, complexity and nature of the Sale and the efforts (and the significant due diligence costs and expenses) that have been and will be expended by Purchaser even though the proposed Sale is subject to higher or better offers; and (iv) necessary to ensure that Purchaser will continue to pursue its proposed acquisition of the Assets. The Debtor accordingly requests that the Court authorize payment of the Expense Reimbursement and Break-Up Fee pursuant to the terms and conditions of the Agreement.

### Sale Free and Clear of Liens and Interests under Section 363(f) of the Bankruptcy Code.

58.     Under Section 363(f) of the Bankruptcy Code, a debtor in possession may sell property free and clear of any interest in such property of an entity other than the estate only if, among other things:

> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)     such interest is in bona fide dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Satisfaction of any one of the above five requirements will suffice to permit

KL2 2266339 8

the sale of the Acquired Assets "free and clear" of Interests.

59.     The holders of interests in the Acquired Assets will he adequately protected

because their Interests will attach to the Closing Cash Payment ultimately attributable to the

Acquired Assets against or in which such holders have Interests, subject to any claims and

defenses the Debtor may possess with respect thereto.  Furthermore, the Debtor's DIP Lender,

the only party known to have asserted a security interest in the Acquired Assets, will be paid in

full out of the Purchaser's Deposit immediately upon approval of the Procedures Order.

Accordingly, the Sale should be approved, free and clear of Interests under Section 363(f) of the

Bankruptcy Code.

### Assumption and Assignment of Contracts

60.     Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that the

trustee may assign an executory contract or unexpired lease of the debtor only if - -

> (A)     the trustee assumes such contract or lease in accordance with the
> provisions of this section; and
>
> (B)     adequate assurance of future performance by the assignee of such contract
> or lease is provided, whether or not there has been a default in such contract or
> lease.

11 U.S.C. § 365(2). Under Section 365(a) of the Bankruptcy Code, a debtor, "subject to the

court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

11 U.S.C. § 365(a). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements

for assuming an unexpired lease or executory contract of a debtor. This subsection provides:

> (b)(1)     If there has been a default in an executory contract or unexpired lease of the
> debtor, the trustee may not assume such contract or lease unless, at the time of assumption of
> such contract or lease, the trustee
>
> > (A)     cures, or provides adequate assurance that the trustee will promptly cure,
> > such default;

- 21 -

(B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

61.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical pragmatic construction." *EBG Midtown South Corp. v. McLaren/Hart Envtl. Engineering Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 992) (citations omitted), aff'd, 993 F.2d 300 (2d Cir. 1993); see *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*. 103 B.R. 524, 538 (Bankr. D.N.J. 1988) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance").

62.    Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., *In re Bygaph, Inc.*, 56 BR. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

63.    To the extent that any monetary defaults exist under any Contracts, such defaults will be cured prior to the assumption and assignment of such agreement. The Debtor represents that Purchaser has sufficient financial resources and experience to adequately assure the non-debtor parties to the Contracts of future performance. Accordingly, the Debtor submits that the assumption and assignment of the Contracts should be authorized. Except as otherwise provided in the Agreement, Purchaser (or a Successful Bidder, as the case may be) and its designee will

- 22 -

KL2 2266339.8

not be liable for any obligation to the non-debtor party to the Contracts arising before the Closing Date and the Debtor will be relieved of any liability arising after the Closing Date pursuant to 1 1 U.S.C. § 365(k).

### Good Faith Purchaser under Section 363(m) of the Bankruptcy Code

64.    The Agreement has been negotiated at arms' length and in good faith and, thus, Purchaser is entitled to the protections of Section 363(m) of the Bankruptcy Code as a good faith purchaser. Although the Bankruptcy Code does not define "good faith", the Second Circuit in Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 390 (2d Cir. 1997) has held that the "[g]ood faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings." As set forth above, Purchaser was selected by the Debtor and its financial advisor only after exploring all other alternatives, expending substantial resources in negotiating with other potential purchasers and determining that Purchaser's terms were more favorable to the Debtor than those submitted by any other party.  Accordingly, the Debtor requests that this Court make a finding that the Agreement was reached at arms' length and that Purchaser is entitled to the protections of Section 363(m) of the Bankruptcy Code.

### Approval of the Purchaser DIP Financing Agreement is Warranted Under Section 364(c) of the Bankruptcy Code

65.    Ample justification exists for the approval of the Purchaser DIP Financing Agreement under Section 364(c) of the Bankruptcy Code.  The new facility will allow the Debtor to maintain a liquidity cushion necessary to continue its operations pending consummation of the sale.  The current facility expires on July 30, 2004 and will require additional fees as well as other requirements to further extend the maturity date.  Furthermore, the current facility only provides $1.5 million of borrowings, while the Purchaser facility will provide $2 million.

- 23 -

KL2 2266339.8

66.    Section 364(c) of the Bankruptcy Code provides that if a debtor is unable to obtain unsecured credit allowable as an administrative expense allowable under section 503(b)(1) of the Bankruptcy Code, then the Court, after notice and a hearing, may authorize the debtor in possession to obtain or incur debt on, inter alia, the following bases:

- with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

- secured by a lien on property of the estate that is not otherwise subject to a lien; or

- secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § § 364(c)(1), (2) and (3).

67.    At the outset of this case, the Debtor was unable to obtain alternative financing on an unsecured basis. Given the current posture of this chapter 11 case, the Debtor believes that unsecured financing is still unavailable to it, and that the Purchaser DIP Financing is the only viable option available to the Debtor at this juncture. Moreover, while the Debtor could continue to utilize the existing DIP facility, the cost to extend that facility through closing is prohibitively expensive and the current facility does not provide the Debtor with sufficient availability and flexibility to operate its business through closing of the sale transaction.

68.    The terms and provisions of the facility were negotiated at arms' length and in good faith by the Debtor and the Lender. In fact, the terms of the new facility are more favorable to the Debtor than the terms of the current facility. Based on the foregoing, the Purchaser and new DIP Lender should be afforded the benefits of section 364(e) of the Bankruptcy Code.

69.    Accordingly, the Debtor believes that the Purchaser DIP Financing Agreement is in the best interests of its estate, its creditors and all parties in interest, and hereby requests that the Court grant the relief requested.

- 24 -

KL2 2266339 8

## Relief from Rule 6004(g) of the Bankruptcy Rules

70.     Rule 6004(g) of the Bankruptcy Rules provides that an "order authorizing the use, sale, or lease of property is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." The Debtor requests any order approving the Sale in accordance with the Bidding Procedures be effective immediately upon entry of such order by providing that the ten-day stay shall not apply.

## Notice

71.     The Debtor proposes to give notice of this Motion by first class mail postage pre-paid to the Notice Parties.  The Debtor submits that such notice constitutes good and sufficient notice of this Motion and all proceedings to be held thereon, and that no other or further notice need be given.

WHEREFORE, the Debtor respectfully requests entry of the proposed Procedures Order.  In addition, assuming that this Court enters the Procedures Order, the Debtor respectfully request entry of a Sale Approval Order (after the Sale Approval Hearing) authorizing the Sale and granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
        July 14, 2004

KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/ Robert T. Schmidt
Kenneth H. Eckstein, Esq. (KE-6021)
Robert T. Schmidt, Esq. (RS-8881)
Jack A. Hazan, Esq. (JH-3833)
919 Third Avenue
New York, New York  10022
(212) 715-9100

Attorneys for Debtor and Debtor in Possession

- 25 -

KL2 2266339.8