**SUPREME COURT OF THE STATE OF NEW YORK**
**NEW YORK COUNTY**

| | |
|---|---|
| ANGELA SHELTON, TIFFANY CONNOR, CAROLYN FEARS, SHEILA JOHNSON, and RACHEL SHEA, on their own behalf and on behalf of the classes of similarly situated persons set forth below,<br><br>Plaintiffs,<br><br>v.<br><br>ELITE MODEL MANAGEMENT, INC.; ELITE MODEL MANAGEMENT S.A.; ELITE GROUP S.A. (a/k/a ELITE S.A.); GERALD MARIE; JOHN CASABLANCAS; ALAIN KITTLER; MONIQUE PILLARD; 1 MODEL MANAGEMENT; SCOTT LIPPS; FORD MODELS, INC.; GERARD W. FORD (a/k/a GERRY FORD); EILEEN FORD; MARY KATHERINE FORD (a/k/a KATIE FORD); MARION SMITH; JOSEPH HUNTER; WILHELMINA INTERNATIONAL, LTD.; WILHELMINA MODELS, INC.; LOREX A.G.; DIETER ESCH; NATASHA ESCH; ANA-GABY ESCH; ROBERT KREUSLER; CREATION MANAGEMENT LLC; BRAD KRASSNER; THE KRASSNER FAMILY FOUNDATION; BOSS MODELS, INC.; DAVID BOSMAN; CLICK MODEL MANAGEMENT, INC.; JOSEPH GRILL; FRANCES GRILL; ALLAN MINDEL; COMPANY MODELS; MICHAEL FLUTIE; ROBERT FLUTIE; MFME MODEL MANAGEMENT COMPANY LTD.; ID MODEL MANAGEMENT; PAOLO ZAMPOLLI; GEORGE GALLIER; IMAGES MANAGEMENT; HEINZ VOLLENWEIDER; IMG MODELS, INC.; INTERNATIONAL MANAGEMENT GROUP, INC.; KARIN MODELS LLC; JEAN-LUC BRUNEL; MARILYN MODEL MANAGEMENT INC., d/b/a MARILYN AGENCY; MARILYN GAUTHIER; METROPOLITAN MODEL AGENCY USA, INC. ; THOMAS ZEUMER; METROPOLITAN MODELS, PARIS; MICHEL LEVATON; NEW YORK MODELS, a/k/a NEW YORK MODEL MANAGEMENT; NEXT MANAGEMENT CORP.; FAITH KATES; WILCOR GROUP; CLAXON INC.; PARTNERSHIP HOLDING; JOEL WILKENFELD; DOUGLAS ASCH; Q MODEL MANAGEMENT, a/k/a QUE MODEL | Index No.  601076/2003<br><br><u>AMENDED COMPLAINT</u><br><br><br><u>JURY TRIAL DEMANDED</u> |

MANAGEMENT; DIVA ENTERTAINMENT; T MANAGEMENT; WOMEN MODEL MANAGEMENT, a/k/a MEN/WOMEN MODEL MANAGEMENT; PAUL ROWLAND; and BARBARA LANTZ;

Defendants.

Plaintiffs, on their own behalf and on behalf of the several classes of similarly situated persons described below, by their undersigned counsel, as and for their Amended Complaint in this action, aver as follows, with knowledge of their own actions and conduct and events occurring in their presence, and upon information and belief as to all other matters:

## NATURE OF THE ACTION

1.    For the past 30 years, the modeling industry in New York has operated in knowing violation of state laws enacted a century ago to regulate their industry. During that time, almost without exception, modeling agencies in New York

   a.   have not been licensed by the Department of Consumer Affairs, as required by Article 11 of the New York General Business Law;

   b.   charged models in excess of the 10% commission permitted by GBL Article 11; and

   c.   used false and misleading contracts that purported to evade Article 11 by disavowing any representations regarding finding work for the models – flatly contrary to the actual representations made by the agencies to their models.

2.    The industry has maintained this situation through the years by a variety of methods:

   a.   in the 1970s, the agencies then active each resigned their licenses, created a trade association specifically for "managers" who were not licensed, and defendant Ford quashed a subpoena from the Department of Consumer Affairs challenging the industry's move;

   b.   in the 1980s and 1990s, the industry closely monitored cases alleging (and holding) that self-proclaimed "managers" were required to be licensed, and

2

worked to develop standard contracts that purported to disavow any obligation to find work for the models;

c.    in the 1990s, defendants and their trade association made false representations to the Department of Consumer Affairs and state officials about the nature of the services they provide;

d.    also in the 1990s, defendants lobbied to change the law to grant them the specific exemption they now claim not to need – a change they did not get.

3.    The agencies' ongoing misrepresentation of their business – and their need to stick together in making those misrepresentations – has created a dysfunctional and corrupt ethos that now permeates the industry. A 1999 meeting of the industry's trade association illustrates this point. Members of the trade association were advised by defendant Boss Models that some of Boss' former models had complained to the Department of Consumer Affairs ("DCA") about Boss, which at that time was notorious for withholding payments from models. However, Boss also raised the concern that any scrutiny from the DCA might lead to the entire industry being regulated. Faced with that choice – encourage models to report dishonest agencies, or risk DCA regulation – the trade association's draft meeting minutes show that the members agreed not to encourage models to report any complaints to the DCA.

4.    Corrupt and dishonest practices have flourished as a result of the industry's peculiar status. For years, certain of the largest agencies – including Ford, Elite, and Wilhelmina – circumvented the law by using "captive" affiliates to book models for Screen Actors' Guild and AFTRA jobs that had to be booked through licensed agents, and took undisclosed kickbacks from licensed agents who booked models into union jobs. This conduct proves the hypocrisy of the agencies' claim to be "managers", since a true manager has a fiduciary duty to disclose any such compensation to his or her client – yet the agencies in question, to this day, fail to acknowledge that there was anything wrong in receiving these undisclosed payments.

3

5.    The industry has claimed that the lack of any recent enforcement action by the DCA somehow validates their position, but the above conduct, and other evidence of false representations by the industry to the DCA and state officials, flatly contradicts the agencies' claims to be "managers" who principally advise models on their "image" and career, and only incidentally book work for the models they represent.  As one Ford booker succinctly put it in January 2003, "if we sat here trying to create images we'd be out of a job in six months.  It's not about an image, it's about dollars.  It's about finding a catalogue model and making her just that."

6.    As its final defense against regulation, the industry has pleaded poverty, and claimed that it cannot operate without regularly charging a 20% commission to the model and a 20% "service charge" to the client who books the model – for a total of one-third of each dollar spent by the client on the booking.  This is legally irrelevant; it also ignores the fact (acknowledged by defendant Gerry Ford and others) that the industry's costs have always risen to meet its revenues.  For example, the agencies now pay millions in referral fees to out of town "mother agents" and convention operators who find and pass on models to the New York agencies.  The fact that these payments are usually made without the knowledge or consent of the models themselves is a separate, distinct breach of the "manager's" duty of fairness and full disclosure to the model.

7.    Defendants also seem not to have realized that their pricing practices have created a self-perpetuating system in which they need to charge exorbitant (and unlawful) rates because they are generally excluded from the more lucrative fields of film and television work, and that models who become successful in those fields, aware that they were gouged, replace their "model managers" at the earliest opportunity with true agents and (if necessary) managers.

4

Documents recently produced by talent agency ICM, testimony from longtime industry leader

John Casablancas (founder of Elite), and other evidence, all confirm the basic conflict between

"model managers" and genuine talent agents who work in TV and film – a conflict that would

not exist if the industry had chosen to comply with the law.

8.      Plaintiffs therefore bring this action, asserting individual claims for damages and

declaratory relief against specific agencies based on specific practices engaged in by those

agencies, as well as proposed class action claims for damages and injunctive relief on behalf of

the following classes:

a.      The Model Agency Class consist of all current and former professional models who booked work through any of the defendant agencies from 1971 through the present, and seeks injunctive relief and damages under Section 349 and Article 11 of the General Business Law against each such agency and each person who owned 10% or more of each such agency and participated in the management of the agency, as well as under common law theories of liability, jointly and severally;

b.      The Elite Class consists of current and former professional models who are or have been represented by Defendant Elite Model Management Corp. and its affiliates from 1977 to the present, and seeks additional damages against Elite and its owners for specific practices engaged in by Elite during that time;

c.      The Wilhelmina Class consists of current and former professional models who were represented by Wilhelmina Models, Inc. from 1989 to the present and seeks additional damages against Elite and its owners for specific practices engaged in by Wilhelmina during that time;

d.      The Ford Class consists of current and former professional models represented by Ford Models, Inc. from 1989 to the present and seeks additional damages against Ford and its owners for specific practices engaged in by Ford during that time; and

9.      The claims asserted herein include both claims asserted as supplemental to the

federal antitrust claims in an action filed last year in the Southern District of New York, <u>Masters</u>

<u>v. Wilhelmina</u>, No. 02-CV-4911 (HB)(HBP), over which the federal court has declined to exercise

supplemental jurisdiction, and additional claims that were discovered only after that action was

filed. Plaintiffs had hoped to litigate their claims in one forum, but have been required to file this separate action to assert their state-law claims.

## PARTIES

10. Plaintiff Angela Shelton is a resident of Los Angeles, California, who was represented by IMG and Elite during the Elite and Model Agency Class Periods. She brings this action on her own behalf and on behalf of the Elite and Model Agency Classes.

11. Plaintiff Tiffany Connor is a resident of California. She is a professional model who was represented by Wilhelmina beginning in about 1988. She brings this action on her own behalf and on behalf of the Wilhelmina and Model Agency Classes.

12. Plaintiff Carolyn Fears is a resident of California who was represented by Ford from 1989 through 2000. She brings this action on her own behalf and on behalf of the Ford and Model Agency Classes.

13. Plaintiff Sheila Johnson is a resident of Los Angeles, California. She is a professional model and actress who was represented by Elite from 1979 until the early 1990s. She brings this action on her own behalf and as a representative of the Elite and Model Agency Classes.

14. Plaintiff Rachel Shea is a resident of New York, New York who had a written agreement with Elite to represent her from 2000 through 2002. She brings this action on her own behalf and as a representative of the Elite and Model Agency Classes.

15. Defendant Elite Model Management Corp. (hereafter "Elite") purports to be a corporation duly organized under the laws of the State of New York with its principal place of business located at 111 East 22nd Street, 2nd Floor, New York, New York, 10010. Its shareholders

6

reportedly include defendants Marie, Pillard and Elite Model Management S.A. Elite is one of the Model Agency Defendants, defined below.

16. Defendant Elite Model Management S.A. is reported to be a European corporation and the parent company of Elite. Though nominally a separate company from Elite, Elite Model Management S.A. acts in various ways as the alter ego of Elite, including through the commingling of funds and personnel and failure to follow corporate formalities, and by engaging in various activities on Elite's behalf which render it Elite's alter ego as a matter of law, including accepting payments in its European accounts from European clients for work done by models who are represented by Elite in order to avoid tax liabilities.

17. Defendant Elite Group S.A. is reported to be a European corporation and the parent company of Elite Model Management S.A. Though nominally a separate company from Elite, Elite Group S. A. acts in various ways as the alter ego of Elite, including through the commingling of funds and personnel and failure to follow corporate formalities, and by engaging in various activities on Elite's behalf which render it Elite's alter ego as a matter of law.

18. Defendant Gerald Marie, a/k/a Gerald Marie de Castellac, is a part-owner of Elite S.A. and succeeded Casablancas as chief executive of Elite and its affiliated companies in about 1999.

19. Defendant John Casablancas was the founder and at least a part-owner of Elite and its affiliates since the 1970s. He served as the chief executive of Elite and its related companies until about 1999. He currently resides at 260 Island Drive, Key Biscayne, Florida 33149.

20. Defendant Monique Pillard was an employee of Ford Models whom Casablancas hired in the late 1970s to build Elite's New York operations. She has remained with Elite since

7

that time, and her loyalty has been rewarded with a 10% equity interest in Elite. She currently claims to reside in Pennsylvania while continuing to work at Elite.

21. Defendant Alain Kittler has been a part-owner of Elite, either directly or through its parent companies, since the 1970s, and Elite's own documents show that he has been involved in the operations and management of Elite at various points during that time.

22. Defendant 1 Model Management is reported to be a New York corporation with its principal place of business at 424 West Broadway, New York, New York 10012. Marie has testified that 1 Model Management is and always has been a wholly-owned subsidiary of Elite. 1 Model Management is one of the Model Agency Defendants, defined below.

23. Defendant Scott Lipps is a resident of New York City and is reported to be the founder, President and at least part owner of 1 Model Management. He is also reported to be the former President of Defendant Karin Models.

24. Defendant Ford Models, Inc. is a Delaware corporation authorized to do business in the state of New York, with its principal place of business located at 142 Greene Street, New York, New York 10012. Ford is one of the Model Agency Defendants, defined below.

25. Defendant Gerard W. Ford (a/k/a Gerry Ford) is the co-founder and co-chairman of the board of Ford Models Inc. He currently resides at 10 Fieldview Lane, Califon, New Jersey 07830.

26. Defendant Eileen Ford is the co-chairman of the board of Ford Models Inc. and co-founder of the Ford agency. She currently resides at 10 Fieldview Lane, Califon, New Jersey 07830.

27. Defendant Mary Katherine Ford (a/k/a Katie Ford) was appointed co-president of Ford in 1993, became the agency's sole president in 1995 and continues to be active in running the agency. She reportedly has held an equity stake in the agency from at least that time forward.

28. Defendant Marion Smith is a resident of the State of New York and the Vice President of New York Model Management. Smith is also a former co-president of Ford, in which she held an equity interest of 10% or more. Smith also was the former managing director of Company Management.

29. Defendant Joseph Hunter (a/k/a Joey or Joe Hunter) was a co-president of Defendant Ford in the 1990s, in which he held an equity interest of 10% or more. After leaving Ford, Hunter opened Defendant Karin Models in New York in 1997, and reportedly obtained an equity stake in that company. He currently resides at 238 McManus Road North Patterson, New Jersey 12563.

30. Defendant Wilhelmina Models, Inc. ("Wilhelmina") purports to be a corporation duly organized under the laws of the State of New York with its principal place of business located at 300 Park Avenue South, New York, New York 10010. Wilhelmina is one of the Model Agency Defendants, defined below.

31. Defendant Wilhelmina International, Ltd. is the parent company of Wilhelmina and reportedly maintains its principal place of business at 300 Park Avenue South, New York, New York, 10010. It is sued here both in its capacity as the parent of Wilhelmina, whose operations it directs and controls, as well as in its capacity as the successor-in-interest to Wilhelmina Model Agency, Inc., which is the corporation that entered into an agreement and conspiracy with other model agencies in the early 1970s to resign their licenses with the Department of Consumer Affairs and falsely claim that they were not employment agencies

subject to regulation under state law. Wilhelmina International is one of the Model Agency Defendants, defined below.

32. Defendant Lorex A.G. is a foreign corporation located in Switzerland which was reportedly owned by one or more of Natasha Esch, Dieter Esch, and Ana-Gaby Esch, and held an equity stake in Wilhelmina of 50% or more throughout the Wilhelmina Class Period.

33. Defendant Dieter Esch acquired control of Wilhelmina and Wilhelmina International in about 1989, reportedly through defendant Lorex A.G. One or more of Dieter Esch, Natasha Esch, and Ana-Gaby Esch, have owned (directly or through Lorex), controlled and overseen the operations of Wilhelmina since that time. Esch himself recently retired as co-president of Wilhelmina, but has not given up his equity stake.

34. Defendant Ana-Gaby Esch, who currently resides at 15 Butlers Island Road, Darien, Connecticut 06820, is the former wife of Dieter Esch and, according to Dieter Esch's testimony, owned and was personally involved in the management of Wilhelmina and/or Wilhelmina International during the 1990s, including personally involved in dealing with members of the Wilhelmina Class and signing contracts with models.

35. Defendant Natasha Esch, who currently resides at 7374 Beverly Boulevard, Los Angeles, California 90036, is the daughter of Dieter Esch. She was also reported to have an equity interest in the agency, and ran the agency from about 1993 through 1997. She was also personally involved in dealing with members of the Wilhelmina Class.

36. Defendant Robert Kreusler is a co-owner of Creation Management LLC, which reportedly owns a 50% equity state in Wilhelmina. He currently resides at 927 Lincoln Road, Suite 200, Miami Beach, Florida 33139.

37.    Defendant Creation Management LLC, which is reportedly owned by Robert Kreusler, Brad Krassner, and The Krassner Family Foundation, reportedly owns a 50% equity stake in Wilhelmina.

38.    Defendant Brad Krassner, through The Krassner Family Foundation, is the co-owner of Creation Management LLC, which reportedly owns a 50% equity stake in Wilhelmina. Mr. Krassner, who is also the chairman of Wilhelmina, is reportedly a Florida resident.

39.    Defendant The Krassner Family Foundation reportedly is a part-owner of Creation Management LLC and Wilhelmina. Dieter Esch has testified that The Krassner Family Foundation owns Creation Management LLC.

40.    Defendant Boss Models, Inc. is reported to be a corporation established under and pursuant to the laws of the state of New York with its principal place of business located at 1 Gansevoort Street, New York, New York 10014. Boss is one of the Model Agency Defendants, defined below.

41.    Defendant David Bosman founded Boss Models in 1988 where he holds the position of President. He currently resides at 1641 Jefferson Avenue, Miami Beach, Florida 33139-7602.

42.    Defendant Click Model Management, Inc. is reported to be a corporation maintaining its principal place of business at 129 West 27th Street, New York, New York 10001. Click is one of the Model Agency Defendants, defined below.

43.    Defendant Joseph Grill has been the vice president of Click and a part-owner of the agency since at least 1994. He is believed to be a resident of New York City.

11

44.    Defendant Frances Grill is the co-founder and current president of Click. She has remained a co-owner of the agency throughout the Class Period.  She is believed to be a resident of New York City.

45.    Defendant Allan Mindel was a co-founder of Defendant Click Model Management in about 1979 and both held an equity stake in Click and helped run the agency during that time.

46.    Defendant Company Models (a/k/a MFME Model Management Company Ltd.) has its principal place of business located at 270 Lafayette Street New York, New York 10012. Company is one of the Model Agency Defendants, defined below.

47.    Defendant Michael Flutie was the president of Company agency and reportedly owned 10% or more of the agency during the class period. He currently resides at 28 East 10th Street, New York, New York, 10003.

48.    Defendant Robert Flutie reportedly founded Defendant Company Model Management in 1989 and owned at least 10% of the agency during the class period. He is also the founder of Flutie Entertainment, and currently resides at 911 Greentree Drive, Winter Park, Florida 32789.

49.    Defendant ID Model Management was a member of IMMA and its successor MMC from at least 1998 to 2000. ID is reported to be a corporation maintaining its principal place of business at 155 Spring Street, New York, New York 10012. ID is one of the Model Agency Defendants, defined below.

50.    Defendant Paolo Zampolli is the owner and President of ID Models, which is apparently a successor in interest to American Models, a member of IMMA and its successor

12

MMC in the 1980s and 1990s. Zampolli currently resides at 149 East 18th Street, New York, New York 10003.

51.    Defendant George Gallier was an owner of American Models, ID Models' predecessor, during the Class Period. Gallier, who also owns an agency called Metropolitan Models Paris, currently resides at 3655 North Bay Homes Drive, Miami, Florida 33133.

52.    Defendant Images Management has its principal place of business located at 30 East 20th Street New York, New York 10003. Images is one of the Model Agency Defendants, defined below.

53.    Defendant Heinz Vollenweider, who is the founder of Defendant Images and owned 10% or more of the agency during the class period, currently resides at East 57th Street, New York, New York 10022. He reportedly also founded Maxx Men, which is now understood to be a division of Images. Plaintiffs assert claims against Maxx Men as a division of Images.

54.    Cathy Geraghty is the current president of Defendant Images and has owned 12% of the agency during the class period.

55.    Defendant Catherine Plegat reportedly owns over 10% of the equity of Images. She is believed to be a resident of France.

56.    Defendant IMG Models, Inc. is a New York corporation with its principal place of business located at 304 Park Avenue South, New York, New York 10010. It is the successor in interest to International Legends, which was founded in 1980 by a former Wilhelmina booker, Kay Mitchell, and Mark McCormack, who also controlled defendant IMG. In about 1987, McCormack bought out Mitchell, and since then IMG Models has operated as one of

13

the many operating divisions of IMG. IMG Models is one of the Model Agency Defendants, defined below.

57.    Defendant International Management Group, Inc. owns and controls defendant IMG Models, Inc., and its executives have been substantially involved in the management of IMG Models. In addition, IMG and IMG Models have failed to maintain the formalities of corporate separateness as a matter of law, and IMG is therefore liable for the acts and conduct of IMG Models as the alter ego of IMG Models. For example, among other things, IMG Models' corporate records are the same as IMG's; IMG's personnel regularly provide legal, financial and administrative services to IMG Models, and there appears to be no clear accounting for those services provided.

58.    Defendant Karin Models LLC is reportedly a corporation with its principal place of business at 6 West 14th Street, New York, New York 10011. Karin is one of the Model Agency Defendants, defined below.

59.    Defendant Karin Models is reportedly a French corporation and the parent company of defendant Karin Models LLC. Through its employees, officers, and agents, which over the years have included defendants Jean-Luc Brunel and Joseph Hunter, Karin Models has actively participated in the operations of Karin Models LLC and it is therefore jointly and severally liable for the conduct of the Model Agency Class.

60.    Defendant Jean-Luc Brunel is the chief executive and part-owner of Defendant Karin Models LLC. He currently resides at 1100 West Avenue, Miami Beach, Florida 33139.

61.    Defendant Marilyn Model Management Inc., d/b/a Marilyn Agency, operates an office at 300 Park Avenue South, New York, New York 10010. Marilyn is one of the Model Agency Defendants, defined below.

14

62.    Defendant Marilyn Gauthier is the president of defendant Marilyn Model Management and owned an equity stake in that agency during the Class Period.

63.    Defendant Metropolitan Model Agency USA, Inc. is a modeling agency that reportedly maintains its principal place of business at 5 Union Square West, New York, New York 10003. From 1991 to 1998, Metropolitan was a member of IMMA and its successor MMC. Metropolitan is owned by Metropolitan Paris, a French corporation. Metropolitan is one of the Model Agency Defendants, defined below.

64.    Defendant Metropolitan Paris is a French corporation operating an office at 23 Boulevard Capucines, 75002 Paris, France. It is the parent company of Metropolitan.

65.    Defendant Thomas Zeumer is reportedly the founder and president of Metropolitan and owns at least 10% of the agency. He currently resides at 178-180 Cross Highway, Westport, Connecticut 06880.

66.    Defendant Metropolitan Models, Paris is reportedly a French corporation and the parent company of Metropolitan Model Agency USA, Inc.

67.    Defendant Michel Levaton is reportedly President of Metropolitan Models, Paris and owned at least 10% or more of the agency during the class period. Levaton was personally involved in the operations of Defendant Paris, USA.

68.    Defendant New York Models, a/k/a New York Model Management maintains its principal place of business at 596 Broadway, Suite 701, New York, New York 10012. New York Models is one of the Model Agency Defendants, defined below.

69.    Defendant Heinz Holba reportedly founded New York Model Management, in which he still reportedly maintains an equity interest, in 1995. Holba maintains a residence at 77 Bleecker Street, New York, New York 10012.

70.    Defendant Cory Bautista is reportedly the co-owner of Defendant New York Model Management and owns 10% or more of the company.  Bautista maintains a residence at 160 Bleecker Street, New York, New York 10012.

71.    Defendant Next Management Corp. ("Next") is one of the largest modeling agencies in New York.  Next is a New York partnership with its principal place of business at 23 Watts Street, New York, New York 10013.  It is owned by Partnership Holding, Wilcor Group and Claxon, Inc.  Next is one of the Model Agency Defendants, defined below.

72.    Defendant Faith Kates is the founder and chief executive of Defendant Next.  She is a resident of New York City.  Through Partnership Holding, Kates owns over 10% of the equity of Next.  She is also the chairman of Claxon Inc.

73.    Defendant Partnership Holding is part-owner of Defendant Next.  Partnership Holding is believed to be a New York corporation wholly owned by Faith Kates.

74.    Defendant Wilcor Group is part-owner of Defendant Next.  It is believed to be a New York corporation owned by Joel Wilkenfeld.

75.    Defendant Joel Wilkenfeld is a resident of the State of New York.  He is a senior executive and (through Wilcor Group) part-owner of Next.

76.    Defendant Claxon, Inc. is part-owner of Defendant Next.  It is believed to be a New York corporation owned by Lorenzo Pedrini.

77.    Defendant Douglas Asch is sued here as a former owner of Paris U.S.A., an unlicensed model "manager" that was also a member of the industry's trade association, IMMA, and which actively engaged in the conduct of the Model Agency Class.

78.    Defendant Q Model Management, a/k/a Que Model Management ("Q") has its principal place of business at 180 Varick Street, New York, New York 10014.  Q is a wholly-

owned subsidiary of Defendant Diva Entertainment. Q is one of the Model Agency

Defendants, defined below.

79.   Defendant Diva Entertainment is a Florida corporation that owns Defendant Q.

Diva Entertainment is, in turn, a wholly-owned subsidiary of Diva Entertainment, a Delaware

corporation, which apparently employs Peter Zachariou to oversee the operations of Diva

Entertainment and Q.

80.   Defendant T Management is reportedly a New York corporation with its principal

place of business at 91 Fifth Avenue, New York, New York 10012. T is one of the Model

Agency Defendants, defined below.

81.   Defendant Women Model Management, a/k/a Men/Women Model Management is

reportedly a New York corporation with its principal place of business at 107 Greene Street,

New York, New York 10012. Women is one of the Model Agency Defendants, defined

below.

82.   Defendant Paul Rowland founded Women Model Management in 1988 and

currently holds the title of president. He currently resides at 95 Horatio Street, New York,

New York 10014.

83.   Defendant Barbara Lantz was the president of Zoli Management, which has stated

that it dissolved as a corporation. Lantz is therefore sued in her capacity as former owner of

more than 10% of Zoli's equity, as well as the long-term Secretary of the industry's trade

association IMMA and its successor, MMC.

## JURISDICTION AND VENUE

84.   The Court has jurisdiction over this action in that each of the agencies and parent

companies sued herein (except for Elite Model Management Corp. S.A., Elite Group S.A., and

Karin) are located in this County, have done business with models who reside in this County, or both. Each of the individual defendants have transacted and business in this County during the relevant Class Periods described herein, and each of Elite Model Management Corp. S.A., Elite Group S.A., Karin, and Wilhelmina International Ltd. regularly transacts business, including with Elite, Karin LLC, and Wilhelmina, respectively, in this County.

## CLASS ACTION ALLEGATIONS

85.    Each of the plaintiffs brings the claims set forth in the First and Second causes of action on behalf of the Model Agency Class, consisting of all models who were or have been represented by any of the defendants who were operating as modeling agencies or purported "model managers" (the "Model Agency Defendants" identified above), for purposes of securing modeling work. Plaintiffs bring this claim pursuant to GBL Article 11 and Section 349 to recover the excessive and unlawful fees and commissions paid by the Model Agency Class to each of the Model Agency Defendants based on their false representations (and, for many if not all of the Model Agency Defendants, their affirmative conspiracy to misrepresent) to the models that the agencies were not required to be licensed and could lawfully charge fees and commissions in excess of 10%.

86.    The Class Period for the Model Agency Class runs from 1974 for Ford, Wilhelmina, and Zoli, and from the inception of their operations in New York for all other Model Agency Defendants (e.g., 1977 for Elite, 1979 for Click, 1980 for IMG, etc.).

87.    Plaintiffs Angela Shelton, Rachel Shea, and Sheila Johnson bring the claims asserted in the third and fourth causes of action alleged herein on behalf of themselves and the Elite Class, defined as all current and former models who have been represented by Elite (i.e., had an

oral or written agreement whereby Elite referred them to actual and potential opportunities for employment as a model) since 1977, when Elite began operations in New York.

88.    Plaintiff Tiffany Connor brings the claims asserted in the fifth and sixth causes of action alleged herein on behalf of herself and the Wilhelmina Class, defined as all current and former models who have been represented by Wilhelmina (i.e., had an oral or written agreement whereby Wilhelmina referred them to actual and potential opportunities for employment as a model) since the Esch family acquired control of the agency in about 1989.

89.    Plaintiff Carolyn Fears brings the claims asserted in the seventh and eighth causes of action alleged herein on behalf of herself and the Ford Class, defined as all current and former models who have been represented by Ford (i.e., had an oral or written agreement whereby Ford referred them to actual and potential opportunities for employment as a model) since she started with that agency in about 1989.

90.    Plaintiffs do not know the exact size of the Model Agency Class, and the Elite, Wilhelmina and Ford Classes, because such information is in the exclusive control of Defendants.  Nonetheless, there are over 1,000 members of each Class, who are now geographically dispersed throughout the United States.  Both classes are so numerous that joinder of all class members, whether required or permitted, is impracticable.

91.    The claims of plaintiffs against the Model Agency Defendants as a whole are typical of the claims of the members of the Model Agency Class Defendants because through the Class Period, the Model Agency Defendants consistently misrepresented to members of the Model Agency Class that they were not required to be licensed under Article 11 (and its conspiracy with other agencies to misrepresent that status), and were legally entitled to charge fees and commissions in excess of 10% total commission permitted by GBL Article 11.  These

19

misrepresentations were made to the public generally and to the entire class of thousands of working models who came into contact with the Model Agency Defendants; they are reflected in the contracts that the Model Agency Defendants caused the models to sign, as well as in oral representations made by the Model Agency Defendants regarding commissions and fees that were "standard" in the industry.

92.    The members of the Model Agency Class have been harmed as a result of the Model Agency Defendants' misrepresentations regarding their legal status in that, for all but a handful of the thousands of professional models active during that time, the Model Agency Defendants have charged fees and commissions in excess of 10% total commission permitted by GBL Article 11.

93.    The claims of Shelton, Shea and Johnson are typical of the claims of the members of the Elite Class because, like all Elite Class members, they were each damaged by Elite's pattern and practice of unlawful conduct (apart from the GBL), and they were each damaged by Elite's misrepresentations regarding its status (and its conspiracy with other agencies to misrepresent their status) under the GBL. But for that conspiracy and those misrepresentations, the leading agencies would have had to remain licensed employment agencies, and would be limited to charging commissions that were no more than 10%.

94.    Connor's claims are typical of the claims of the members of the Wilhelmina Class because, like all Wilhelmina Class members, she was damaged by Wilhelmina's pattern and practice of unlawful conduct (apart from the GBL), and they were each damaged by Wilhelmina's misrepresentations regarding its status (and its conspiracy with other agencies to misrepresent their status) under the GBL. But for that conspiracy and those misrepresentations, the leading

20

agencies would have had to remain licensed employment agencies, and would be limited to charging commissions that were no more than 10%.

95. Fears' claims are typical of the claims of the members of the Ford Class because, like all Ford Class members, she was damaged by Ford's pattern and practice of unlawful conduct (apart from the GBL), and they were each damaged by Ford's misrepresentations regarding its status (and its conspiracy with other agencies to misrepresent their status) under the GBL. But for that conspiracy and those misrepresentations, the leading agencies would have had to remain licensed employment agencies, and would be limited to charging commissions that were no more than 10%.

96. The plaintiffs will fairly and adequately protect the interests of their respective Classes because Plaintiffs' interests are coincident with, and not antagonistic to, those of each Class. Representative Plaintiffs have retained counsel with substantial experience in the prosecution class action litigations, including class action litigation against the Modeling Agency Defendants.

97. Questions of law and fact that are common to the members of the Model Agency Class predominate over questions that affect only individual members. In particular common questions exist regarding whether the agencies in operation at any given time:

    a.    misrepresented their status as a general matter to all models whom the agencies purported to represent for purposes of obtaining work, thereby violating GBL Section 349

    b.    operated in violation of GBL § 172 by operating as an unlicensed "employment agency", as that term is defined under the New York General Business Law ("GBL"); and

    c.    charged models in excess of the 10% commission permitted by GBL Article 11.

21

98.    Questions of law and fact that are common to the members of the Elite Class predominate over questions that affect only individual members.  Among the questions of law and fact that are common to the Elite Class include whether Elite:

a.    charged models in excess of the 10% commission permitted by GBL Article 11; and

b.    operated in violation of GBL § 172 by operating as an unlicensed employment agency;

c.    violated GBL § 187(8) by operating other businesses from the same locations as its employment agency businesses;

d.    violated GBL § 187(10) by requiring Plaintiffs to contribute to the cost of advertising materials intended to assist Defendants in procuring employment for Plaintiffs; and

e.    with the knowledge and approval of its owners and long-serving senior management, and as part of a systematic course of conduct, regularly and flagrantly breached its fiduciary and other duties to Plaintiffs by misrepresenting Elite's status as exempt from regulation under GBL Article 11 and by

i.    soliciting and accepting payments from other agencies to whom Elite referred models for film and television bookings, and concealing those payments from the Plaintiffs;

ii.    soliciting and accepting payments for Plaintiffs' work that were greater than the amounts Plaintiffs were told they were being paid;

iii.    charging plaintiffs commissions greater than the amounts set forth in the written agreements that Elite had the models sign; and

iv.    Profiting from the provision of services that Elite claimed, and claims, to be provided at cost or at a loss.

99.    Questions of law and fact that are common to the members of the Wilhelmina Class predominate over questions that affect only individual members.  Among the questions of law and fact that are common to the Wilhelmina Class are whether Wilhelmina:

22

a.   has operated in violation of GBL § 172 by operating as an unlicensed employment agency, as that term is defined under the New York General Business Law ("GBL");

b.   violated GBL § 187(8) by operating *other* businesses from the same locations as its employment agency businesses;

c.   violated GBL § 187(10) by requiring Plaintiffs to contribute to the cost of advertising materials intended to assist Defendants in procuring employment for Plaintiffs; and

d.   with the knowledge and approval of its owners and long-serving senior management, and as part of a systematic course of conduct, regularly and flagrantly breached its fiduciary and other duties to Plaintiffs by

i.   misrepresenting Wilhelmina's status as exempt from regulation under GBL Article 11;

ii.   soliciting and accepting payments from other agencies to whom Wilhelmina referred models for film and television bookings, and concealing those payments from the Plaintiffs; and

iii.   profiting from ancillary services provided to Plaintiffs (including services that Wilhelmina requires Plaintiffs to procure from Wilhelmina).

100.   Questions of law and fact that are common to the members of the Ford Class predominate over questions that affect only individual members. Among the questions of law and fact that are common to the Ford Class include whether Ford:

a.   has operated in violation of GBL § 172 by operating as an unlicensed employment agency;

b.   violated GBL § 187(8) by operating *other* businesses from the same locations as its employment agency businesses;

c.   violated GBL § 187(10) by requiring Plaintiffs to contribute to the cost of advertising materials intended to assist Defendants in procuring employment for Plaintiffs; and

d.   with the knowledge and approval of its owners and long-serving senior management, and as part of a systematic course of conduct, regularly and flagrantly breached its fiduciary and other duties to Plaintiffs by

23

    i. misrepresenting Ford's status as exempt from regulation under GBL Article 11;

    ii. soliciting and accepting payments from other agencies to whom Ford referred models for film and television bookings, and concealing those payments from the Plaintiffs; and

    iii. profiting from ancillary services provided to Plaintiffs (including services that Ford requires Plaintiffs to procure from Ford).

101.    Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. No difficulties are likely to be encountered in the management of this case that would preclude its maintenance as a class action.

102.    Each of the Model Agency Defendants, Elite, Wilhelmina, and Ford have acted on grounds generally applicable to their respective Classes, thereby making final relief appropriate with respect to the Classes as a whole. Prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendants.

103.    Prior to the investigative efforts undertaken as part of the Fears v. Wilhelmina action, and as a result of discovery in that action, plaintiffs had no factual basis to allege the claims set forth herein. Plaintiffs were not aware, and in the exercise of reasonable diligence could not have discovered, the evidence showing that the Model Agency Defendants had, e.g., affirmatively and for decades affirmatively misrepresented the nature and extent of their operations to the DCA and other government officials, nor did plaintiffs have access to the internal documents and

statements of various of the Model Agency Defendants showing that they knew they were acting as employment agencies. Prior to the discovery obtained in the Fears action, plaintiffs also did not and could not have obtained evidence of the pattern and practice of Elite's, Wilhelmina's and Ford's specific instances of self-dealing and misconduct (as well as the personal knowledge and involvement of their respective owners, officers, and parent companies).

104.    Prior to that discovery, Elite, Wilhelmina and Ford had each consistently represented to the models they represented that they were acting lawfully on the models' behalf, in good faith and with honesty and due care for the models' interests, and the Model Agency Defendants had made such representations to the Model Agency Class as a whole. Each of Elite, Wilhelmina, Ford and the Model Agency Defendants had consistently represented to the models they represented that the models could, and should, trust and rely on the agency's representations that they were acting lawfully and did not need to be licensed, that their other business affairs were in order, that their respective books and records regarding the charges and fees and amounts collected on the models' behalf were true and accurate, that they kept good and accurate records of those transactions, and that they could be trusted with regard to their representations regarding their business activities.

105.    Indeed, each of Elite, Wilhelmina, and Ford continue to this day to deny that it engages in any of the unlawful activities set forth herein, and claims that documentation for its expenses is available for inspection. At the same time, however, they have done everything in their power to frustrate Plaintiffs' efforts to obtain information regarding its billing and collection practices. For example, Plaintiff Shea has requested documentation for the expenses that Elite claims were properly charged to her account, and Elite (through its collection agency) has

25

failed and refused to provide that information. Accordingly, Plaintiffs could not in the exercise of reasonable diligence have discovered their claims prior to 2003.

## BACKGROUND: GBL ARTICLE 11

106. Over a century ago, the New York State Legislature enacted the predecessor of the current Article 11 of the New York General Business Law ("GBL"), §§ 170-190, setting forth clear rules regulating a variety of employment agencies, including setting maximum rates and fees that could be charged. For decades, modeling agencies -including Elite's main rivals and Pillard's former employer - were understood to be subject to that statute, and ensured that they were, in fact, duly licensed by the appropriate agency under that statute.

107. Article 11 has never been amended to exempt modeling agencies. After the Masters action was filed, however, several agencies hired a well-known PR and lobbying firm to explore the possibility of seeking an amendment to the statute to protect their "unique" business of "model management". The PR and lobbying firm produced several drafts of a report, entitled "Not Employment Agencies", which is apparently so sensitive that the industry's trade association (a) refused to identify the document on a privilege log, (b) unsuccessfully applied ex parte to keep the name and nature of the report secret, (c) simultaneously claimed, in a recent hearing, that the report reflected attorney-client legal advice, was work product (i.e., prepared in contemplation of litigation), and had nothing to do with the pending litigation. (Each of these objections was rejected by the Court.)

108. As of this time, however, Elite, Wilhelmina, Ford, and the other agencies remain subject to Article 11 as it now exists, which

   a.   requires them to be licensed (GBL § 172),

    b.    limits the gross fees they can charge to 10% of the compensation payable to the model (GBL § 185(8)),

    c.    prohibits the operation of other business on the same premises as the employment agency" (GBL § 187(8)); and

    d.    prohibits the agencies from requiring the models to contribute to the cost of advertising (GBL § 187(10).

109.    Specifically, GBL § 171 defines an "employment agency" as any individual or company "who, for a fee, procures or attempts to procure employment or engagements for . . . modeling or other entertainments or exhibitions or performances." The statute excludes from the definition of "employment agency" "the business of managing . . . where such business only incidentally involves the seeking of employment."

110.    This exception, commonly known as the "incidental booking exception", has been repeatedly held by the courts of this state to mean exactly what it says - that the seeking of employment must be incidental to the provision of management services. For decades, the state's courts have consistently held that even a few instances of procuring employment void the exception, and they have rejected claims that look solely to the wording of a "management" contract, holding that the substance of the parties' relationship, and not the recitals in the contract, are what matters.

111.    This incidental booking exception is the only basis for the model agencies' claim of exemption from the strictures of GBL Article 11. And because any one agency could not maintain the facade of "management" if its competitors acknowledged that they were, in fact, subject to regulation, each agency (including defendants) has had an overwhelming incentive to work together to misrepresent the nature of their activities - in their contracts, in their trade association activities, and in their lobbying activities. (As an example of the semantic contortions entailed by defendants' deception, Elite's counsel began a deposition by insisting that his own

client's use of the work "agency" should not be construed as an admission that Elite was, in fact, an agency; Wilhelmina began its deposition by stating that it would use the phrases model agency and model manager as synonymous.)

## THE MODEL AGENCY DEFENDANTS' FALSE CLAIMS TO BE EXEMPT FROM GBL ARTICLE 11

112.    The Modeling Agency Defendants' own statements -- about themselves and each other -- and the statements of their purported competitors, all confirm that none of them qualify for the "incidental booking" exception. Elite and Wilhelmina have each already admitted, in sworn deposition testimony, that one of the services they regularly provide to models is to find them work. Indeed, both Elite and Wilhelmina require that the models they represent refer all inquiries for the models' services to the respective agencies, so that the agency can arrange for the booking.

113.    Elite's role as an employment agency dates to its inception in Paris in the early 1970s, continued throughout the time of its operations in New York in the late 1970s, and continues through today. Throughout that time, the primary service Elite has provided to the models it represents is to find them work. Pillard's skills at providing this service were the reason that Casablancas hired her from Ford, and she continued to provide this service to Elite's models after she switched agencies.

114.    The fact that Elite and other major model agencies regularly procure work for models has been repeatedly alleged by Elite and its purported competitors in court pleadings; been found by various courts in various contexts to be fact; and it has repeatedly been broadcast in publications and other media Elite uses to promote itself. For example, in Brinkley v.

28

Casablancas, 438 N.Y.S.2d 1004, 1005 (1st Dep't 1981), the court stated that Elite Model

Management Corp. is a model agency.

115.    The president of Elite Runway (then an operating division of Elite) also testified

in Wilhelmina Models, Inc. v. Elite Runway Inc., John Casablancas, Ellen Harth and Nathalie

Dale, Index No. 97600861 (N.Y. Sup. Ct 1997) that Elite Runway's operation includes

"bookings, selling, promoting" the models.

116.    About ten years ago, Elite cooperated with Ford, Wilhelmina, and an

investing banking and advisory firm Translink S.A. in the preparation of a report by Translink as

part of a planned "roll-up" of all three agencies into one new entity.  The Translink Report states

that "[t]he business of Elite US and its subsidiaries is to arrange work for professional fashion

and commercial models.  (Translink Rep. at 106.)

117.    The principal service that Elite provides getting models work - is carried out

through persons who are employed by Elite (and other agencies) and known as "bookers".  One

industry publication, endorsed by Elite as a reputable guide to the modeling industry, claims that:

"A model agent is commonly referred to as a booker.  Your booker/agent will become one of the

most important people in your career."  Debbie Press & Skip Press, Your Modeling Career: You

Don't Have to be a SuperModel to Succeed ("Your Modeling Career") 87 (Allworth Press 2000).

118.    Acting on behalf of the Elite, the booker speaks to third parties, such as

photographers, casting agents, advertising agencies, magazines and retailers about employment

opportunities for models; contacts the models on a regular basis to inform them of possible

employment opportunities; schedules or "books" employment engagements and negotiates the

model's fees for modeling engagements.  In addition, Elite bills the models' employers for the

29

jobs their models have performed and collect money from the models' employers on the model's behalf.

119.    The role of the booker is noted in many publications, including publications endorsed by Elite and Wilhelmina. In Your Modeling Career (contributed to by Wilhelmina and Elite), in a chapter entitled "All about Agencies", states that Defendants "functions like an employment agency, obtaining work for models by providing models for clients." (Id. at 86). And The Modeling Life (endorsed by Elite), in the chapter entitled "The Agency", states that "The agency is a model's link to jobs." (Id. at 239).

120.    Elite's representations regarding its abilities to get models work and its status as an agency are reflected by the claim on its web page that "[i]n the world of modeling, few agencies have the recognition, respect and reputation of Elite Model Management, Inc." The website goes on to proclaim that, "Elite, more than ever, has positioned itself as an agency built on a solid foundation of history and experience. . . Elite has launched the careers of more industry superstars than any other agency in the world." Http://www.elitemodel.com (May 24, 2002) (emphasis added).

121.    Elite's founder Casablancas writes in his foreword to The Complete Idiot's Guide to Being a Model ("The Complete Guide"), ". . .for a lucky few, all they need to do is send a couple of snapshots to an agency, or drop by when the agency is seeing new models." Roshumba Williams, The Complete Idiot's Guide to Being a Model (MacMillan, Inc. 1999) (emphasis added).

122.    Elite often refers to itself as the "Elite Agency Group". See the website for John Casablancas Modeling and Career Centers http://www.jc-centers.com/fags.html (May 24, 2002).

30

123.   Also, flatly inconsistent with its assertions to be a management company, Elite has for years run numerous modeling contests each year in which it guarantees winners a minimum salary, and also (despite public denials) maintains an affiliation with "John Casablancas" modeling schools and receives compensation from those schools.

124.   Plaintiffs were not aware of the matters set forth in these affidavits and affirmation, and could not have been aware of such facts, until they were discovered during the investigation of counsel which shortly preceded the filing of the initial complaint in the Fears litigation.   There are several reasons why these were not the kind of public statements that would suffice to constitute notice to the Plaintiffs:

   a.   First, the papers were submitted by Elite's own lawyer in a private civil litigation, which was settled.  No government agency brought any enforcement action based on the statement; in fact, the agencies were allowed to proceed in business as purported managers, instead of as licensed agencies.

   b.   The vast bulk of the models are unrepresented by a manager or counsel, and are young (including many who were underage, and whose parents were unaware of the history of the modeling industry), with an average career length of six years. Many were not even born when the lawsuit instituted by Elite received whatever publicity it did in the late 1970s.

125.   Wilhelmina has also admitted in court papers that it regularly procures work for models.  For example, in Wilhelmina Models, Inc. v. Elite Runway Inc., John Casablancas., Ellen Harth and Nathalie Dale, Index No. 97600861 (N.Y. Sup. Ct. 1997), Wilhelmina stated that it was "in the business of managing and directing the careers of fashion models, including . . . negotiating and booking engagements. . .", Complaint at 16.  Wilhelmina's president Dieter Esch described the nature of Wilhelmina's business in his deposition as "it arranges for models to be booked with customers." (Esch dep. at 16.)

31

126.     More recently, in another action filed in New York State Supreme Court, Wilhelmina v. Fernandez, Wilhelmina stated that the bookers - whose function it is to get the models work - are "the heart and soul of the modeling agency."

127.     And in Wilhelmina v. Major S.R.L., Index No. 99/600672, Wilhelmina told this Court that it "employs bookers to schedule and procure work for its models." (Second Amended Complaint, at 15-17).  Wilhelmina's deposition testimony describes their function as communicating with customers in order to secure job opportunities for the models. (Wilhelmina dep. at 8-9, 78.)

128.     Wilhelmina's website also boasts that "it is one of the leading modeling agencies in the industries. . . As agent for over 1000 models. . . Wilhelmina is a full service agency." http://www.wilhelmina.com (May 24, 2002).

129.     Ford's status as an employment agency is confirmed by many sources, including two affidavits submitted by two bookers that Elite had hired away from Ford in the late 1970s. Each of those bookers (one of whom was defendant Pillard) testified that the nature of Ford's business was finding work for models, and that that business had not changed since the mid-1960s, when Ford and other agencies were licensed.  Elite also submitted an affirmation of counsel stating that Elite was prepared to present sworn testimony from a witness to a 1974 meeting at which Ford and others (including at least Wilhelmina) agreed to collude to circumvent the licensing requirements of GBL Article 11 in order to raise prices above the 10% cap set by Article 11.

130.     Ford and its current and former executives and employees have similarly admitted that the procurement of employment for its models is Ford's primary function.  Ford admitted in recent deposition testimony that its business is to arrange work for models it represents.  (Ford dep. at 61-62.)  Ford also cooperated with the Translink Report which openly states that the

32

business of the Ford Agency is to arrange work for professional fashion and commercial models, male and female. (Translink Rep. at 56.)

131. Former Ford booker Pillard, who is now with Elite, describes her work at Ford, both before and after Ford purportedly changed its business to "management" as "The basic nature of the Executive Booker's job is to correlate requests for certain models by clients with a particular model's schedule, which constitutes a substantial portion of that work."

132. Ford books thousands of modeling jobs each year, which number far exceeds the level of an incidental booking.

133. Similarly, Eileen Ford's book "Secrets of the Model's World" (1970) describes Ford's booking room as the heart of the agency. (Id. at 8-9.) It further describes how Ford places or receives several thousands of calls a day on fifty-odd phones lines. In fact, according to the book, Ford's bookers actively seek bookings "with the zeal of a stockbroker with his first hot tip." (Id. at 9) And Ford recently testified that this description still applies today. (Ford dep. at 163.)

134. Despite Ford's persistent claims that it truly engages in "management" services, its former co-owner Joey Hunter recently testified Ford really manages only supermodels and potential supermodels, who constitute not even half of Ford's models. (Hunter dep. at 163-65.)

135. Today, Wilhelmina, Elite, and Ford remain major modeling agencies. No major modeling agency is licensed by the Department of Consumer Affairs, and each routinely charges above 10% commissions. Absent a law degree and a knowledge of pleadings filed before they were in high school, as well as the time and resources to review other court dockets and professional publications and to locate and interview witnesses and former models, there is no way that a person seeking to begin their modeling career at any time from the late 1970s onward

would have any reason to disbelieve the uniform assertions of Elite and other leading agencies - in print and in oral communications - that they did not need to be licensed as employment agencies under the GBL.

136.    For its services, each of the Modeling Agency Defendants has long charged, and continues to regularly charge the vast majority of their models, a 20% commission on all monies the models receive for modeling (except for work in film and television that is subject to Screen Actors Guild or AFTRA jurisdiction, in which case the agencies charge only 10% because they are not allowed to charge more). This "standard rate" applies to the vast majority of the professional models.

137.    The Model Agency Defendants also regularly charge the models' employers an additional 20% of the model's fee for a job, as a purported "service charge". This double-dipping means that when a model is "paid" $100 for a job, the agency collects $20 from the model, plus another $20 from the employer, or $40 total, while the model takes home $80. In effect, on any given job, the agencies pocket one-third of the total amount paid by the employers who hire professional models.

138.    This service charge and its possible impact on the agencies's status as employment agents or managers has also been the product of discussion and agreement among the major agencies, including Wilhelmina, Elite, and Ford.

139.    On top of the standard 20% commission, and the "firm policy" of charging another 20% to clients who book the models, the Model Agency Defendants also each charge Plaintiffs for, incidental "services", such as advertising the models' portfolios, messengers, and color copies of the models' "cards".

140.    Each of the Model Agency Defendants, on its own, and the leading Model Agency Defendants (Ford, Elite, Wilhelmina, IMG and Next) collectively, have imposed these charges based on their false claim to be "managers" entitled to claim the "incidental booking" exemption from regulation under Article 11 of the New York GBL. Each of the Model Agency Defendants have used standard contractual forms and provisions, and draft "standard" contracts, that lie about the services they promise to provide to the model. In addition, several agencies (including Ford, Elite, and Wilhelmina) have misrepresented the general nature of their business and operations to regulators (including the Department of Consumer Affairs), and concealed from regulators (including the New York State Department of Labor) various facts regarding their business that contradict their claimed legal status, such as (i) the accepted practice of guaranteeing models a minimum income from their work, which makes the agencies talent agents as a matter of law, and subjects them to the GBL limit of a 10% commission, and (ii) and the high percentage of models who have no written contracts with their agency, and are booked on an ad-hoc basis – a situation the DCA has suggested is contrary to the agency's claim of being a "manager."

141.    Industry documents show that the DCA conducted a review of the industry in late 1993 and early 1994, and requested information from the modeling agencies at about that time regarding the nature of their services. On or about September 7, 1993, Gerard Ford of Ford Models, Inc. responded to the DCA's inquiries with a letter stating, inter alia, "we are not in the business of seeking employment for models." In the first draft of that letter, Mr. Ford actually wrote the opposite – "it is true that we do seek models assignments" – but his lawyer deleted that admission from the final version. Mr. Ford has now acknowledged, in his deposition in the Fears action, that the business of Ford Models is to arrange work for models it represents.

142.   The Translink Report's opening sentence states: "The business of a modeling agency is to market the services of male and female models." Other passages make clear that the "marketing" performed by the agencies means arranging the models' work assignments. The closest the discussion of marketing comes to what the agencies have called "management" are some references to advising the models on their portfolios – no different from the most basic marketing advice that agents and employment agencies in a wide variety of fields give to persons for whom they are trying to get jobs.

143.   Trade association minutes from this time period confirm the agencies' understanding of the precariousness of their position. To give just one example, on April 3, 1994, Messrs. Joseph Hunter (an industry veteran) and David Blasband, the trade association's attorney, reported to the association's members about their meeting with the DCA with the message that advertising for new models will now be a problem, and the agencies' practice of attending model search conventions is also suspect – ostensibly because a model will not lightly understand why her prospective agency disavows the very purpose for which it is retained, and models are obviously being told the agencies will get them work.

144.   In 1996, the DCA (through Ms. Hedy Voigt) again requested information from the industry regarding the nature of the agencies' services, and received two versions of a statement by Joey Hunter, then the president of the industry's trade association, describing the business of legitimate managers. Hunter's statement begins by begging the question, stating that an agent (as opposed to a manager) earns money from booking a model and focuses on getting the jobs, while for model managers "the obtaining of employment is incidental to the [counseling and guidance] functions they perform."

145.   To illustrate this distinction, Hunter's 1996 statement repeated a statement from Ford's 1993 letter with regard to the nature of inquiries that a "manager" receives for the model the manager represents: "clients know who they are and call our booking staff when they wish to employ a specific model whom they normally ask for by name."

146.   That statement is false. It was false in 1993 and in 1996; it is false today; and it was false in 1971, when Ford resigned its license. On October 1, Hunter testified that about half of the inquiries that an agency receives for potential work assignments are general inquiries for various types of models, to which the agency usually responds by sending information on one or more models. Hunter also stated that when he was at Ford Models – from 1970 through the late 1990s – their business was "managing supermodels" and potential supermodels (the latter group being identified as their entire "new faces" or "development" division); he admitted that this definition included less than half of all Ford models at any given time.

147.   A more accurate picture of the nature of the agencies' work is provided by Eileen Ford's own book, "Secrets of the Model's World", which describes an agency in which bookers actively seek bookings "with the zeal of a stockbroker with his first hot tip."

> The heart of the Ford Agency is the "booking room" on the second floor. A huge room, it never fails to amaze visitors to the agency because of the fifty-odd phones handling several thousand calls a day. ... Through the booking room you can count on getting accurate information on all your jobs, and you can be confident that every client has been checked out. The agency never accepts a client until it knows that it is a legitimate and reputable organization or photographer. ... Phones shout to be answered, and if they jangle more than once, Eileen can be heard, calling out from her office, in the manner of a ship's captain, "Answer that phone!" Walls of gliding charts give information about a model's activities.
>
> Models call in several times a day to get new bookings, changes or cancellations. ... Bookers should be able to reach models at fairly short notice, so the girls have to check their answering service (if they have one), or call in frequently. A model's most important call is at the end of the day when she confirms what's on her chart for the following day. Id. at 8-9 (emphasis added).

Gerard Ford recently testified that this description still applies to the way Ford operates today.

148.   In short, it is clear from Ford's own statements that booking jobs – or arranging work, as the Translink Report calls it – is at the "heart of the Ford Agency." This is perfectly consistent with Hunter's own description of the work of an <u>agent</u>, who, <u>unlike a manager</u>, "focuses on getting the jobs, spending a great deal of time calling clients and keeping on top of the needs of those who use the services of models in order to have the earliest possible chance of placing the agent's models in those jobs."

149.   The basic contradiction between what the agencies claim to do and what they really do is also illustrated in their contracts. In about 1980, at least one agency (IMG Models), or a lawyer acting for one or more agencies, appears to have drafted a new contract, using a form management agreement from the National Conference of Personal Managers as a basis. While IMG copied from that form contract provisions disavowing that the manager would seek employment for the person being managed, IMG deliberately <u>omitted</u> the sentence from the form contract which stated that the talent will retain a <u>separate</u> agent or booker to procure work. This led to the absurd situation – widespread in the industry – in which models are required to refer all inquiries for their employment to their agencies, and the agencies have the exclusive right to book the model, and yet the agencies disavow any obligation to seek work for the models.

150.   The self-contradictory position of these contracts is well illustrated by a memorandum produced by IMG. When asked what to say to one prospective model who had questioned the stock disclaimer that IMG was being hired to obtain employment or engagements, Chuck Bennett (the head of IMG Models) could do no better than beg the question: "We're not an employment agency. We're managers"; "Ask Jackie Simpson [an in-house lawyer at IMG] if you need a better answer."

38

151.    The absurdity of the industry's contracts is also underscored by the testimony of Marion Smith, who (along with Hunter) was a longtime Ford Models employee, served with Hunter as Co-President of Ford Models in the 1990s, and today is affiliated with an agency called New York Models. Asked why her current agency's contracts with the models it represents do not refer to any agreement or undertaking to get work for the models, Ms. Smith answered:

A.    I believe the contract states that we will get them work, that's the whole purpose of the –   .
Q.    That's the whole purpose of the contract?
A.    The whole purpose of why we're doing it. (Smith dep. at 235) (emphasis added)

152.    The agencies know that what they are doing involves more than what true personal managers exempt from GBL Article 11 are allowed to do. One reason they have survived for this long is, perhaps, the fact that some good agents do things that personal managers do, in addition to arranging specific bookings, and the industry has cultivated an image in which its "services" are identified with the glamour of the supermodels. But the statute – and a century of caselaw – make clear that agencies are not exempt if they happen to also provide management services to some (or even all) of their models. Moreover, testimony such as Hunter's – that Ford was in business of managing and developing supermodels, which he admitted included less than half of Ford's models – proves that for the majority of professional models any "management" services are truly incidental to the booking services the agencies provide.

153.    Meanwhile, the agencies' assertions about their investments in training and "grooming" even these "supermodels", or any other models, are grossly overstated. Through their trade association, the agencies have also told the United States Senate that "high fashion modeling is wholly unrelated to education or training. Photographic modeling is totally unique,

39

in that it involves a subjective 'look' that cannot be taught or learned through training or education."

154.   While the major agencies resigned their licenses in the early 1970s and no other major agency ever applied for a license, the agencies have knowledge that they are not true managers exempt from the statute.  Their continual concern that the DCA might someday recognize this and require them to be licensed, are found in the draft minutes of the April 20, 1999 meeting of the industry's trade association:

> A letter from David Bosman of Boss Models is read by The President, Jerry Ford regarding a Department of Consumer Affairs complaint registered by four former Boss models, allegedly at the prompting of their current managers, accusing Boss of non payment of fees due.  The subject of licensing modeling agencies by the Department of Consumer Affairs is discussed as a possible fallout of this situation, which would result in a 10% commission restriction.  David Blasband adds that Mr. Bosman has requested that no model managers should prompt clients to go to the Department of Consumer Affairs.  David Blasband suggests, and all members agree that it is not in their best interest to refer clients to the Department of Consumer Affairs.  (emphasis added)

155.   This agreement – again, from the industry's own trade association's draft minutes – is striking in several ways.  Boss Models was not itself a trade association member, having been kicked out for non-payment of dues.  Boss was notorious for often not paying its models even after the agency had been paid.  Boss apparently wrote to the trade association because the "current managers" who advised the models to go to the DCA were members of the association.  Yet when Boss reminded those agencies that any scrutiny of its operations might lead the DCA to decide that Boss and other agencies should be licensed, the agencies agreed that the risk of that outcome was sufficiently large that it outweighed any duty or loyalty the agencies owed to the very models they claimed to manage.

156.   For the reasons set forth above, each of the Model Agency Defendants individually, and each of Ford, Elite and Wilhelmina together (along with other members of the

industry's trade association) have engaged in an ongoing fraud against the public and the

thousands of aspiring and actual working models who seek employment with the New York

agencies each year. This wrongdoing has included:

a. violation of GBL § 349, by misrepresenting their legal status as "managers" exempt from GBL Article 11, and entitled to charge in excess of the 10% set forth in that statute;

b. violation of GBL § 172 by operating as employment agencies without a license;

c. violation of GBL § 185(8) -- which prohibits agencies from taking more than 10% of models' earnings -- by regularly charging Plaintiffs 20% commissions; in fact, the typical modeling contract explicitly requires Plaintiffs to pay Defendants 20% of any movies that Plaintiffs receive for modeling, even if Plaintiffs obtained employment without Defendants' help or with the help of another agency;

d. violation of GBL § 187(8) -- which prohibits agencies from engaging in any business on its premises other than the business of operating an employment agency; and

e. violation of GBL § 187(10) -- which prohibits agencies from charging models for incidental services or the cost of advertising -- by charging Plaintiffs for various expenses, such costs associated with sending a model's portfolio to prospective employers.

## FIRST CAUSE OF ACTION

### (Violation of Section 349 – Against the Model Agency Defendants)

157.   Plaintiffs Shelton, Connor, Fears, Johnson, and Shea repeat and reallege the allegations of Paragraphs 1 through 156 as if set forth fully herein.

158.   Plaintiffs Shelton, Connor, Fears, Johnson, and Shea, on their own behalf and on behalf of the Model Agency Class, herein seek injunctive relief and damages under Section 349 against each Model Agency Defendant.

41

159.   Through the Model Agency Class Period, which dates form 1974 for Ford and Wilhelmina, each of the Model Agency Defendants, individually, and defendants Elite, Ford and Wilhelmina (collectively, with others) has been engaged in a deliberate and long-running, dishonest campaign, to misrepresent their status as "managers" exempt from regulation under the GBL.

160.   In support of this ongoing fraud, the Model Agency Defendants have made various false and fraudulent representations over the years to the public, to actual and aspiring models, and to regulators regarding the nature and extent of their business operations.  For example, virtually without exception, the agencies have used and continue to use false and misleading contracts that deliberately omit any reference to getting the models work, or expressly disavow any obligation to get work for the models, even though the agencies orally represent to the models that they will get work for them (and, in many cases, guarantee the models a minimum wage for a given time period).  The false and fraudulent representations set forth in the models' contracts are essentially "form" agreements, and thus constitute false claims made to thousands of employment-seekers on a regular basis.

161.   More recently, many agencies have added language to their form contracts expressly disavowing their obligation to be licensed – an effort to have the models waive legal rights that are non-waivable.

162.   If the Model Agency Defendants did not make these false statements regarding their legal status – if they told the truth, and were licensed as employment agencies – they would be limited to 10% commissions, and would not be able to charge the fees and other rates that they charge.

42

163. Defendants' conduct constitutes an on going course of consumer fraud, in violation of GBL Section 349, for which plaintiffs and the Model Agency Class may seek actual damages and injunctive relief, pursuant to GBL Section 349(h).

## SECOND CAUSE OF ACTION

### (Violation of GBL Article 11 – on behalf of the Model Agency Class against all Defendants)

164. Plaintiffs Shelton, Connor, Fears, Johnson, and Shea repeat and reallege the allegations of Paragraphs 1 through 156, as if set forth fully herein.

165. This claim is brought by Shelton, Connor, Fears, Johnson, and Shea, on their own behalf and on behalf of the Model Agency Class, against each Defendant, to recover damages for each Defendant's violation of GBL Article 11 and state common law.

166. As fiduciaries, the Modeling Agency Defendants had a duty to deal candidly and in good faith with Plaintiffs. Above all else, the agencies' fiduciary duties required them to disclose to Plaintiffs the fact that they were operating as employment agencies without a license in contravention of New York State Law. At all times, each Model Agency Defendant told the models it represented that it was acting lawfully and was duly authorized to conduct its business in New York. Plaintiffs, who as a class were young and not legally sophisticated, were not in a position to challenge those assertions, nor did they do so. Indeed, each Model Agency Defendant at some point during the Class Period began to use contracts which recited that it was not required to be licensed as an employment agency under New York law.

167. Each Model Agency Defendant's knowingly false statements regarding its status and duties under New York law constitute breaches of its fiduciary duties to the Model Agency

43

Class, separate and apart from any other liabilities that may flow from that conduct. Had each Model Agency Defendant told its models the truth about its legal status, it would have had to admit that it was operating unlawfully and cut its rates drastically. Each Model Agency Defendant chose to lie rather than do that.

168.    Plaintiffs Shelton, Connor, Fears, Johnson, Shea, and members of the Model Agency Class have each been harmed as a result of each Model Agency Defendant's fraudulent misrepresentations and breaches of its fiduciary duties.

169.    As a direct and proximate result of each Model Agency Defendant's breaches of duty as and misrepresentations alleged above, Plaintiffs Shelton, Connor, Fears, Johnson, Shea, and members of the Model Agency Class have suffered and will continue to suffer substantial damages, including but not limited to the loss of compensation and income wrongfully retained by each Model Agency Defendant.

170.    Each of the Model Agency Defendants are each therefore jointly and severally liable for all damages suffered by Shelton, Connor, Fears, Johnson, Shea, and the Model Agency Class as a result of this unlawful conduct, in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

### (The Elite Class — Common Law Breach of
### Fiduciary Duty and Misrepresentation)

171.    Plaintiffs Shelton, Shea, Johnson and the Elite Class repeat and reallege the allegations of Paragraphs 1 through 156 as if set forth fully herein.

172.    Plaintiffs Shelton, Shea and Johnson, on their own behalf and on behalf of the Elite Class, herein seek to recover damages for various unlawful business practices of Elite separate and apart from Elite's violation of Article 11 of the New York General Business Law, and to

44

recover the same damages against Marie, Casablancas, Pillard, and Elite S.A. as persons who owned and controlled Elite and were engaged in its unlawful operations detailed herein.

173. As a purported manager, Elite owes fiduciary and other good faith duties to plaintiffs Shelton, Shea, and Johnson and the Elite Class under New York law. Indeed, Elite has alleged and admitted that the relationship between agency and model is personal and confidential, and gives rise to fiduciary obligations. As fiduciaries, Defendants had a duty to deal candidly and in good faith with Plaintiffs, and to *disclose any* self-dealing or secret profits in their transactions with models they represented.

174. Elite has systematically breached its obligations to Shelton, Shea and Johnson and the Elite Class since at least 1979. These *practices, which* Elite has regularly employed for years with the knowledge and approval of its senior management and owners, include the following in particular:

175. Throughout the Class Period, Elite has had a custom and practice of soliciting and accepting undisclosed payments from agencies that book Elite models into television and film work. Elite, in its deposition in the <u>Masters</u> action, <u>admitted</u> to this practice.

176. Elite has also maintained a custom and habit of telling models that their rate on a particular job was less than what the client agreed to pay and pocketing the difference, and concealing information regarding the models' true rate from the model.

177. Elite has also sought to profit, and has earned profit, from the provision of ancillary services to models - even though Elite has asserted, under oath, that all such services are supposed to be, and are, provided at cost or at a :loss.

178. Elite has also solicited and encouraged payments and transfers of funds with the intent of unlawfully evading, and causing others to unlawfully evade, the tax laws of the United

States and other jurisdictions - such as by arranging for a foreign client who books a model for a job in New York City to pay its fee into an account controlled by Elite S.A. in Europe, with the intent of not declaring that payment as income in the United States. This conduct has harmed or threatened harm to the Plaintiff class by exposing them to possible claims for unpaid taxes and other liabilities.

179.    Elite has carried out the above conduct on a systematic, companywide basis for years, with the knowledge and participation of its senior management. Each of the unlawful practices set forth above has harmed, and continues to harm, Shelton, Shea, Johnson and the Plaintiff Class.

180.    Elite, Elite S.A., Marie, Casablancas, and Pillard are each therefore liable for all damages suffered by Shelton, Shea, Johnson and the Plaintiff Class as a result of this unlawful conduct, in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### (The Elite Class — Fraud and Breach of Fiduciary Duty, Based on Violations of, and Conspiracy to Violate, GBL §§ 170 -190)

181.    Plaintiffs Shelton, Shea, Johnson and the Elite Class repeat and reallege the allegations of Paragraphs 1 through 156 as if set forth fully herein.

182.    This Claim is brought by Shelton, Shea and Johnson, on their own behalf and on behalf of the Elite Class, to recover damages for Elite's misrepresentations and breaches of fiduciary duty relating to its long-running, knowingly dishonest campaign, in concert and conspiracy with other leading New York model agencies, to hold themselves out as "managers" exempt from regulation under the GBL.

183.    As fiduciaries, Defendants had a duty to deal candidly and in good faith with Plaintiffs. Above all else, Defendants' fiduciary duties required them to disclose to Plaintiffs the fact that they were operating as employment agencies without a license in contravention of New York State Law. At all times, Elite told the models it represented that it was acting lawfully and was duly authorized to conduct its business in New York. Plaintiffs, who as a class were young and not legally sophisticated, were not in a position to challenge those assertions, nor did they do so. Indeed, Elite at some point during the Elite Class Period began to use contracts which recited that Elite was not required to be licensed as an employment agency under New York law.

184.    Elite's false statements regarding its status and duties under New York law constitute breaches of its fiduciary duties to the Elite Class, separate and apart from any other liabilities that may flow from that conduct. Had Elite told its models the truth about its legal status, it would have had to admit that it was operating unlawfully and cut its rates drastically. Elite chose to lie rather than do that.

185.    Plaintiffs Shelton, Shea, and Johnson and members of the Elite Class have each been harmed as a result of Elite's misrepresentations and breaches of its fiduciary duties.

186.    As a direct and proximate result of Defendants' breaches of duty as and misrepresentations alleged above, Plaintiffs Shelton, Shea, and Johnson and members of the Elite Class have suffered and will continue to suffer substantial damages, including but not limited to the loss of compensation and income wrongfully retained by Elite.

187.    Elite, Elite S.A., Marie, Casablancas, and Pillard are each therefore liable for all damages suffered by Shelton, Shea, Johnson and the Plaintiff Class as a result of this unlawful conduct, in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

47

**(The Wilhelmina Class – Common Law Breach of
Fiduciary Duty and Misrepresentation)**

188.   Plaintiffs Connor and the Wilhelmina Class repeat and reallege the allegations of Paragraphs 1 through 156 as if set forth fully herein.

189.   Plaintiff Connor, on her own behalf and on behalf of the Wilhelmina Class, herein seeks to recover damages for various unlawful business practices of Wilhelmina separate and apart from Wilhelmina's violation of Article 11 of the New York General Business Law, and to recover the same damages against Wilhelmina International, Ltd., Dieter Esch, Ana-Gaby Esch, and Natasha Esch as persons who owned and controlled Wilhelmina and were engaged in its unlawful operations detailed herein.

190.   As a purported manager, Wilhelmina owes fiduciary and other good faith duties to plaintiffs and the plaintiff class under New York law. As fiduciaries, Defendants had a duty to deal candidly and in good faith with Plaintiffs. As fiduciaries, Defendants had a duty to deal candidly and in good faith with Plaintiffs, and to disclose any self-dealing or secret profits in their transactions with models they represented.

191.   Wilhelmina has systematically breached its obligations to Connor and the Wilhelmina Class since at least 1989. These practices, which Wilhelmina has regularly employed for years with the knowledge and approval of its senior management and owners, include the following in particular:

192.   From the inception of the Class. Period through at least the mid-1990s, Wilhelmina had a custom and practice of soliciting and accepting undisclosed payments from agencies that book Wilhelmina models into television and film work. Wilhelmina, in its deposition in the <u>Masters</u> action, <u>admitted</u> to this practice.

193.    Wilhelmina has also sought to profit, and has earned profit, from the provision of ancillary services to models - even though Wilhelmina has asserted, under oath, that all such services are supposed to be, and are, provided at cost or at a loss.

194.    Wilhelmina has carried out the above conduct on a systematic, companywide basis for years, with the knowledge and participation of its owners and senior management. Each of the unlawful practices set forth above has harmed, and continues to harm, Connor and the Wilhelmina Class.

195.    Wilhelmina, Wilhelmina International Ltd., Dieter Esch, Ana-Gaby Esch, and Natasha Esch are each therefore liable for all damages suffered by Connor and the Wilhelmina Class as a result of this unlawful conduct, in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### (The Wilhelmina Class -- Fraud and Breach of Fiduciary Duty, Based on Violations of, and Conspiracy to Violate, GBL, §§ 170 --190)

196.    Plaintiff Connor and the Wilhelmina Class repeat and reallege the allegations of Paragraphs 1 through 156 as if set forth fully herein.

117. Connor, on her own behalf and on behalf of the Wilhelmina Class, herein seeks to recover damages for Wilhelmina's misrepresentations and breaches of fiduciary duty relating to its long-running, knowingly dishonest campaign, in concert and conspiracy with other leading New York model agencies, to hold themselves out as "managers" exempt from regulation under the GBL.

197.    At all times during the Wilhelmina Class period (from the Esch family's acquisition of Wilhelmina in about 1989 through today), Wilhelmina told the models it represented that it was acting lawfully and was duly authorized to conduct its business in New York. Plaintiffs, who as a class were young and not legally sophisticated, were not in a position to

49

challenge those assertions, nor did they do so. Indeed, Wilhelmina has regularly used contracts that recited that Wilhelmina is not required to be licensed as an employment agency under New York law.

198. Wilhelmina's false statements regarding its status and duties under New York law constitute breaches of its fiduciary duties to the Wilhelmina Class, separate and apart from any other liabilities that may flow from that conduct. Had Wilhelmina told its *models the* truth about *its legal* status, it would have had *to* admit that it was operating unlawfully and cut its rates drastically. Wilhelmina chose to lie rather than do that.

199. As a direct and proximate result of Defendants' breaches of duty as and misrepresentations alleged above, Plaintiff Connor and the Wilhelmina Class have suffered and will continue to suffer substantial damages, including but not limited to the loss of compensation and income wrongfully retained by Wilhelmina.

200. Plaintiff Connor and members of the Wilhelmina Class have each been harmed as a result of Elite's misrepresentations and breaches of its fiduciary duties.

201. Wilhelmina, Wilhelmina International Ltd., Dieter Esch, Ana-Gaby Esch, and Natasha Esch are each therefore liable for all damages suffered by Connor and the Wilhelmina Class as a result of this unlawful conduct, in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

### (The Ford Class – Common Law Breach of Fiduciary Duty and Misrepresentation)

202. Plaintiff Fears and the Ford Class repeat and reallege the allegations of Paragraphs 1 through 156 as if set forth fully herein.

203.    Plaintiff Fears, on her own behalf and on behalf of the Ford Class, herein seeks to recover damages for various unlawful business practices of Ford separate and apart from Ford's violation of Article 11 of the New York General Business Law, and to recover the same damages against Gerry Ford, Eileen Ford, Katie Ford, Marion Smith, and Joseph Hunter as persons who owned and controlled Ford and were engaged in its unlawful operations detailed herein.

204.    As a purported manager, Ford owes fiduciary and other good faith duties to plaintiffs and the plaintiff class under New York law. As fiduciaries, Defendants had a duty to deal candidly and in good faith with Plaintiffs. As fiduciaries, Defendants had a duty to deal candidly and in good faith with Plaintiffs, and to disclose any self-dealing or secret profits in their transactions with models they represented.

205.    Ford has systematically breached its obligations to Fears and the Ford Class since at least 1989. These practices, which Ford has regularly employed for years with the knowledge and approval of its senior management and owners, include the following in particular:

206.    From the inception of the Class Period through at least the mid-1990s, Ford had a custom and practice of soliciting and accepting undisclosed payments from agencies that booked Ford models into television and film work. Ford essentially admitted to this practice, which is also confirmed by the Translink Report.

207.    Ford has also sought to profit, and has earned profit, from the provision of ancillary services to models - even though Ford has asserted, under oath, that all such services are supposed to be, and are, provided at cost or at a loss.

208.    Ford has carried out the above conduct on a systematic, companywide basis for years, with the knowledge and participation of its owners and senior management. Each of the unlawful practices set forth above has harmed, and continues to harm, Fears and the Ford Class.

209.   Ford, Gerry Ford, Eileen Ford, Katie Ford, Marion Smith, and Joseph Hunter are each therefore liable for all damages suffered by Fears and the Ford Class as a result of this unlawful conduct, in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

**(The Wilhelmina Class -- Fraud and Breach of Fiduciary Duty,
Based on Violations of, and Conspiracy to Violate, GBL, §§ 170 --190)**

210.   Plaintiff Fears and the Ford Class repeat and reallege the allegations of Paragraphs 1 through 156 as if set forth fully herein.

211.   Fears, on her own behalf and on behalf of the Ford Class, herein seeks to recover damages for Ford's misrepresentations and breaches of fiduciary duty relating to its long-running, knowingly dishonest campaign, in concert and conspiracy with other leading New York model agencies, to hold themselves out as "managers" exempt from regulation under the GBL.

212.   At all times during the Ford Class period (from 1989 through today), Ford told the models it represented that it was acting lawfully and was duly authorized to conduct its business in New York. Plaintiffs, who as a class were young and not legally sophisticated, were not in a position to challenge those assertions, nor did they do so. Indeed, Ford has regularly used contracts that recited that Ford is not required to be licensed as an employment agency under New York law.

213.   Ford's false statements regarding its status and duties under New York law constitute breaches of its fiduciary duties to the Ford Class, separate and apart from any other liabilities that may flow from that conduct. Had Ford told its *models the* truth about *its legal* status, it would have had *to* admit that it was operating unlawfully and cut its rates drastically. Ford chose to lie rather than do that.

214. As a direct and proximate result of Defendants' breaches of duty as and misrepresentations alleged above, Plaintiff Fears and the Ford Class have suffered and will continue to suffer substantial damages, including but not limited to the loss of compensation and income wrongfully retained by Ford.

215. Plaintiff Fears and members of the Ford Class have each been harmed as a result of Ford's misrepresentations and breaches of its fiduciary duties.

216. Ford, Gerry Ford, Eileen Ford, Katie Ford, Marion Smith, and Joseph Hunter are each therefore liable for all damages suffered by Fears and the Ford Class as a result of this unlawful conduct, in an amount to be determined at trial.

## NINTH CAUSE OF ACTION

### (Declaratory Judgment, by the Individual Defendants)

217. Plaintiffs Shelton, Connor, Johnson, and Shea repeat and reallege the allegations of Paragraphs 1 through 156, as if set forth fully herein.

218. Plaintiffs Shelton, Shea, Johnson and Connor, each in their individual capacities, seeks a declaratory judgment that their contracts with their respective agencies are void and unenforceable because they are contrary to public policy as set forth in Article 11 of the GBL.

219. Specifically, Shea has an immediate and ripe dispute with Elite that is an appropriate subject for a declaratory judgment. Elite has recently written to Shea demanding payment of funds purportedly owed to Elite pursuant to Shea's contract with Elite, and has retained a collection agency to send Shea dunning notices for thousands of dollars purported incurred by Elite on Shea's behalf.

53

220.   Shea disputes Elite's claims, including disputing Elite's right to seek to enforce any part of its contract with her (or retain funds charged to her) because that contract violates GBL Article 11 and is therefore unenforceable.

221.   Prompt judicial resolution of this dispute will have a real and immediate benefit for Shea, because Elite's collection agency is presently pursuing her for payment of funds purportedly owed. Shea therefore needs a prompt adjudication of her rights and obligations regarding Elite so as to be able to carry on her career without Elite's claims for compensation clouding her credit rating and business activities.

222.   Shea is not a plaintiff in the Fears action, and defendants have resisted the addition of new plaintiffs to that action. Shea therefore is unable to seek a declaration of her rights in any forum other than this Court.

223.   Shelton is also a proper plaintiff for a declaratory judgment because, in her deposition in the Masters case, she was threatened by counsel for defendants with a counterclaim for breach of her contracts. The claim, as put to Shelton in the deposition, is that she failed to terminate her contracts, and therefore is liable to pay 20% of all funds earned by her from modeling to date. Shelton disputes such a claim, including on the grounds that defendants' contracts are void and unenforceable because they violate GBL Article 11. There is, therefore, a clear dispute between the parties.

224.   Prompt judicial resolution of this dispute will have a real and immediate benefit for Shelton, because she is seeking a mortgage, and financing for her business activities, and has been asked by prospective lenders whether she is the subject of a counterclaim or any other claim that would impair her financial standing. Shelton therefore needs a prompt adjudication of her

54

rights and obligations regarding defendants so as to be able to carry on her business (including obtaining financing) without fear of such a counterclaim.

225. Shelton had sought to adjudicate issues relating to the validity of her contracts in the Masters action, but the court in that action held that there was no private right of action for damages under the GBL (which is, as courts have noted, a separate question from whether modeling contracts which violate the statute may be enforced by the agencies), and dismissed the other state-law claims without prejudice.

226. Johnson also seeks a declaratory judgment because she continues to be a working model, and has been apprised of the nature of the claims that Elite and other agencies have made against models who have sued the industry. Absent such a declaration, Johnson will be subjected to threats and claims for compensation from Elite, which will impair her ability to work with other modeling agencies and earn a living.

227. The basis for Johnson's declaratory judgment is the same as Shea's and Shelton's: that Elite's contract with her is void as against public policy because Elite is an unlicensed employment agency operating in violation of GBL Article 11.

228. Connor is also a proper plaintiff for a declaratory judgment because she has also been threatened with a counterclaim for purported breach of her contract with Wilhelmina. Like Shelton, Connor was accused of not properly terminating her contracts, and therefore is liable to pay 20% of all funds earned by her from modeling to date. Shelton disputes such a claim, including on the grounds that Wilhelmina's contracts are void and unenforceable because they violate GBL Article 11. There is, therefore, a clear dispute between the parties.

229.    Prompt judicial resolution of this dispute will have a real and immediate benefit for Connor, in order to be able to carry on her business (including obtaining financing) without fear of such a counterclaim.

230.    Connor had sought to adjudicate issues relating to the validity of her contracts in the Masters, action, but the court in that action held that there was no private right of action for damages under the GBL (which is, as courts have noted, a separate question from whether modeling contracts which violate the statute may be enforced by the agencies), and dismissed the other state-law claims without prejudice.

231.    As set forth below, the basis for these proposed declaratory judgments is simple, and clear: indeed, Elite's and Wilhelmina's own judicial admissions and statements are dispositive of the nature of the modeling business. There are numerous decisions holding that contracts with unlicensed employment agencies are illegal and contrary to public policy. No court has ever held that the legality of a "management" contract is not a justiciable question.

232.    GBL § 186 provides in relevant part, "Any employment agency which collects, receives or retains a fee or other placement contrary to or in excess of the provisions of this article shall return the fee" no matter how they characterize themselves.

233.    Because Defendants more than incidentally procure employment for Plaintiffs, Defendants are employment agencies within the meaning of GBL § 171(2) and do not fall within the exclusionary provision of GBL § 171(8).

234.    As such, Defendants must be licensed pursuant to GBL § 172, may not charge over 10% commissions pursuant to GBL § 185, may conduct only employment agency business on the premises pursuant to GBL § 187, and may not impose charges for the incidental costs associated with advertising the models' portfolios.

235.    Because Defendants are not licensed, charge over 10% commissions, conduct other businesses on their premises, and charge Plaintiffs for the costs associated with advertising Plaintiffs' portfolios, Defendants are in violation of the aforementioned sections. Accordingly, each plaintiff, in her individual capacity, seeks a declaration that her contract(s) with any defendant are null and void and unenforceable.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs demand judgment against defendants as follows:

(A)    On Count I, in favor of the Model Agency Class, finding that the Model Agency Defendants, and each of them, have violated GBL Section 349 by misrepresenting their legal status, and awarding compensatory damages in an amount to be determined at trial, and an order enjoining those defendants from operating their business in the manner in which they now operate without a license from the Department of Consumer Affairs;

(B)    On Count II, in favor of the Model Agency Class, finding that each of the Model Agency Defendants has violated various provisions of GBL Article 11, awarding compensatory damages against the other defendants named herein who owned 10% or more of each of the Model Agency Defendants and were involved in the management or operations of any such agency; and awarding compensatory damages jointly and severally against each such defendant found to have done so in concert with other defendants;

(C)    On Counts III-VIII, awarding each of the Elite Class, the Wilhelmina Class, and the Ford Class damages and compensation on the claims set forth therein, in an amount to be determined at trial, including disgorgement of all commissions and funds unlawfully obtained by

57

Defendants and all secret profits that the Defendants have received as a result of their wrongful conduct;

(D)    that the Court enter a declaratory judgment declaring that each of the individual plaintiffs' contracts with any of the defendants be declared null and void and of no legal effect because Elite and Wilhelmina each have operated as unlicensed employment agencies in violation of the GBL and cannot enforce any part of such contracts;

(E)    Pre-judgment interest and post judgment interest from the date of entry until the date of satisfaction at the highest rates allowable by law;

(F)    Reasonable attorneys fees and costs incurred by Plaintiffs in this action; and

(G)    Such other and further relief as this Court deems just and proper.

New York, New York
November 3, 2003

BOIES, SCHILLER & FLEXNER LLP

By: _Andrew W. Hayes_____
Andrew W. Hayes
Olav A. Haazen
Christina M. Lewicky
333 Main Street
New York, New York 10504
(914) 749-8200 (phone)
(914) 749-8300 (fax)

Paul R. Verkuil
570 Lexington Avenue
New York, New York 10022
(212) 446-2300 (phone)
(212) 446-2350 (fax)

58